UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | ) | | |
| | ) | | |
| v. | ) | No. | <u>3:18-cr-00293-8</u> |
| | ) | | |
| LUIS COLINDRES | ) | | Judge Richardson |

**UNITED STATES' RESPONSE TO
DEFENDANT'S MOTION TO SUPPRESS**

The United States, through Thomas J. Jaworski, Attorney for the United States,[1] and Ahmed Safeeullah and Brooke Farzad, Assistant United States Attorneys, and David L. Jaffe, Chief of the Organized Crime and Gang Section of the Department of Justice, and Trial Attorney Matthew K. Hoff, hereby responds to Defendant Luis Colindres' motion to suppress statements that he made to officers. (DE #396). This motion should be denied because: (i) the defendant was properly advised of his *Miranda* rights before he made incriminating statements; (ii) the officers did not overbear the defendant's will and coerce him into making these statements; and (iii) the officers did not violate the defendant's Sixth Amendment right to counsel when they questioned him about three murders because he had not passed a critical stage of his prosecution on these offenses.

**Statement of Facts**

On or about September 24, 2017, two males were shot multiple times and killed at the Maple Crest Apartment Complex in Nashville, Tennessee. The apartment complex's surveillance video captured the shooting. The following day, another male was shot multiple times and killed, before his body was burned and left in Cheatham County, Tennessee. Shortly after these murders,

---

[1] Acting under Authority Conferred by 28 U.S.C. § 515

Metropolitan Nashville Police Department ("MNPD") Detectives, Homeland Security Investigation ("HSI") Special Agents, and Special Agents with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") developed several murder suspects as part of an ongoing investigation. They suspected the defendant Luis Colindres ("the defendant") and another individual shot the two males at the apartment complex while co-conspirator Oscar Delgado-Flores ("Delgado") drove them to and from the murders. On September 29, 2017, MNPD Homicide Detective Derry Baltimore obtained state arrest warrants for the defendant and Delgado from a judge in Davidson County, Tennessee, which charged them with criminal homicide for their involvement in the murders at the Maple Crest Apartment Complex. (DE #396-1).

On October 9, 2017, Kentucky State Trooper Daniel B. Holland stopped a vehicle in Hopkinsville, Kentucky, for driving 17 miles over the speed limit and improper lane usage. When Trooper Holland approached the vehicle, he discovered the defendant in the driver seat, Israel Lara-Flores in the front passenger seat, and Reyna Cardoza-Funez in the rear seat lying down and not wearing her seatbelt. Lara-Flores exited the car and told the Trooper that the car belonged to him (Lara-Flores). Neither the defendant nor Lara-Flores could provide Trooper Holland with the car's registration or insurance paperwork. Lara-Flores subsequently gave the Trooper consent to search the car.

Upon a search of the car and the area around the car, Troopers discovered a set of black digital scales, several empty baggies, a small bag containing approximately 1.4 grams of cocaine, a stolen .38-caliber revolver, and a magazine for a .45-caliber handgun. Based on the stop and the seizure of the drugs and guns, Trooper Holland charged the defendant with Speeding, Improper Lane Change, No Insurance, No Registration, Seat Belt Violation, Possession of a Controlled Substance, Tampering with Physical Evidence, Possession of Drug Paraphernalia, and Being a

Fugitive ("the Kentucky Offenses"). *See* Attachment A (Christian County, Kentucky Court Documents).

Shortly after his arrest for the Kentucky Offenses, the defendant appeared in court in Christian County, Kentucky, and was appointed counsel. The court scheduled a preliminary hearing for October 18, 2017, and the defendant was ordered detained. *Id*. On December 1, 2017, the defendant was indicted on state charges for the Kentucky offenses.

On February 28, 2018, HSI Special Agent Michael Perez, ATF Special Agents Warren Smith and Reginald Johnson, and MNPD Detective Donald C. Barr traveled from Nashville, Tennessee to Kentucky to interview the defendant about the three murders that occurred in September 2017 and his involvement in *La Mara Salvatrucha*, also known as "MS-13." Prior to the start of the interview, Agent Perez asked the defendant several preliminary questions "to know that [the defendant was] the right person that we came to talk to." *See* Attachment B (Excerpts of Transcript of Defendant Interview) at p. 2. Agent Perez confirmed the defendant's name, date of birth, place of birth, date of entry into the United States, and primary language. *See id.* at pp. 2-3. After asking these identifying questions, Agent Perez told the defendant, "Okay, now, I am going to advise you of the rights you have here in the United States, as they always do . . . And . . . but before you make your decision about whether or not you're going to talk to us, I have a story that I want to explain to you, so that you understand very well . . . about what is happening." *See id.* at p. 4. Agent Perez asked if the defendant could read Spanish. *Id*. The defendant responded that he could and said that he completed 11 or 12 years of school but did not graduate. *Id*. Agent Perez then asked the defendant to read the Spanish *Miranda* waiver form with him. *See id.* at pp. 4-5. The defendant then read the following statement with Agent Perez:

> Before asking you any questions it is my duty to inform you of your right to remain silent. Anything that you say may be used against

> you in court or other or other proceeding. You have the right to consult an attorney before making any statement or answering any question. You have the right to have your attorney present while we question you. If you cannot afford an attorney on your own, an attorney will be assigned to you before any questions . . . If you decide to answer my questions at this time you maintain the right to re . . . refuse to answer the question at any time or stop the questioning for the purpose of consulting an att . . . an attorney.

*Id.* Agent Perez then explained to the defendant that he worked in Nashville, Tennessee; he and the other officers had been investigating MS-13 in Nashville for a longtime; and they were aware that the defendant was involved in three homicides. *See id.* at pp. 5-10. After informing him of the topics for discussion and the area of their investigation, Agent Perez asked, "The, the man says that [if] you agree to talk to us about this thing that happened, he wants to start with September 24th. Are you willing to talk with us about this?" *See id.* at p. 11. The defendant responded, "I can talk. I can begin with whatever you guys tell me . . . I agree." *Id.*

Agent Perez then provided the defendant with an HSI *Miranda* waiver form for the defendant to sign. *See* Attachment C (Signed *Miranda* Waiver Form). Agent Perez signed and dated this form. *Id.* Agent Perez added, "this part here says that, 'They have read me my rights, which have been explained, and I understand my rights completely. I waive my rights freely and voluntarily, without threats or intimidation, and without promises of compensation or immunity.'" *See* Attachment B at p. 11; Attachment C. Agent Perez then told the defendant "[w]e are not here to shout at you." *See* Attachment B at p. 11. Agent Perez showed the defendant where on the form he needed to sign if he wished to speak with them, and the defendant replied, "Okay. Complete name or …." *See id.* at pp. 11-12. Agent Perez responded to the defendant's question about how to sign the form by saying, "Complete name as you write it, and there the way you sign a check." *Id.*; Attachment C.

After the defendant signed the *Miranda* waiver form, Agents began questioning the defendant about the pending federal investigation into the three murders and his involvement with MS-13. *See* Attachment B at p. 12. They did not discuss the circumstances surrounding his Kentucky arrest and resulting charges for which he was appointed counsel.

The following is a summary of the defendant's statement from the interview, which is 422 pages long.[2] The defendant said he was born and raised in Honduras, where he attended school in Honduras up until the 11th or 12th grade. He had one additional year of school to complete in order to graduate. He also acknowledged that he served in the military in Honduras before eventually deciding to come to the United States. When questioned about his involvement in the murder at the Maple Crest Apartment Complex, the defendant said he "was not involved in anything good." He added that he sold drugs to one of the victims and the victim owed him money for the drugs. The defendant also said he sold MS-13 members guns and drugs. However, the defendant denied participating in, or being present at, the murders at the Maple Crest Apartment Complex.

With respect to the victim who was murdered and burned the following day, the defendant said he provided the victim drugs to sell and the victim owed him money for drug sales. He recalled being with the victim in the moments before his death, but he said Delgado brought the victim to him as he waited in his 2014 Dodge Avenger at Daniela's nightclub with another person, whom he identified as "Bomba." When Delgado and the victim arrived, the victim paid the defendant for a past drug debt. The defendant then drove the victim, Delgado, and Bomba to a secluded location. When they arrived at this location, Delgado and the victim exited the car and were met by Jorge Flores and Franklin Hernandez, who were in another car. The defendant said Delgado, Flores, and

---

[2] If the Court wishes, the government can provide a copy of the entire transcript.

Hernandez killed the victim and got into their car, while he and Bomba drove away from the scene in his Dodge Avenger.

The defendant said minutes after the shooting, he communicated with Flores, Hernandez, and Delgado about where they would meet. They told the defendant to go to a Waffle House, but the defendant went to the wrong Waffle House. The defendant eventually located Flores, Hernandez, and Delgado at another secluded location. At this location, Delgado, Flores, and Hernandez burned a car, which the defendant believed contained the victim. Afterwards, Flores drove him, Bomba, Delgado, and Hernandez back to Nashville in the defendant's 2014 Dodge Avenger.

The defendant made these statements in Spanish to Agent Perez, who then translated these statements to MNPD Detective Barr and the other agents who were listening. Because Agent Perez was translating for the defendant, the interview lasted approximately five and a half hours. Over the course of the interview, the defendant did not express any concerns or ask the agents to stop the interview. Agents did not curse or yell at the defendant. Agents did, however, explain to him that they had done their research, gathered evidence, and did not randomly come to talk to him. They explained that they believed he was involved in the three murders based on his association with MS-13, and they could speak with prosecutors and their supervisors about protection and assistance for him and his family members if he provided truthful information. The defendant continuously denied being present at the double murder. He also denied knowing about the third murder until after it occurred.

Subsequent to this interview, the defendant called federal authorities and asked to speak with them again. Accordingly, on May 18, 2018, ATF Special Agent Jesus Alvarez and MNPD Detective Derry Baltimore returned to the Christian County Jail to question the defendant about

his involvement in the three murders. *See* Attachment D (Excerpts of Transcript of Second Defendant Interview).[3] Agent Alvarez began the interview by introducing himself and Detective Baltimore as law enforcement officers, asking the defendant if he spoke English, and if wanted anything to drink. *Id.* at pp. 1-2. Agent Alvarez then explained the reason they were there by saying, "I understand that you—you, uh, called saying that you wanted to talk to us." *Id.* at p. 3. The defendant responded, "yes." *Id.* Agent Alvarez told the defendant, "Well, before I start, uh, talking with you, I need to . . . advise you of your rights." *Id.* Agent Alvarez confirmed that the defendant could read and then the defendant and Agent Alvarez read a *Miranda* waiver together. *Id.* at pp. 3-4. The defendant said he understood his rights, initialed the form, and signed and dated it. *Id.* at pp. 4-5. Agent Alvarez then asked the defendant for his date of birth, place of birth, and other identifying information before asking the defendant substantive questions about his involvement in the three murders. *Id.* at pp. 5-8.

During this interview with Agent Alvarez and Detective Baltimore, the defendant denied participating in the double murder, but said he sold guns to the gang and that members of the gang used 9mm handguns that he sold to them to commit the double murder. He claimed that he learned at a gang meeting, after the murders occurred, that they used these firearms. When questioned about any prior knowledge of these murders, the defendant said he previously attended a gang meeting where a plan was discussed to kill one of the victims of the double murder. The defendant also admitted being present when the third victim was killed, but he denied knowing that this murder would occur beforehand.

On August 8, 2018, a federal Grand Jury in the Middle District of Tennessee returned an Indictment charging the defendant and Delgado with RICO Conspiracy (Count One), Conspiracy

---

[3] In the transcript, the defendant is identified as MV3, Agent Alvarez is identified as MV2, and Detective Baltimore is identified as MV1.

to Commit Murder in Aid of Racketeering (Count Two), Witness Tampering (Count Three), Discharging a Firearm During and In Relation to a Crime of Violence (Count Four), and Causing Death through the Use of a Firearm (Count Five). (MD/TN Case No. 3:18-cr-200, DE #1). On October 26, 2018, the defendant sent a letter to federal government officials offering to provide additional information. *See* Attachment E (Letter to David Jaffe). On January 3, 2019, the defendant appeared in federal court, was appointed counsel, and ordered to be continuously detained pending trial. (DE ##27, 32).

On July 26, 2021, a federal Grand Jury in Nashville returned a Second Superseding Indictment which encompassed the offenses charged in Case No. 3:18-cr-200. In addition, this indictment charged the defendant and eight other defendants with 55 additional charges. (MD/TN Case No. 3:18-cr-293). The United States moved to dismiss the indictment against the defendant in Case No. 3:18-cr-200, and the Court granted this motion. (DE ##162-63).

On February 24, 2023, the defendant filed a motion to suppress the statements that he made on February 28, 2018 and May 8, 2018 to federal and local law enforcement about his involvement in gang activity and the three murders that occurred in late September 2017. (DE #396). The United States hereby responds in opposition.

## LEGAL ANALYSIS

I. **Federal Agents and the MNPD Detective Did Not Violate the Defendant's Fifth Amendment Right Against Self-Incrimination.**

The Fifth Amendment guarantees that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court "established certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before

commencing custodial interrogation." *Duckworth v. Eagan*, 492 U.S. 195, 201 (1989). In particular, *Miranda* prescribed the following four warnings:

> [A suspect] must be warned prior to any questioning [1] that he has the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

384 U.S. at 479. However, "[t]he Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege," as long as he is advised of "the critical advice that whatever he chooses to say may be used as evidence against him." *Colorado v. Spring*, 479 U.S. 564, 574 (1987).

A suspect may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly, and intelligently. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). A court's inquiry into the validity of a waiver "has two distinct dimensions." *Id.* First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. "[C]oercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the due process clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Moran*, 475 U.S. at 421. "Whenever the [government] bears the burden of proof in a motion to suppress a statement that the defendant claims was obtained in violation of the [the] *Miranda* doctrine, the [government] need prove waiver only by a preponderance of the evidence." *Connelly*, 479 U.S. at 168.

"The test for whether a Miranda waiver is voluntary is essentially the same as the test for whether a confession is voluntary." *United States v. Redditt*, 87 F. Appx. 440, 445 (6th Cir. 2003)

(citing *Connelly*, 479 U.S. at 169-70). In determining whether a confession is involuntary due to police coercion, this court employs a three-step analysis: "(i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; (iii) and the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statements." *United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999).

        A.      <u>The Police Activity Was Not Objectively Coercive.</u>

The defendant argues that the police activity was objectively coercive based on the setting of the interviews, the length of the interviews, and promises made during the interviews. (DE #396, PageID #: 1324-328). The defendant's interviews were conducted at the Christian County Jail in Kentucky. The interviews were not late at night or early in the morning. The defendant was in handcuffs and not free to leave, but he was not physically restrained to a stationary object. The conditions of the interviews were not hostile, and the investigators conducted both interviews in a calm and respectful manner. *See* Attachments B and D. They did not yell or curse at the defendant. *See* Attachments B and D. Notably, the defendant waived his *Miranda* rights within the first five minutes of both interviews and the interviewing officers told the defendant that he could end the interviews at any time. *See* Attachments B and D. Thus, the defendant's statements were given voluntarily without intimidation or coercion.

These facts do not elevate to the level of coercion. *United States v. Stokes*, 631 F.3d 803, 809 (6th Cir. 2011). Although Colindres' initial interview did last approximately five hours, like the defendant in *Stokes*, "interviews lasting several hours (as opposed to entire days) are not considered to be of 'great duration.'" *Id.* (citing *United States v. Williams*, 612 F.3d 417, 422 (6th Cir. 2010)). Furthermore, the defendant was not questioned consistently for five hours. Much of the five-hour interview was devoted to Agent Perez translating the defendant's statements to other

officers. "Even if the five-hour time period did constitute great duration, it would need to be accompanied by other factors indicating coercion before the confessions were found to be involuntary." *Stokes*, 631 F.3d at 809.

The defendant also alleges that there is another factor of coercion which warrants a finding that his statements were involuntary. (DE #396, at PageID #: 1324-328). He claims the officers "offer[ed] what amounts to illusory promises that they could aid or at the very least provide some leniency if Mr. Colindres answered their questions." *Id.* at 1325-327. While it is true that in some situations, "[p]olice promises of leniency ... can be objectively coercive," generally, such promises are coercive only "if they are broken or illusory," *United States v. Johnson*, 351 F.3d 254, 261-62 (6th Cir. 2003), and "promises to recommend leniency and speculation that cooperation will have a positive effect do not make subsequent statements involuntary." *United States v. Delaney*, 443 F. Appx. 122, 129 (6th Cir. 2011) (citation and internal quotation marks omitted). Further, "[a] promise of leniency in exchange for cooperation ... usually [is] permissible." *Id.*

"[A]n illusory promise is a statement in the form of a promise, but lacking its substance in that it does not actually commit the police to undertake or refrain from any particular course of action." *Johnson*, 351 F.3d at 262 n.1; *see also United States v. Siler*, 526 F. Appx. 573, 576 (6th Cir. 2013) (stating that a promise is also "problematic if a police officer leads a defendant to believe that he will receive lenient treatment when this is quite unlikely") (internal quotations and citations omitted).

In this case, Agents Perez and Alvarez did not offer illusory promises to the defendant. Specifically, Agent Perez told him:

> Today is the day where you can talk to us, where we can possibly help you out with this. Later, when you have charges in other areas and everything that happened, everything is going to be much different at that time.

This statement was not a promise of leniency or a broken promise. First, the agents told him they could *possibly* help the defendant. It is well known that if a defendant chooses to be honest and forthcoming and cooperate with the government, there are a number of benefits available to the defendant, including a potential reduction in sentence or the potential to be charged in federal court pursuant to a sealed information as opposed to an indictment. Agents telling the defendant that they may be able to help him if he cooperates is not an illusory promise as this happens often in federal criminal cases.

Agent Perez also explained to the defendant that they believed his actions were committed as a part of MS-13 gang activity and that the gang could target his family for cooperation, but they could provide assistance in providing protection for him and his family. Specifically, during the first interview, Agent Perez said:

> That's why we're telling you that we want to help you if you weren't involved, and we want to help if your family needs it, too. But, uh, we need to know that you're telling the truth. . . . He's [Detective 1] saying that if you have that, that fear that something, something is going to happen to your family, we work for the federal government. We have the power to move people from one city to another city if necessary. You shouldn't be afraid if you're going to help us, we're going to help you. Do you understand?

Attachment B at p. 318. Similarly, when the defendant expressed concern about his safety if he provided information to the agents, Agent Alvarez told the defendant the agents could help with protection for his family and for him while he is incarcerated. Attachment D at p. 47. These statements were not promises of leniency on pending charges nor were they illusory promises. HSI and Agents within that department have the ability to parole individuals into the United States to remove them from danger. Additionally, federal agents can, and often do, assist victims of crimes with immigration cases and move individuals who are in danger within the United States. Therefore, the Agents' statements were not illusory as Agents deal with these issues regularly.

Here, the Agents offered to help the defendant and his family with safety concerns in the event that he cooperated, a promise which the Agents had the authority to make as they often provide assistance in these situations. As was the case in *Johnson*, the Agents' promises were "not an illusory promise as it actually committed [the Agents] to undertake a specific course of action in return for [Colindres'] cooperation." 351 F.3d at 262. There is no evidence, and the defendant does not allege, that the Agents broke any promises.

In addition, there is no evidence that the agents made explicit statements that were legally inaccurate. They did not misstate evidence that investigators had obtained, promise the defendant leniency, nor say he would not be charged if he confessed. The Agents also did not make statements indicating that they had the authority to bind either the district attorney or federal prosecutors, only that they could "possibly help [defendant] out with" the situation. Agent Perez repeatedly told the defendant that he would relay the defendant's statements, truthfulness, or lack of candor to the prosecutors to make charging decisions. As a result, the Agents' statements were not objectively coercive, and the defendant made his statements voluntarily.

   B. <u>The Alleged Coercion Was Not Sufficient to Overbear the Defendant's Will.</u>

Even assuming *arguendo* that the Agents' statements and the conditions of the interviews created an objectively coercive environment, which they did not, these statements and conditions did not overbear the defendant's will because he had experience with the criminal justice system, was educated, and understood the nature of the questions and inquiry. *See e.g.*, *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988) (stating that "[o]nce it is established that the police activity was objectively coercive, it is necessary to examine petitioner's subjective state of mind to determine whether the 'coercion' in question was sufficient to overbear the will of the accused").

"An admission is deemed to be coerced when the conduct of law enforcement officials is such as to overbear the accused's will to resist." *Ledbetter v. Edwards*, 35 F.3d 1062, 1067 (6th Cir. 1994).

> In determining whether a confession has been elicited by means that are unconstitutional, this court looks at the totality of the circumstances concerning 'whether a defendant's will was overborne in a particular case.' Factors to consider in assessing the totality of the circumstances include the age, education, and intelligence of the accused; whether the accused has been informed of his constitutional rights; the length of the questioning; the repeated and prolonged nature of the questioning; and the use of physical punishment, such as the deprivation of food or sleep. *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973).

*Id.* at 1067.

The defendant's interview on February 18, 2018, was not his first encounter with police or the legal system. Prior to this interview, he had at least five prior arrests or encounters with law enforcement officers in the United States. Three of these contacts were for driving offenses, one contact was for two felony offenses, and the last contact was with the Kentucky Troopers regarding the October 9, 2017 arrest. In addition, the defendant had a high school diploma from Manuel Bonilla High School in Honduras (DE #396, at PageID #: 1319), and he can read Spanish. *See* Attachment B at p. 4. Furthermore, the defendant served in the military in Honduras enforcing laws prior to his arrival in the United States. (DE #396, at PageID #: 1319). In both interviews, the defendant was informed of his constitutional rights before he began discussing the homicides. *See* Attachment B at p. 5; Attachment D at p. 4. In both interviews, the defendant agreed to talk with Agents. *See* Attachment B at p. 11; Attachment D at pp. 2-8. He then wrote and signed his name on the waiver forms. *See* Attachment C; Attachment D at pp. 4-5. The defendant never expressed that he was feeling fatigued, he did not ask investigators to stop the interviews for food or water, and there is no allegation or indication that the defendant was subjected to physical punishment.

Based on these facts, the officers did not overbear the defendant's will and coerce him into waiving his *Miranda* rights and making statements.

      C.      <u>The Alleged Misconduct Was Not the Crucial Motivating Factor in the Defendant's Decision to Offer the Statement.</u>

In this case, the defendant was motivated to speak with Agents and attempt to minimize his involvement in the three murders. The defendant was aware that Delgado had been arrested in connection with the murders at the Maple Crest Apartment Complex. When Agents arrived, they informed him that there was a warrant for his arrest as well. The defendant was motivated to speak with agents in an attempt to have his charges dismissed and to not be charged federally. Therefore, the defendant spoke with Agents for hours and denied involvement in the double murder. In fact, the Agents went to speak with the defendant a second time at the defendant's initiation and request. In both interviews, the defendant maintained that he was not there and only learned of the murders after they were committed. Additionally, the defendant repeatedly told officers that he had no idea that the third victim would be killed when he transported him to a secluded location. He attributed the victim's death to others. Because the defendant sought to use his statements to officers to absolve himself of guilt, any alleged misconduct was not the crucial motivating factor in the defendant making his statements.

      **II.**      **Federal Agents and the MNPD Detective Did Not Violate the Defendant's Sixth Amendment Right to Counsel.**

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the [a]ssistance of [c]ounsel for his defense." U.S. Const. amend. VI. The Supreme Court has held that the Sixth Amendment guarantee of the assistance of counsel attaches at arraignment, which signals the initiation of adversary judicial proceedings against a defendant. *Michigan v. Jackson*, 475 U.S. 625, 628 (1986). That guarantee applies thereafter at

"critical stages" of the prosecution, including custodial interrogation. *Id*. at 630. "[I]f police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." *Id*. at 636.

The Supreme Court has held that the Sixth Amendment guarantee is "offense specific," in that a defendant who has exercised his right to the assistance of counsel on one charge is not automatically considered to have invoked the right at a custodial interrogation about other charges. *McNeil v. Wisconsin*, 501 U.S. 171, 178-82 (1991). Consequently, the Court explained in *McNeil* that the fact that the defendant had requested the appointment of counsel on an armed robbery charge did not render invalid his waiver of his Fifth Amendment right to the assistance of counsel at a subsequent interrogation relating to a murder investigation. *Id*.; *see also Williamson v. Parke*, 963 F.2d 863, 865-67 (6th Cir. 1992). In addition, the Sixth Circuit has opined that state and federal offenses are separate offenses because they are brought by dual sovereigns. *See also United States v. Turner*, 885 F.3d 949, 954-55 (6th Cir. 2018).

In this case, the defendant was arrested and being detained in Kentucky for numerous offenses in violation of Kentucky law. He was assigned an attorney on these charges, but he had not been appointed counsel for the Davidson County offenses which the MNPD detectives and the HSI and ATF Agents were investigating. Because the Sixth Amendment is offense specific and investigators were not questioning him regarding the Kentucky Offenses for which he was represented, they did not violate his Sixth Amendment right to counsel. *McNeil*, 501 U.S. at 175-76; *Texas v. Cobb*, 532 U.S. 162, 173 (2001).

The defendant contends that his Kentucky lawyer should have been present when agents questioned him about his offenses committed in Davidson County. (DE #396, PageID #: 1330).

However, the Kentucky Offenses and the Nashville offenses were distinct in time, location, and substance. Notably, the defendant offers no evidence to support his claim that the Kentucky authorities were conducting a "sham prosecution" or obtaining post-indictment evidence to share with the federal agents and Nashville detective. (*Id.*, PageID #: []). Nor could he because the record shows that the federal agents and Nashville detective were simply investigating separate crimes, not sidestepping Mr. Colindres' Kentucky lawyer. To exclude evidence pertaining to charges as to which the Sixth Amendment right to counsel had not attached, simply because other charges were pending at the time, would unnecessarily frustrate the public's interest in the investigation of criminal activities. *McNeil*, 111 U.S. at 175-76; *see also United States v. Bray*, 9 F.3d 110, at *3-5 (6th Cir. 1993). Hence, the defendant's claim that officers violated his Sixth Amendment right to counsel lacks merit.

## CONCLUSION

For the reasons stated above, the defendant's motion to suppress should be denied because the defendant was properly advised of his *Miranda* rights and waived these rights before he made his statement. In addition, the officers did not coerce the defendant into making an involuntary statement or violate his Sixth Amendment right to counsel. Therefore, his motion should be denied.

Respectfully submitted,

THOMAS J. JAWORSKI
Attorney for the United States
Acting under Authority Conferred
By 28 U.S.C. § 515

BY: *s/ Ahmed A. Safeeullah*
    Ahmed A. Safeeullah

BY: *s /Brooke Farzad*
    Brooke Farzad
    Assistant U.S. Attorneys
    719 Church Street,
    Suite 3300
    Nashville, Tennessee 37203
    Phone: 615-736-5151

DAVID L. JAFFE
Chief, Organized Crime and Gang Section

By: */s/ Matthew Hoff*
    Matthew Hoff
    Trial Attorney
    1301 New York Avenue, NW,
    Suite 700
    Washington, D.C. 20005
    Telephone: 202-598-8093

## CERTIFICATE OF SERVICE

      I hereby certify that a true and correct copy of the foregoing Position of the Government Regarding Presentence Report was served via the U.S. District Court's ECF on March 10, 2023, to counsel for the defendant.

*s/ Ahmed Safeeullah*
Ahmed Safeeullah
Assistant United States Attorney