```
 1              IN THE UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF TENNESSEE
 2                      NASHVILLE DIVISION

 3
   UNITED STATES OF AMERICA          )
 4                                    )
                                      )
 5      v.                            ) 3:18-cr-00293
                                      ) JUDGE RICHARDSON
 6                                    )
   JORGE FLORES, ET AL.               )
 7                                    )
                                      )
 8 ------------------------------------------------------------

 9

10

11

12

13     BEFORE THE HONORABLE ELI J. RICHARDSON, DISTRICT JUDGE

14

                       TRANSCRIPT OF PROCEEDINGS
15
                        TRIAL VOLUME 5 of 18
16

17
                          April 11, 2023
18

19

20

21

22 ------------------------------------------------------------

23 DEBORAH K. WATSON, RPR, CRR
   Official Court Reporter
24 713 Church Street, Suite 2300
   Nashville, TN 37203
25 debbie_watson@tnmd.uscourts.gov
```

```
 1    APPEARANCES:

 2

 3    For the Government:

 4                    AHMED A. SAFEEULLAH
                      BROOKE C. FARZAD
 5                    U. S. Attorney's Office
                      Middle District of Tennessee
 6                    719 Church Street, Suite 3300
                      Nashville, TN 37203
 7                    (615) 736-5151
                      Email: ahmed.safeeullah@usdoj.gov
 8                    Email: brooke.farzad@usdoj.gov

 9                    MATTHEW KEVIN HOFF
                      Department of Justice
10                    Organized Crime and Racketeering Sect
                      1301 New York Avenue, 7th Floor
11                    Washington, DC 20005
                      (202) 598-8093
12                    Email: matthew.hoff2@usdoj.gov

13

14    For the Defendant, Jorge Flores:

15                    VAKESSHA HOOD-SCHNEIDER
                      236 Public Square, Suite 103
16                    Franklin, TN 37064
                      (615) 791-1819
17                    Email: vhslaw1@gmail.com

18                    LEONARD E. LUCAS, III
                      The Law Firm of Leonard Earl Lucas
19                    315 Deaderick Street, Suite 1550
                      Nashville, TN 37238
20                    (301) 204-6498
                      Email: leonard.lucas@lellawfirm.com

21

22

23

24

25
```

```
1    APPEARANCES  (Continued):

2

3    For the Defendant, Jose Pineda-Caceres:

4              THOMAS F. BLOOM
               911 Marengo Lane
5              Nashville, TN 37204
               (615) 260-5952
6              Email: tfbloom1@comcast.net

7              GEORGE TRAVIS HAWKINS
               Hawkins Law Firm, PLLC
8              735 Broad Street, Suite 305
               Chattanooga, TN 37402
9              (615) 599-1010
               Email: travis@travishawkins.com
10

11

12   For the Defendant, Luis Colindres:

13              KYLE F. MOTHERSHEAD
                Relentless Advocacy, PLLC
                2901 Dobbs Ave
14              Nashville, TN 37211
                (615) 429-4717
15              Email: kyle@relentlesslaw.com

16              JAY C. CLIFTON, III
                Clifton Law Office
17              707 Main Street, Suite 123
                Nashville, TN 37206
18              (615) 400-1267
                Email: jaycliftonesq@gmail.com
19

20

21

22

23

24

25
```

1    APPEARANCES  (Continued):

2

3    For the Defendant, Kevin Tidwell:

4              JUNI S. GANGULI
              Ganguli Law Firm
5              202 Adams Avenue
              Memphis, TN 38103
6              (901) 544-9339
              Email: j.ganguli@gmail.com

7
              MATTHEW C. GULOTTA
8              The Gulotta Firm, PLLC
              202 Adams Avenue
9              Memphis, TN 38103
              (901) 213-6648
10              Email: matt@gulottalaw.net

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I   N   D   E   X

2                                                    Page

3
     PRELIMINARY MATTERS                             20
4

5    TESTIMONY OF JOHN TERRY

6    Direct Examination (Continued)
     By Ms. Farzad                                   42
7

8    TESTIMONY OF KIMBERLY CACERES

9    Direct Examination
     By Mr. Safeeullah                               64
10
     Cross-Examination
11   By Mr. Ganguli                                  96

12
     STIPULATION READ RE: FLORES, NOS. 1 AND 2,      105
13   GOVERNMENT EX. 1331

14
     STIPULATION READ RE:  Defendant Flores          106
15

16   TESTIMONY OF ETHAN LUFFMAN

17   Direct Examination
     By Mr. Hoff                                     108
18

19   TESTIMONY OF FRANCISCO AVILA

20   Direct Examination
     By Mr. Hoff                                     115
21

22

23

24

25

```
 1                E  X  H  I  B  I  T  S

 2                                                    Page

 3   Government Exhibit 1                                48
          Black handgun, with Evidence ID Label
 4        tied to it – Case Number
          776075-17-0064, Action – Seized
 5        Judicially, Cust Date 1/14/2020, Exh #
          061, Description of Property – Firearm:
 6        Handgun, MNF; Glock GMBH, Type: Pistol,
          Model: 30, Cal: 45, SN: GBE515, Person
 7        Recovered From: Flores, Jorge

 8   Government Exhibit 2                                48
          Black handgun, with Evidence ID Label
 9        tied to it – Case Number
          776075-17-0064, Action – Seized
10        Judicially, Cust Date 1/14/2020, Exh #
          061, Description of Property – Firearm:
11        Handgun, MNF:  Glock GMBH, Type:
          Pistol, Model: 30, Cal: 45, SN: GBE515,
12        Person Recovered From: Flores, Jorge

13   Government Exhibit 3                                48
          Physical sealed (red edging) clear
14        plastic bag containing black weapon
          magazine and brown paper with red tape
15        "evidence" and a white sticker,
          "PR25507576" "Incident: 20170688839"
16        "Category: Property" "Suspect:
          Unknown" "Description: MV Theft, (1)
17        Magazine for 7 62x39 Recovered from
          rear seat of vehicle: VIN
18        4T1BF1FK1DU271097, "Release on
          File-Form 141-SA Johnson or Chouanard"
19        "Submitted by: Terry, John D",
          "Received by: Thiede, Geoffrey A"
20        "Received On : 8/4/2017 5:51:00 PM"

21

22

23

24

25
```

```
1                                                    Page

2   Government Exhibit 4                              48
        Physical sealed (red edging) clear
3       plastic bag containing black weapon
        magazine and brown paper with red tape
4       "evidence" and a white sticker,
        "PR25507577" "Incident: 20170688839"
5       "Category: Property" "Suspect: Unknown"
        "Description: MV Theft, (1) Magazine
6       for 7 62x39 Recovered from trunk of
        vehicle: VIN 4T1BF1FK1DU271097,
7       "Submitted by: Terry, John D",
        "Received by: Thiede, Geoffrey A"
8       "Received On : 8/4/2017 17:51 PM" and
        "#216" in red marker also on white
9       sticker

10  Government Exhibit 5                              48
        Physical sealed (red edging) clear
11      plastic bag containing 10 rounds of
        ammunition and brown paper with red
12      tape "evidence" and a white sticker,
        "PR25507581" "Incident: 20170688839"
13      "Category: Property" "Suspect: Unknown"
        "Description: MV Theft, (10) Rounds of
14      live 45 ACP ammunition  from Glock
        recovered from frt floorbd of vehicle:
15      VIN 4T1BF1FK1DU271097 (4-WIN: 6-Ruger)
        , "Release on File-Form 141-SA Johnson
16      or Chouanard" "Submitted by: Terry,
        John D", "Received by: Thiede, Geoffrey
17      A" "Received On : 8/4/2017 5:51:00 PM"

18  Government Exhibit 6                              48
        Physical sealed (red edging) clear
19      plastic bag containing black box with
        red print "WINCHESTER," white print "45
20      AUTO/FMJ" and brown paper with  red
        tape "evidence" and a white sticker
21      (unable to read print on white paper -
        covered by box)

22

23

24

25
```

|   |   | Page |
|---|---|------|
| 1 |   |   |
| 2 | Government Exhibit 7 | 48 |
| 3 |     Physical sealed (red edging) clear plastic bag containing multiple rounds | |
| 4 |     of ammunition (copper-colored tips and dark gray body), small brown bag | |

Government Exhibit 7                               48
     Physical sealed (red edging) clear
     plastic bag containing multiple rounds
     of ammunition (copper-colored tips and
     dark gray body), small brown bag
     (contents unknown), and brown paper
     with red tape "evidence" and a white
     sticker, "PR25507578" "Incident:
     20170688839" "Category: Property"
     "Suspect: Unknown" "Description: MV
     Theft, (67) live rounds of 7, 62x39
     ammunition,  7-Tulammo  from Trunk Mag:
     30 Tulammo from rifle mag: 30 Hotshot
     from back seat mag" and "#216" in red
     marker also on white sticker

Government Exhibit 8                               48
     Tan-colored bullet proof vest with
     black bottom flaps

Government Exhibit 9                               48
     Physical sealed (red edging) clear
     plastic bag containing digital scale
     (Digitz) and brown paper with red tape
     "evidence" and a white sticker,
     "PR25507580" "Incident: 20170688839"
     "Category: Property" "Suspect: Unknown"
     "Description: MV Theft, (1) digital
     scale (Digitz Brand: Mdl: DZ3-100)
     w/unk  white residue recovered from
     front psgr seat of vehicle: VIN
     4T1BF1FK1DU271097 (4-WIN: 6-Ruger) ,
     "Release on File-Form 141-SA Johnson or
     Chouanard" "Submitted by: Terry, John
     D", "Received by: Thiede, Geoffrey A"
     "Received On : 8/4/2017 5:51:00 PM"

Government Exhibit 746                             77
     Physical DVD in white sleeve other than
     clear plastic middle.  Printed on DVD
     "U.S. v. Ochoa-Martinez, et al."
     "3:18-cr-00293" "Government's Trial
     Exhibit 746" "Cellphone video clip".
     Hand-written initials "KC".

```
                                             Page

Government Exhibit 747                        77
     Physical DVD in white sleeve other than
     clear plastic middle.  Printed on DVD
     "U.S. v. Ochoa-Martinez, et al."
     "3:18-cr-00293" "Government's Trial
     Exhibit 747" "Cellphone video clip".
     Hand-written initials "EN".

Government Exhibit 751                        47
     Color image of "I.D. Photo Work Order",
     Date: 8/4/2017, Time: 2210, Complaint
     #: 17-0688839, Type Call: -43/72,
     Victim: Unk @ Time, Address: 1201
     Freightliner Dr, Photos Taken Of:
     Vehicle/Evidence, Section Req.: GANG,
     Officer Req. C. Key, Taken By: Terry
     #774100 (1 page)

Government Exhibit 752                        47
     Color image of right front view of
     white vehicle. (1 page)

Government Exhibit 753                        47
     Color image of passenger's side of
     4-door white vehicle. (1 page)

Government Exhibit 754                        47
     Color image of view of rear passenger's
     side of white Toyota 4-door vehicle
     with black marks on rear passenger
     bumper.  Temporary license plate. (1
     page)

Government Exhibit 755                        47
     Color image of view of rear driver's
     side of white Toyota vehicle.  Damage
     done to back quarter panel of vehicle,
     around gas lid.  (1 page)

Government Exhibit 756                        47
     Color image of Temporary Operation
     Permit for vehicle, "351292", outlined
     in "The University of Iowa Hawkeyes"
     yellow frame. (1 page)
```

```
                                              Page

Government Exhibit 757                          47
     Color image of rear of white Toyota
     Camry vehicle, Temporary Tag "351292".
     (1 page)

Government Exhibit 758                          47
     Color image of interior backseat of
     white vehicle, dark-colored hat with
     "NY" stitched in white on hat, front
     passenger's seat reclined. (1 page)

Government Exhibit 759                          47
     Color image of close-up view interior
     backseat of white vehicle, dark-colored
     hat with "NY" stitched in white on hat,
     front passenger's seat reclined (1
     page)

Government Exhibit 760                          47
     Color image of gray cloth, interior of
     vehicle, green plastic Sprite bottle,
     barrel of rifle. (1 page)

Government Exhibit 761                          47
     Color image of interior of vehicle's
     passenger's side, black handgun on
     floorboard, blue and black material
     covering seat.  (1 page)

Government Exhibit 762                          47
     Color image of vehicle's floorboard,
     passenger side, black handgun on
     floormat. (1 page)

Government Exhibit 763                          47
     Color image of close-up of black
     handgun on black and yellow floormat.
     (1 page)

Government Exhibit 764                          47
     Color image of gray vehicle seat, black
     object on floorboard and beige object
     on floorboard. (1 page)
```

|  |  | Page |
|--|--|------|
| 1 | | |
| Government Exhibit 765 | | 47 |
|     Color image of beige bullet proof vest on floorboard below a gray-material vehicle seat. (1 page) | | |
| Government Exhibit 766 | | 47 |
|     Color image of black box "Winchester", Cigar package, clear glass bottle with gray lid. (1 page) | | |
| Government Exhibit 767 | | 47 |
|     Color image of close-up view of black box with red print "Winchester", "Train & Defend," "Practice Ready," and "Less Recoil". (1 page) | | |
| Government Exhibit 768 | | 47 |
|     Color image of close-up of black nylon bag and gun magazine. (1 page) | | |
| Government Exhibit 769 | | 47 |
|     Color image of gun magazine, dark gray nylon bag, 2 pairs of shoes, tube of Colgate toothbrush, blue scrub brush, Vaseline lotion, white socks. (1 page) | | |
| Government Exhibit 770 | | 47 |
|     Color image of close-up view of ammunition in magazine. Magazine being held by blue-gloved hand. Partial view of tennis shoes, top right of image. (1 page) | | |
| Government Exhibit 771 | | 47 |
|     Color image of close-up view of gray-cloth vehicle seat with dark-colored ball hat with stitched "NY" on seat. (1 page) | | |
| Government Exhibit 772 | | 47 |
|     Color image of close-up view of gray-cloth vehicle seat, with dark-colored ball hat, lying upside down. Inside of ball cap "59FIFTY" "Authentic Collection", "Performance Headwear". (1 page) | | |

                                                    Page

Government Exhibit 773                                47
     Color image of off-white bulletproof
     vest resting on ground.  Partial view
     of vehicle tire to left of image.  (1
     page)

Government Exhibit 774                                47
     Color image of upper portion of black
     rifle on vehicle floorboard. (1 page)

Government Exhibit 775                                47
     Color image of black rifle resting
     against vehicle tire of white vehicle
     (1 page)

Government Exhibit 776                                47
     Color image of blue-gloved hand holding
     ammunition contained in a gun magazine.
     Partial view of rifle to right of
     magazine. (1 page)

Government Exhibit 777                                47
     Color image of partial view of contents
     inside vehicle trunk including spare
     tire, white plastic bag, yellow object,
     red object, etc. (1 page)

Government Exhibit 778                                47
     Color image of close-up view of
     blue-gloved hand holding ammunition
     contained in a gun magazine, red
     object. (1 page)

Government Exhibit 779                                47
     Color image of black cardboard box,
     "WINCHESTER," PRACTICE READY," "LESS
     RECOIL," "45 AUTO," brass-colored
     bullet. (1 page)

Government Exhibit 780                                47
     Color image of black digital scale on
     blue background (1 page)

```
 1                                              Page

 2   Government Exhibit 781                       47
         Color copy of Weapon Identification
 3       Card, Date: 8/4/17, Complaint #:
         17-0688839, Make: Glock, Model: 19,
 4       Serial #: GBE515, Caliber: 45 ACP,
         Barrel Length: 3 ¼", Chambered Round:
 5       Yes, Magazine w/ 9 round(s), Revolver
         w/ - round(s), (1 page)
 6
     Government Exhibit 782                       47
 7       Color image of black Glock handgun, a
         bullet standing against top of gun,
 8       ruler above gun, Identification Card to
         right of trigger area of handgun, 9
 9       rounds of ammunition to right of gun
         and left of unloaded magazine. (1 page)
10
     Government Exhibit 783                       47
11       Color image of close-up view of
         information on black gun.  "GBE515,"
12       "MADE IN AUSTRIA," "GLOCK INC., SMYRNA,
         GA" (1 page)
13
     Government Exhibit 784                       47
14       Color image of headstamp of round of
         ammunition, "45 AUTO" "WIN" "NT" with
15       blurred plastic ruler above the
         ammunition and part of black handgun
16       below ammunition. (1 page)

17   Government Exhibit 785                       47
         Color image of headstamp of 9 rounds of
18       ammunition, black gun magazine above
         rounds. (1 page)
19
     Government Exhibit 786                       47
20       Color image of Weapon Identification
         Card, Date: 8/4/17, Complaint #:
21       17-0688839, Make: Inter Ordinance,
         Model: STG 2000-C, Serial #: G058.3-06,
22       Caliber: 7.62 x 39, Barrel Length: 17",
         Chambered round: NO, Magazine w/ 30
23       round(s), Revolver w/ - round(s). (1
         page)
24

25
```

1                                                        Page

2   Government Exhibit 787                                47
        Color image of black weapon with yellow
3       measuring stick above it, white
        identification card below it, 30 rounds
4       of ammunition at bottom of image with
        gun magazine to right of ammunition. (1
5       page)

6   Government Exhibit 788                                47
        Color image of close-up view of
7       information on black gun.  "G0583-06,"
        "STG 2000-C," and "Cal 7 62x39mm". (1
8       page)

9   Government Exhibit 789                                47
        Color image of close-up view of
10      information on black gun.  "Made in
        Romania," "Imported by".  (1 page)
11
    Government Exhibit 790                                47
12      Color image of black cardboard box
        "WINCHESTER," "45 Auto/FMJ" with tray
13      containing 50 holes, 8 of those holes
        containing 8 rounds of ammunition. (1
14      page)

15  Government Exhibit 791                                47
        Color image of close-up view of
16      headstamps of 8 rounds of ammunition
        "45 AUTO," "WIN NT". (1 page)
17
    Government Exhibit 792                                47
18      Color image of 7 rounds of ammunition,
        magazine to right of rounds, white card
19      to right of magazine "MAGAZINE FROM
        TRUNK", yellow measuring tape above
20      rounds and magazine. Small yellow
        square outlined in black, bottom right
21      of image, Government Exhibit 792,
        3:18-cr-00293 (1 page)
22

23

24

25

| | | Page |
|---|---|---|
| 1 | | |

Government Exhibit 793                           47
     Color image of headstamps of 5 rounds
     of ammunition. Small yellow square
     outlined in black, bottom right of
     image, Government Exhibit 793,
     3:18-cr-00293 (1 page)

Government Exhibit 794                           47
     Color image of 30 rounds of ammunition,
     magazine to right of rounds, white card
     above rounds "MAGAZINE FROM REAR SEAT",
     yellow measuring tape above rounds and
     magazine. (1 page)

Government Exhibit 795                           47
     Color image of headstamps of 5 rounds
     of ammunition "HOTSHOT" "7.62x39", with
     blurred view of 5 other rounds above
     the in-focus rounds. (1 page)

Government Exhibit 1139                          83
     Color image of brown two-story
     structure, with two balconies on 2nd
     floor and brown wooden fencing in front
     of structure. (1 page)

Government Exhibit 1140                          83
     Color image of interior of residence.
     Pale green walls with block-glass
     window between two rooms.  Wall
     decoration above dark-colored sectional
     in corner of front room, wood-type
     flooring in front room. Windows in nook
     area in back room. Trashcan against
     back wall. (1 page)

Government Exhibit 1141                          83
     Color image of interior of residence.
     TV cabinet against pale green wall,
     partial view of dark-colored sectional
     to left of image, black and orange
     generator to right of image, near open
     door, 2 male individuals in hallway. (1
     page)

|   |   | Page |
|---|---|---|
| Government Exhibit 1144 Color image of interior of bedroom. Dark-wood bed with blanket and pillow on bed with mattress tiled upward, Baby bed to right of bed along with miscellaneous items beside baby bed. Blue drapery. (1 page) | | 83 |
| Government Exhibit 1252 Color image of map - Google Maps-https://www.google.com/maps/@36.07 55669, -86.692033, 15.58z. (1 page) | | 111 |
| Government Exhibit 1258 Color image of head shot of dark-haired male with moustache and tattoo down left side of face under eye. (1 page) | | 115 |
| Government Exhibit 1259 Color image of head shot of dark-haired male, no facial hair or tattoos visible. (1 page) | | 115 |
| Government Exhibit 1262 Color image (somewhat blurry) of head shot of dark-haired male, no facial hair or tattoos visible. (1 page) | | 115 |
| Government Exhibit 1263 Color image of head shot of dark-haired male, no facial hair or tattoos visible, wearing dark shirt. (1 page) | | 115 |
| Government Exhibit 1264 Color image of head shot of dark-haired (with highlights) male, slight goatee, wearing gray t-shirt. (1 page) | | 115 |
| Government Exhibit 1266 Color image of blurry head shot of dark-haired male, goatee and moustache, wearing dark-colored t-shirt. (1 page) | | 115 |
| Government Exhibit 1267 Color image of head shot of dark-haired male, slight goatee, wearing dark t-shirt. (1 page) | | 115 |

|  |  | Page |
|---|---|---|
| 1 |  |  |
| 2 | Government Exhibit 1268 | 115 |
|  | Color image of head shot of dark-haired |  |
| 3 | male, slight goatee, and moustache, |  |
|  | wearing black & white plaid shirt.  (1 |  |
| 4 | page) |  |
| 5 | Government Exhibit 1269 | 115 |
|  | Color image of head shot of dark-haired |  |
| 6 | male, looking towards his right, |  |
|  | wearing gray hoodie.  (1 page) |  |
| 7 |  |  |
|  | Government Exhibit 1270 | 115 |
| 8 | olor image of head shot of dark-haired |  |
|  | male, slight goatee, tear drop tattoo |  |
| 9 | at corner of each eye, "TPLS" tattooed |  |
|  | on neck, wearing white, yellow, and |  |
| 10 | blue shirt.  (1 page) |  |
| 11 | Government Exhibit 1271 | 115 |
|  | Color image of head shot of male with |  |
| 12 | dark hair (very short haircut), full |  |
|  | beard and moustache, wearing white |  |
| 13 | sleeveless shirt., dark t-shirt.  (1 |  |
|  | page) |  |
| 14 |  |  |
|  | Government Exhibit 1273 | 115 |
| 15 | Color image of head shot of male with |  |
|  | dark hair, wearing dark shirt.  (1 |  |
| 16 | page) |  |
| 17 | Government Exhibit 1274 | 115 |
|  | Color image of head shot of male with |  |
| 18 | dark hair (longer in the back), |  |
|  | earrings, and wearing a black & white |  |
| 19 | print shirt. (1 page) |  |
| 20 | Government Exhibit 1275 | 115 |
|  | Color image of head shot of male with |  |
| 21 | dark hair (with reddish/orange |  |
|  | highlights) and wearing a pink shirt |  |
| 22 | with a white shirt underneath.  (1 |  |
|  | page) |  |
| 23 |  |  |
| 24 |  |  |
| 25 |  |  |

1                                                    Page

2    Government Exhibit 1276                          115
         Color image (somewhat blurry) of head
3        shot of male with receding dark hair,
         goatee, and moustache, wearing a dark
4        striped open shirt with white shirt
         underneath.  (1 page)
5
     Government Exhibit 1277                          115
6        Color image of head shot of male with
         dark hair, small goatee, and wearing a
7        dark shirt.  (1 page)

8    Government Exhibit 1278                          115
         Color image (somewhat blurry) of head
9        shot of male with brown hair, short
         goatee and moustache, tattoos on right
10       side of face and on neck, wearing
         orange shirt with white shirt
11       underneath. (1 page)

12   Government Exhibit 1280                          115
         Color image of head shot of male with
13       dark hair, full beard, and moustache,
         wearing blue shirt.  (1 page)
14
     Government Exhibit 1281                          115
15       Color image of head shot of male with
         dark curly hair, tattoos on face and
16       neck, eyebrow piercing over left eye,
         wearing orange shirt with white shirt
17       underneath.  (1 page)

18   Government Exhibit 1301                          115
         Color image of male torso, tattoo of
19       MS-13 on torso, white elastic material
         around waist. (1 page)
20
     Government Exhibit 1302                          115
21       Color image of head shot of male with
         dark hair, tattoo on right side of
22       neck, wearing dark shirt.  (1 page)

23   Government Exhibit 1303                          115
         Color image of head shot of male with
24       dark hair, wearing dark shirt with
         white shirt underneath.  (1 page)
25

|    |                                                                                 | Page |
|----|---------------------------------------------------------------------------------|------|
| 1  |                                                                                 |      |
| 2  | Government Exhibit 1329                                                          | 43   |
| 3  | Color image of black and white diagram, Date/Time: 05-21-2017/0130hrs,          |      |
| 4  | Complaint #: 2017-0447305, Victim: A. Garcia-Munos, Scene: 10-52, Location:      |      |
| 5  | 1088 Murfreesboro Pk, Drawn by: J. Terry (#774100).  (1 page)                    |      |
| 6  | Government Exhibit 1330                                                          | 107  |
| 7  | STIPULATION – (1) Before 8/4/2017, Defendant Flores was convicted of a           |      |
| 8  | crime punishable by imprisonment for more than one year; and (2) Before         |      |
| 9  | 8/4/2017, Defendant Flores knew he had been convicted of a crime punishable by  |      |
| 10 | imprisonment for more than one year (1 page)                                     |      |

1                        *   *   *

2          The above-styled cause came on to be heard at

3    9:17 a.m. on April 11, 2023, before the Honorable Eli J.

4    Richardson, District Judge, when the following proceedings

5    were had, to-wit:

6

7          THE COURT:  All right.  We are here for Day 5 of

8    the trial in *United States v. Jorge Flores, et al.*  Looks

9    like all counsel of record are here.

10          I understand we may still have a juror or two

11   that's not here, and I think that may be occasioned by the

12   fact that unexpectedly, and thus far to my knowledge

13   unexplained, the garage they use just closed today.  So

14   scrambling to find different parking spaces, I'm sure that's

15   held them up.

16          The other thing I wanted to mention is, this

17   Court does need to squeeze in a hearing this afternoon, so

18   we'll go till 4:25 today, a little bit shorter than usual.

19   But, you know, I'm prepared to bring the jurors in whenever

20   they're here and get going.

21          In the meantime, do we have preliminary matters?

22          MR. SAFEEULLAH:  Yes, Your Honor.  There is one

23   preliminary matter from the United States.  Our -- not our

24   next witness but the witness after that is an in-custody

25   witness, and we wanted to know how Your Honor planned on

1    dealing with a witness that's in custody.

2            **THE COURT:**  Well, here's my sense of that.

3    Typically, the -- you know, and it's going to be no secret

4    that the individual is in custody, right?  It's going to be

5    part of what's going to be brought out before the jury; fair

6    to say?

7            **MR. SAFEEULLAH:**  That's correct, Your Honor.

8            **THE COURT:**  So my thought is, and -- I'll tell

9    you what.  Here's what I'm going to do.  Maybe what I'll do

10   is, on that particular thing, let me step off the bench a

11   minute.  I want to consult with the Marshals Service, and

12   then I'll get back with you on that.  I have a particular

13   take in mind, but for the security of everyone involved, I

14   don't want to get crosswise with the Marshals.

15           So everyone keep their seats.  I'll step down

16   from the bench and have a discussion with our Deputy U.S.

17   Marshal, and we'll go from there.

18               (Recess 9:20 a.m. to 9:23 a.m.)

19           **THE COURT:**  Here's what I'm envisioning for this,

20   would be to have the witness come in through the side door,

21   come up here, leg shackles only, have a Deputy Marshal

22   behind the witness for purposes of security.

23           We'll also have Mr. Avila -- or is it -- it

24   may -- I don't know if it's Mr. Avila based on this witness

25   list.  I know that he would appear to be the person that you

1   might be referring to.

2                   **MR. SAFEEULLAH:**  That's correct, Your Honor.

3                   **THE COURT:**  Is that right?  Okay.  Does he need a

4   translator, an interpreter?

5                   **MR. SAFEEULLAH:**  Yes, Your Honor.

6                   **THE COURT:**  Okay.  So we'll have an interpreter

7   nearby as well, Deputy Marshal there, leave leg irons on.

8   As I say, you know, I don't think it's a situation where

9   either side is prejudiced by showing the fact -- it's going

10  to be brought out anyway -- he's in custody.  Bring him up

11  here, and then when he's done testifying, go back through

12  the side door.  So that was my plan.

13                  Does that work for you, Mr. Safeeullah?

14                  **MR. SAFEEULLAH:**  Yes.  Thank you, Your Honor.

15                  **THE COURT:**  All right.  Counsel for defendants,

16  any issues with that?  Any hands?  Okay.  All right.

17                  Let's see.  The -- I wanted to sort of circle

18  back.  Obviously, we had this issue that arose, and, you

19  know, some issues regarding timing related to a particular

20  government witness and disclosure of particular recently

21  received information from the government.

22                  Mr. Safeeullah, as far as you're concerned, was

23  that handled?

24                  **MR. SAFEEULLAH:**  Yes, Your Honor.  We turned over

25  the recordings to the defense.  They're in Spanish.  I'm not

1   sure if they've had a chance to have them interpreted

2   overnight.  It was late last night when we turned them over.

3          The government has not listened to all of these

4   recordings in their entirety or had them interpreted, but we

5   did turn them over, and we anticipate Ms. Caceres will

6   testify about a small portion of her conversation with

7   Mr. Jorge Flores that was captured on those recordings.

8          **THE COURT:**  Okay.  Thanks very much.

9          All right.  Ms. Hood-Schneider, any reaction to

10  that?  Not saying that you have to have any reaction

11  but . . .

12         **MS. HOOD-SCHNEIDER:**  I guess all I can say is,

13  obviously Mr. Flores has the right to cross-examine, and

14  it's going to be extremely difficult to cross-examine

15  Ms. Caceres on a phone call that we have not had the chance

16  to get interpret -- you know, to get it translated so that

17  we can effectively do our cross-examination.  I'm not sure

18  what we do at this point.

19         **THE COURT:**  All right.  What do you think about

20  that, Mr. Safeeullah?  The notion being, well, the right to

21  effective cross-examination may not be vindicated if -- you

22  know, to cross on the matters that you'll bring up if they

23  haven't had a chance to translate the calls.  What do you

24  think about that?

25         **MR. SAFEEULLAH:**  I think that's a valid point.

1    That's why the United States doesn't plan on going in depth

2    into the calls.  But it's a conversation that the defendant

3    had with Ms. Caceres.  Counsel can ask him about that

4    conversation that he had with her, and based on his

5    responses, they can draft questions to cross-examine her.

6         It's akin to other conversations that cooperators

7    or witnesses have where they have conversations with the

8    defendants that isn't recorded.  The defendant can basically

9    tell his attorney the gist of that conversation, what took

10   place, and advise their attorney on how to cross-examine

11   that witness.

12        **MS. HOOD-SCHNEIDER:**  Well, Mr. Flores does not

13   have to put on any proof, and that would be effectively he

14   would be required to tell us something.  As the Court was

15   well aware, Mr. Flores is well within his right to sit down

16   and not say anything to us.

17        But if they've got this call in their possession

18   that is a statement from Mr. Flores, we should have the

19   opportunity to effectively review that statement and use it

20   to -- for impeachment purposes or, you know, whatever other

21   reasons we have we can use it for under the Rules of

22   Evidence.  But to say that, well, they can always go back

23   and talk with their client, that's basically saying, well,

24   they have to produce evidence or they have to do research to

25   be able to cross-examine, research coming from Mr. Flores.

         Mr. Flores really doesn't have to tell us
anything because the burden of proof is not on him.  But if
they've got this call, then we should have the opportunity
to review it.

         **THE COURT:**  Well -- but you have the call the
same way the government does, right?  Hold that thought.

         Mr. Safeeullah, does the defense have the same
thing you do, which is untranslated versions of the call?

         **MR. SAFEEULLAH:**  That's correct, Your Honor.

         **THE COURT:**  Okay.  So would you say both sides
are on sort of equal footing at this point on these calls?

         **MR. SAFEEULLAH:**  That's correct.  As soon as we
received it in our possession, within an hour or so, we
provided it to the defense, and we have the same version of
the call that they have.

         **THE COURT:**  From your perspective, you put the --
let's say you put the witness up.  Would you know whether
there's anything on the call, that if it was translated from
Spanish to English, could potentially serve to impeach her
version of events?  Sounds like that's possible because you
haven't been able to check her testimony against an English
translation of the calls; is that right?

         **MR. SAFEEULLAH:**  That's correct, Your Honor.

         **THE COURT:**  Okay.  All right.  It seems to me --
here's the way I look at it -- that, you know, the

1  government perceives that it's jeopardy, and I think I'm

2  permitted to take Mr. Safeeullah at his word right now, you

3  know, they don't know what's on the call. They don't know.

4  They've been told by -- apparently they've been told by the

5  witness what's on the call, but they proceed at their

6  jeopardy, and they're not in any better shape than the

7  defendant. They don't have any more knowledge about what

8  was said on the call than the defendants do, and I think

9  they're allowed to call a witness and see what happens.

10          And if it comes out later, and it can -- it

11  can -- it can come out later if -- and obviously Mr. Flores

12  has the right to present a case in chief or not, but I don't

13  know that the government is prohibited by -- particularly

14  given the circumstances here, I think it's within its rights

15  to say we need to put this testimony on now. It can't wait.

16  We have no more knowledge of what's on the call than the

17  defendants do, and the witness can be cross-examined here.

18          Is there any reason why, Mr. Safeeullah, if

19  Mr. Flores chose to do so, that later, he could not call

20  this witness under defendants' case in chief?

21          **MR. SAFEEULLAH:** He could, Your Honor.

22          **THE COURT:** Okay. Ms. Hood-Schneider, I don't

23  know that there's any legal principle that would prevent me

24  from allowing the government to put the witness up now in

25  this order, elicit her version of what happened, and it is

```
1    subject to exploitation by the defense if it turns out the

2    defendant is able to, through its work, through its

3    interpretation, figure out that what she said was wrong.

4            MS. HOOD-SCHNEIDER:  Well, the only thing I would

5    mention is I disagree that we're on this equal footing.  My

6    understanding was, when the government reviewed this call,

7    they reviewed it with an interpreter.  So the government

8    knows what's on this call.  The defense does not.  So in

9    that respect, we're not on equal footing.  We would like to

10   know what's on this call just like the government knows

11   what's on this call.  I mean, my understanding is that's

12   what happened:  They listened to it with an interpreter.

13           THE COURT:  Is that what happened,

14   Mr. Safeeullah?

15           MR. SAFEEULLAH:  Your Honor, we tried to listen

16   with -- to the entire call with the interpreter, but the

17   quality of the call is not the best.  And the statements

18   that the government intends to elicit from Ms. Caceres that

19   the interpreter was able to interpret was Mr. Flores asking

20   Ms. Caceres not to come to court, and please not to come to

21   court.  Those are the statements that the government intends

22   to elicit from Ms. Caceres.  And this is what we told the

23   Court yesterday at the hearing.  There's nothing in addition

24   to that we plan to get out from this call.

25           THE COURT:  All right.  Nothing about threats or
```

1  violence or anything like that, it's more like that he was

2  kind of making a request and that's it?

3         MR. SAFEEULLAH:  That's correct.  Because we

4  don't know what's on the entirety of these calls.

5         THE COURT:  Okay.  You know, from your

6  perspective, based on how you reviewed it and the quality of

7  the tape, could you really -- do you really know anything

8  else that's on there, or is it all sort of, as far as you're

9  concerned, you can't really determine anything else that's

10 on there?  The only thing that you feel comfortable with are

11 those statements that you just mentioned?

12        MR. SAFEEULLAH:  That's the only thing the

13 government feels comfortable with.

14        THE COURT:  Okay.  Now, would you say, then,

15 Mr. Safeeullah, that now having heard you,

16 Ms. Hood-Schneider knows everything you know about what was

17 said on the calls?  Do you see what I'm saying?  Is there

18 anything else you know that she doesn't know now?

19        MR. SAFEEULLAH:  That there was a comment that

20 Ms. Caceres said that she loved her children and she would

21 do what she had to to protect her children.

22        THE COURT:  Okay.  So that, the interpreter was

23 able to convey to you, and it was sufficiently on the clear

24 on the tape for her to convey to you; is that right?

25        MR. SAFEEULLAH:  That's correct.

1      **THE COURT:**  Anything else that you can think of?

2      **MR. SAFEEULLAH:**  Give me one second, Your Honor.

3      **THE COURT:**  Sure.

4      **MR. SAFEEULLAH:**  I don't think -- outside of that

5    first initial statement that he asked her not to come to

6    court, those are the only things we plan on eliciting, but

7    she did say that she loved her children.

8           Mr. Flores asked her whether she was going to be

9    cooperating against the gang.  Her response was, I don't

10   know anything about the gang.  You never tell me anything

11   about the gang.

12          But the call continues for a period of time and,

13   it's muffled, and the United States cannot determine the

14   other part of that.

15          What we plan on doing is sending the call to a

16   translator to have them see if they can listen to it in a

17   better quality, get it transcribed, and then admit it

18   possibly through evidence through the jail custodian and

19   then through the translator who transcribes it, like we plan

20   on doing with the other jail calls from Carlos Ochoa and

21   Jason Sandoval.

22          **THE COURT:**  And this would be evidence, really

23   electronic evidence of statements of a party opponent, so it

24   would be admissible under the rule against hearsay for that

25   reason.

1          And then there would be, with respect to

2   Ms. Caceres's statements, they might be -- to the extent

3   that they are offered to prove the truth of any matter -- to

4   the extent they would be offered to proven the truth of the

5   matter asserted, her comments, then they might be excludable

6   under the rule against hearsay.  But they would not be

7   excluded to the extent they provide context -- they're

8   introduced in order to provide context for what the

9   defendant says.

10          Would you agree with that analysis?

11          **MR. SAFEEULLAH:**  That's correct, Your Honor.

12          **THE COURT:**  All right.  So that may or may not be

13   offered later.  I do think that here, based on the

14   government's representations, it sounds like the parties are

15   on equal footing about the defense knows what the government

16   believes to be true about what's on the tape.  And, you

17   know, the government's proceeding at its jeopardy here

18   because it could turn out to be wrong in which case the

19   defendant would have the option to impeach with prior

20   inconsistent statements, or maybe this could be treated as

21   sort of also impeachment evidence on a noncollateral matter.

22          And the fact that the defendant has that option

23   doesn't mean that the burden, any burden has shifted to the

24   defendant.  I mean, that's kind of where I'm seeing it right

25   now.

1       Yes, Ms. Hood-Schneider?

2       **MS. HOOD-SCHNEIDER:** I just want to make the

3 record clear. I have a feeling which direction the Court is

4 going, but I just want to make the record clear that

5 Mr. Flores is objecting to this witness, Ms. Kim Caceres,

6 testifying to the call.

7       And then we also would -- Mr. Flores would

8 request a delayed cross-examination. If Ms. Caceres does

9 come in today and testify, then we would like the

10 opportunity to get the call -- we would like for her to stay

11 under subpoena, we would like the opportunity to get the

12 call translated, and come -- call her back and effectively

13 cross-examine her on the contents and the context of this

14 call.

15       **THE COURT:** All right. A couple of things.

16 Mr. Safeeullah, what about the notion of her sort of

17 remaining under the government subpoena? What's your view

18 on that? Or should the defendant be obligated to sort of

19 write up the subpoena and, you know, drop it on her here in

20 court?

21       **MR. SAFEEULLAH:** I think it would be more prudent

22 for the defense to call her in their case in chief and use

23 any statement that they think is impeaching to impeach her

24 that way and cross-examine her today.

25       As we mentioned yesterday, she has had travel

issues, she's indigent, and we're dealing with this.  She
showed up on April the 4th ready to testify, and she's been
waiting essentially in the city for a week to testify.  And
she doesn't live here.  So requiring her to stay in a city
that she doesn't live in with little to no funds is really a
hardship on her when the defense can just call her back when
the defense wants to do its case in chief.

          THE COURT:  And do you think they should be
obligated to sort of drop their own subpoena on her?

          MR. SAFEEULLAH:  I think so, Your Honor.  I don't
see that as an onerous task.

          THE COURT:  What time today would you estimate
you would get to her?

          MR. SAFEEULLAH:  Probably in 20, 30 minutes.

          THE COURT:  Okay.  So after we finish up with the
one witness.  All right.  How long do you expect direct
examination to take?

          MR. SAFEEULLAH:  To be about 30 or 45 minutes.

          THE COURT:  All right.  So the one thing about
the defendant, if they're going to subpoena her, they
probably need to do it like when she's -- you know, have
someone do it out in the hallway or something, seems to me.
Does that make sense?

          MR. SAFEEULLAH:  Yes, Your Honor.

          THE COURT:  Okay.  Ms. Hood-Schneider may say,

well, you know, we don't have -- we don't have a subpoena

prepared or a subpoena form or anything like that.

          Is that fair to say?

          **MS. HOOD-SCHNEIDER:**  That's fair to say.  And

also, I recall the government saying yesterday that it was

very difficult to get Ms. Caceres here.  So to release her

from the government subpoena -- and, I mean, it almost

sounded like the reason why they brought her in so early

was, again, travel issues.  There's -- you know, alluded to

she's been threatened.  So to release her from the subpoena

would effectively make her unavailable to the defense.

          **THE COURT:**  Well, not if you subpoena her,

because then you would have your -- you know, your remedies

if she disobeys the subpoena, which is something I would

take seriously.

          Here's -- and let me explain further in response

to the objection.  I do think if no recordings had been made

of this call, with this having happened yesterday, trials

sometimes -- things happen on the fly.  They just do.  And

if allegedly, and the jury will decide ultimately, I

suppose, they're going to consider this.  If something

happened the day before trial or -- and I guess the call

would have been two days before her trial testimony -- and

it had not been recorded, there's no question the government

gets to ask her about that.  I don't see that there's any,

```
1   you know, due process issue or confrontation -- they get to
2   do that.
3            They have discovery obligations.  If the call's
4   recorded, they certainly have discovery obligations under
5   Rule 16.  And it sounds to me like they complied with it,
6   you know, they complied with it as soon as they could, and I
7   just don't see an impediment to them calling the witness
8   when they want to do so.
9            And I don't see, based on the representations
10  made to me by the government, whether they -- that they know
11  more about what's on the English -- you know, what the
12  English translation is of the call than what the defendant
13  knows now.  And so I can't say that there's a prohibition
14  against this.
15           Like I say, this is an easy call if it hadn't
16  been recorded.  But the fact that it was recorded doesn't
17  change that much where both sides, from what I can see, are
18  now in the same information about what the recording shows.
19           Now, on the issue of subpoena, what -- one
20  moment.  Let me ask a question about timing.
21           (Respite.)
22           THE COURT:  Here's the thing:  I want everyone to
23  keep their seat.  What I'm inclined to do, because, you
24  know, I understand what -- you know, the defendant may not
25  have a form.  I'm going to step off the bench for a second
```

1   and see if I can facilitate that process.

2          I do think the notion of defendant having an

3   opportunity to put this witness under subpoena for a

4   potential defense case in chief is appropriate and, you

5   know, I think that literally, the form issue is something

6   that would I think be the only thing standing in their way.

7          I'm going to step out.  I might suggest -- it's

8   the government's call -- that if they have any information

9   to share, if it wants to, you know, if counsel think it

10   serves their client, talk with Ms. Hood-Schneider.  Anything

11   about the logistics of serving her with the subpoena,

12   anything that they want to say -- and I understand why the

13   government may not be keen on the notion of disclosing sort

14   of contact information, but anything logistically that the

15   government may be interested in sharing with

16   Ms. Hood-Schneider to pretermit any claim that they aren't

17   playing fair with this witness, they may want to do it while

18   I'm off the bench.  It's only going to be a couple of

19   minutes, though.

20          So everyone keep their seats.  I'm be right back.

21          (Recess 9:43 a.m. to 9:48 a.m.)

22         **THE COURT:**  So we have that in the works.  Those

23   subpoenas require a particular signature, which actually,

24   it's not a signature for the Court.  And so we were going to

25   have that signed and then give it to Ms. Hood-Schneider.

1          Yes, Mr. Safeeullah?

2          **MR. SAFEEULLAH:**  Your Honor, in thinking about

3     these calls and Your Honor mentioning that we're proceeding

4     at our peril, I think we're going to stay away from the

5     calls, because there were three calls, we don't know what's

6     on the entirety of these calls, and it may be wise for us

7     not to try to introduce them through Ms. Caceres because we

8     don't know what's on the rest of these calls.

9          **THE COURT:**  Okay.

10          **MR. SAFEEULLAH:**  So we're not going to ask her

11     about the conversation that she had with Mr. Flores a couple

12     of days ago.

13          **THE COURT:**  Okay.  Thank you very much for that,

14     Mr. Safeeullah.  And, you know, trials are back and forth,

15     things happen, things develop, parties make strategic calls,

16     and understand what you're saying about that.

17          Ms. Hood-Schneider, do you want a trial subpoena?

18          **MS. HOOD-SCHNEIDER:**  I think we're going to still

19     pursue the trial subpoena, but we are a bit relieved that,

20     you know, the government plans to not go into -- but to be

21     on the safe side, we want to go ahead and proceed getting

22     the subpoena.

23          **THE COURT:**  Okay.  All right.  Like I say, we

24     that in the works and we'll get you one.  And ordinarily,

25     the Court wouldn't do this for defense counsel.  As defense

```
1   counsel know, they're professionals and they handle this on

2   their own.  These are unique developing circumstances where

3   I think it's appropriate for the Court to enable this to

4   happen based on the particular circumstances.

5           So it sounds like this isn't going to come up

6   now.  If it comes up later, then we'll deal with it at that

7   time.  So -- okay.  All right.  We'll proceed accordingly.

8           Mr. Safeeullah, what is your view on, you know,

9   if you get a -- an English translation of this, I would say

10  it would be Rule 16 discoverable, and would your intention

11  be if you do get a translation into English, that you

12  provide that translation to defense counsel as soon as you

13  have it?

14          MR. SAFEEULLAH:  Immediately.

15          THE COURT:  All right.  Thank you.  Thank you,

16  sir.

17          Okay.  Anything else of a preliminary nature

18  before we call in our jurors?

19          MR. SAFEEULLAH:  Not from the United States.

20          MR. MOTHERSHEAD:  Your Honor, there's a witness

21  that's going to be testifying today, Mr. Avila.  We just

22  want to go ahead and put an Enright objection on the record.

23  We don't have to get into it.

24          THE COURT:  Okay.

25          MR. MOTHERSHEAD:  It's my understanding that he
```

1　will be testifying to statements made by Franklin

2　Pineda-Caceres that I think will pertain to Mr. Colindres,

3　and we just want to kind of put a sort of global objection

4　to that conversation as hearsay.

5　　　　　　THE COURT:  So we don't have to necessarily tease

6　this all out now, but to the extent we can, Mr. Safeeullah,

7　it sounds like Mr. Avila is going to testify to a

8　conversation between --

9　　　　　　You had given the name.  It was . . .

10　　　　　　MR. MOTHERSHEAD:  Franklin Pineda, different

11　Pineda than . . .

12　　　　　　THE COURT:  Okay, different, uh-huh.  Franklin

13　Pineda and Mr. Colindres?

14　　　　　　MR. MOTHERSHEAD:  No, I think it's just between

15　the witness and Mr. Pineda --

16　　　　　　THE COURT:  Oh, okay.  Okay.

17　　　　　　MR. MOTHERSHEAD:  -- kind of reporting events

18　that may have involved Mr. Colindres.

19　　　　　　THE COURT:  Okay.  One moment.

20　　　　　　All right.  Mr. Safeeullah or whoever -- you

21　know, it's fine if it's someone else handling the witness.

22　Mr. Hoff?

23　　　　　　MR. HOFF:  Good morning, Your Honor.  Yes, we do

24　anticipate Mr. Avila testifying to a number of statements

25　that we believe qualify as non-hearsay statements under

1    801(d)(2)(E).  And we anticipate there will be many that we

2    believe qualify under that non-hearsay exception.

3         **THE COURT:**  Okay.  Now, of course, I had my order

4    about how to deal with this in my best attempt -- it's kind

5    of sui generis -- I think, but to go with the preferred

6    approach, and there are efficiency reasons for doing it the

7    way I did, but not lose track of the fact that the Court

8    needs to be conscientious on the back end about whether the

9    conditions for the admissibility under the coconspirator

10   exception to the hearsay rule, you know, were satisfied.

11        Do you anticipate, Mr. Hoff, that by the time he

12   gets into this conversation, not necessarily that you would

13   have, you know, conclusively established the

14   appropriateness, but would there -- by the time you offer

15   such statements, would there at least be sort of a

16   background, you know, background facts elicited that would

17   suggest that the witness and Franklin Pineda were in a

18   conspiracy that Mr. Colindres was involved in and that this

19   conversation was during and in relation to that conspiracy?

20        **MR. HOFF:**  Yes, we -- I believe so, Your Honor.

21        **THE COURT:**  Okay.  All right.  So here's --

22   here's the thing.  Here's what I'm going to do.  My general

23   notion from the order is that I'm not going to exclude

24   things because the coconspirator exception hasn't yet been

25   satisfied.  And I've detailed the procedures for everyone to

1  follow for us to, you know, check this out on the back end

2  and see if there's an order for the jury to disregard and so

3  forth.

4  I do think, Mr. Mothershead, if at the time these

5  statements are offered, you know, if you wanted to -- I

6  think that your -- I appreciate the standing objection.  I

7  think it's probably broad enough to cover anything within

8  the description that you've made, for my purposes,

9  conversations between Franklin Pineda and Mr. Avila, you

10  know, that's related to Mr. Colindres.

11  If you want to, at the time these are offered,

12  raise another objection, have a sidebar to kind of see where

13  we are, you can.  But I do anticipate we're probably going

14  to allow these in and then, as I say, deal with them on the

15  back end.

16  MR. MOTHERSHEAD:  Right.  I was just trying to

17  follow the Court's scheme and just put it on the record.

18  THE COURT:  Right, right, yeah.  And I appreciate

19  that.  And the first -- that's the first time coconspirator

20  exception issues have been raised in this trial, so I did

21  want to talk a little bit more about it.  But, you know,

22  your approach was certainly appropriate.

23  MR. MOTHERSHEAD:  Thank you, Your Honor.

24  THE COURT:  Okay.  Thank you.  All right.

25  Anything else from anybody?  Okay.  Looks like we can call

1    in our jurors.  Thank you.

2            (WHEREUPON, the jury re-entered the courtroom at

3    9:57 a.m., with matters being heard in open court as

4    follows:)

5            **THE COURT:**  This situation today, I suppose, with

6    parking probably turned out to be a hassle.  If so,

7    apologies, folks.  We were certainly not aware there would

8    be any issue with parking this morning.  Appreciate your

9    patience with that.

10           Once everyone got here, I think we had a slight

11   delay beyond that, and appreciate your patience with that.

12   More of what I referred to before where the attorneys and

13   judges do what they do in an effort to continue us along

14   with progress at trial.

15           So thanks for your continued attention.  And,

16   Ms. Farzad, when we had broken, you were in the midst of a

17   direct examination.  If you wish to re-call your witness.

18           **MS. FARZAD:**  Thank you, Your Honor.  The

19   government would like to re-call John Terry to the stand.

20           **THE COURT:**  All right.  He may come forward.

21           All right, Mr. Terry.  And you may certainly be

22   familiar with this in your career.  The Court's practice is

23   to just remind a witness whose testimony is broken over two

24   days, remind that witness the second day that they remain

25   under oath.

1          THE WITNESS:  I understand.

2          THE COURT:  Thank you.

3          MS. FARZAD:  Thank you.

4                    *   *   *

5                    JOHN TERRY,

6  having previously been sworn, resumed the witness stand and

7  testified further upon his oath as follows:

8                    DIRECT EXAMINATION (Continued)

9  QUESTIONS BY MS. FARZAD:

10  Q.    Good morning.

11  A.    Good morning.

12  Q.    I'd like to turn your attention to May 21st, 2017.

13  Were you working on that day?

14  A.    I was.

15  Q.    Do you recall being dispatched to a call at 1088

16  Murfreesboro Pike?

17  A.    What was the name of the business?  I don't recall

18  that specifically.

19  Q.    It was just an address.  It was a street -- I'm sorry.

20  It was a strip mall.

21  A.    Yes.  I do recall that, yes.  Murfreesboro Road and

22  East Thompson, yes.

23  Q.    Okay.  And do you recall what that call was for?

24  A.    It was a person shot.

25  Q.    All right.  And what was your role in going out there

1  for that call?

2  A.    My task that I was assigned was to do a diagram of the

3  scene, take measurements and do a rough sketch of the scene

4  with the measurements and eventually do a final

5  computer-generated diagram.

6  Q.    If you could please take a look at the last binder.  I

7  believe it's going to be on the bottom.  It should be the

8  one that goes to Government Exhibit 1329.  And if you could

9  turn, please, to Tab -- I believe it's the very last tab in

10  the book -- 1329, please.

11  A.    Yes, ma'am, it is.

12  Q.    Okay.  Do you recognize that?

13  A.    I do.  That is my diagram, my final diagram that I did

14  of the scene.

15  Q.    And how do you know that's your diagram?

16  A.    Name's on it, case number is correct, and the address

17  is correct.

18         **MS. FARZAD:**  Your Honor, at this time, the

19  government would like to move to admit Government

20  Exhibit 1329 with permission to publish to the jury.

21         **THE COURT:**  All right.  Without objection,

22  Government Exhibit 1329 is admitted, and it may be

23  published.

24         (Government Exhibit 1329 was marked and admitted

25  into evidence.)

**BY MS. FARZAD:**

Q.    All right, sir.  Can you explain to the jury what this diagram represents?

A.    Sure.  This is a bird's-eye view or an overhead view of the scene.  You see the parking lot.  There's a MAPCO Express that is facing Murfreesboro Pike.  The vehicle of interest is the one there with the -- in the middle with the numbers around it.  You'll see items labeled "RPA" and "RPB."  Those are reference points.  When we do a triangulation measurement, we measure each item of evidence back to two reference points, and that's what those denote.

     RPA was the northeast corner of the MAPCO station, and the fire hydrant in the middle of the parking lot was our second reference point.  The numbers that you see are just the numbered of the evidence markers corresponding to pieces of evidence.

Q.    And is there a key on the map here or the diagram that shows what those evidence markers relate to?

A.    It is.  It's under the words, it says "Measurements." You can see it's broken down into columns labeled "Number," "Item," "Distance to RPA," and "Distance to RPB."

Q.    Okay.  And so, for instance, Item No. 1 in the left-hand corner, can you explain to the jury what type of evidence that is?

A.    Sure.  Item No. 1, "FCC" denotes "fired cartridge

1    casing," or it's a spent cartridge casing or shell casing, I

2    believe, is commonly used.  This one is a caliber 7.62x39mm.

3    That shows to be Item No. 1.  You can see it's located over

4    there on the south end of the parking lot there.

5         Just east of the MAPCO Express and going on down the

6    line, it's basically the cartridge casing caliber is what's

7    listed first.  "FCC" denotes that it's a spent cartridge

8    casing.  And you can see some others, there's projectile

9    such as Item 8, and then projectile fragments which were

10   items like 10 and 11.

11   Q.    Thank you.  And just for example, Item No. 3, what

12   does ".40 S&W" stand for?

13   A.    It stands for .40 caliber Smith & Wesson.  It's just a

14   .40-caliber projectile.

15   Q.    And in the diagram here, the vehicle that's in the

16   middle here with all the numbers around it, do you know

17   whether the victim was inside of that vehicle?

18   A.    Yes.  The victim was inside that vehicle.

19   Q.    All right.

20              MS. FARZAD:  I think I'm finished with this

21   exhibit.  Thank you very much.

22   BY MS. FARZAD:

23   Q.    All right.  I'd like you to also turn to -- if -- I'd

24   like to direct you to August 4th, 2017.

25   A.    Yes, ma'am.

Q.    Were you working on that day?

A.    I was.

Q.    Do you recall taking photographs of a search warrant
of a vehicle conducted at 1201 Freightliner Drive?

A.    Yes, ma'am.  That's Metro's impound towing lot.  It's
where vehicles are held pending search warrant or
processing.  A search warrant was executed on that day by
the case detective, and I assisted him in that.

Q.    Okay.  And did you have any involvement in the
investigation leading to that search warrant?

A.    No, ma'am.

Q.    Okay.  So you were called upon simply to help search
the vehicle and take photographs; is that right?

A.    Yes.  I was totally in support of the case detective,
yes.

Q.    Okay.  If you could please take a look at Government
Exhibits 751 through 795 which I believe is going to be in
that second binder closest to me.  Oh, you picked it up.

A.    751?

Q.    751 through 795.  If you could just flip through those
quickly.

A.    What was the last number?

Q.    795.

A.    Yes, ma'am.

Q.    Thank you.  Do you recognize those?

1    A.    I do.   Those are the photographs I took on the date in
2    question.
3    Q.    And how do you know they're the same photographs you
4    took?
5    A.    One of the exhibits shows my photo card which
6    identifies the case, the date, and my name as the
7    photographer.
8              MS. FARZAD:  Your Honor, at this time, the
9    government would like to move to admit Exhibits 751 through
10   795 with permission to publish to the jury.
11             And, Your Honor, may I approach -- oh, I'm sorry.
12             THE COURT:  I was going to say absent objection,
13   Government Exhibit 751 through 795 will be admitted, and
14   they may be published.
15             (Government Exhibits 751 through 795  were marked
16   and admitted into evidence.)
17             MS. FARZAD:  Thank you.  And may I approach the
18   witness with some additional exhibits?
19             THE COURT:  You may.
20   BY MS. FARZAD:
21   Q.    Sir, I'm handing you what's previously been marked as
22   Government Exhibits 1 through 9.  I'm going to stack them
23   here.  Sir, do you recognize these?
24   A.    Yes.  I recognize the handguns and the items, yes, and
25   the body armor.  These are all items that were removed

1    pursuant to the search warrant.

2                (Reporter clarification.)

3                **THE WITNESS:** Removed from the vehicle pursuant

4    to the search warrant.

5    **BY MS. FARZAD:**

6    Q.    And how do you know that these are the same items that

7    were removed during the search of that vehicle?

8    A.    On the items here in the bags, I can see the, what we

9    call the property sheet.  I also recognize my handwriting

10   and the items themselves.

11               **MS. FARZAD:**  Your Honor, at this time, the

12   government would like to admit Government Exhibits 1 through

13   9 with permission to publish to the jury.

14               **THE COURT:**  Absent objection, Government

15   Exhibits 1 through 9 will be admitted and may be published.

16               (Government Exhibits 1 through 9  were marked and

17   admitted into evidence.)

18               **MS. FARZAD:**  Thank you.

19   **BY MS. FARZAD:**

20   Q.    All right.  Sir, I'd like to first take a look at some

21   of these photographs, and then we'll get to some of the

22   evidence that's before you.

23   A.    Yes, ma'am.

24   Q.    If we could please take a look at Government

25   Exhibit 751.  Investigator Terry, what is this?

1   A.    This is the photo work order card that we complete at

2   the start of every task or assignment.  This one indicates

3   the case number -- the complaint number, rather -- where the

4   incident occurred or where the vehicle is being searched, in

5   this case which is at Freightliner.  It shows my name as

6   being the photographer, and the detective that I interacted

7   with was Detective Key.

8   Q.    Thank you.  If we could look, please, at Government

9   Exhibit 752.  What's this a photograph of?

10  A.    Just a picture of the right front of the vehicle, part

11  of the series of overall photographs that I take of the

12  vehicle.

13  Q.    Okay.  And this is the vehicle that you helped search?

14  A.    It is.

15  Q.    Okay.  If we could look, please, at 755.

16  A.    Left rear view showing some of the tags, shows some

17  damage that exists on the car.

18  Q.    Okay.  Could we please look at Government Exhibit 756.

19  And what is this?

20  A.    This was the temporary tag that was affixed to the

21  vehicle at the time it was searched.

22  Q.    Okay.  Government Exhibit 757, please.

23  A.    Just a broader view showing the tag affixed at the

24  rear of the vehicle.

25  Q.    Could we please look at Government Exhibit 759.

A.    This is a view from the right rear passenger door after it's been opened showing some items in the back seat. It shows the front-passenger seat reclined.

Q.    Do you recall if the seat was reclined like that when you first began to search the vehicle?

A.    Yes.

Q.    Could we please take a look at Government Exhibit 760.

A.    It's hard to see in this particular photograph, but that's the barrel of a weapon, of a rifle.

Q.    Okay.  And if we could take a look at Government Exhibit 774, please.

A.    That's just -- once some of the items have been removed from the top of the rifle, it's a better view.  You can see that it's lying in the rear floorboard.

Q.    Okay.  And is this -- I was just going to say what area of the car is this?

A.    This is in the rear floorboard.  The barrel is more on the front rear -- or the rear -- right rear passenger side.

Q.    Okay.  And if you could please take a look at Government Exhibit 1 that's sitting before you.

A.    Yes, ma'am.

Q.    What is that?

A.    This is the same weapon that's shown in State's -- or Government Exhibit 774.

Q.    If you could please show that to the jury.

1   A.    The weapon is clear.

2   Q.    And this is the rifle that you recovered from this

3   vehicle?

4   A.    Yes, ma'am, it is.

5   Q.    How do you know it's the same one?

6   A.    Same case number.  It's the same weapon as I recall

7   it.

8   Q.    Okay.  If we could take a look, please, at Government

9   Exhibit 776.

10       And what's this photograph show?

11   A.    This is a photograph showing the ammunition that was

12   in the magazine once it was removed from the rifle.

13   Q.    Okay.  Can we please take a look at Government

14   Exhibit 786.

15       And what's this a photograph of?

16   A.    This is a weapons identification card typically taken

17   whenever we recover a handgun or a firearm.  It notes the

18   maker, serial number, the model if we can determine that.

19   It also tells you how many live rounds were in the magazine

20   and if one was chambered, which means it was -- if a bullet

21   was chambered, it means it's ready to shoot, ready to fire.

22   Q.    So does it show here how many live rounds were in this

23   magazine?

24   A.    Yes, ma'am.  There were 30 live rounds.

25   Q.    Okay.  If we could please take a look at Government

1  Exhibit 787.

2       What's this photograph depict?

3  A.    This is just, once we recovered the vehicle, we took

4  it back and made additional pictures.  You can see the photo

5  card there.  This is just a profile shot of the weapon

6  showing its magazine and also the rounds that were recovered

7  or removed from that magazine.

8  Q.    If we could please take a look at Government

9  Exhibit 788.

10       What's the purpose of this photograph?

11  A.    It shows the caliber, shows the model, and also shows,

12  I believe that's the serial number if I'm not mistaken right

13  there above.  The STG-2000 is the model, Cal 7.62x39 is the

14  caliber of the weapon.  And then above that is the serial

15  number.

16  Q.    Okay.  If we could take a look at Government

17  Exhibit 768.

18       And what does this show?

19  A.    In the rear seat of the vehicle was a black bag.  I

20  believe the black bag was sitting on top of this magazine

21  cartridge.  This just shows it -- once it was removed, it

22  shows the black bag, just an overall picture and shows the

23  magazine.

24  Q.    So was that magazine just on the floorboard next to

25  the rifle?

1 A.    I believe it was actually on the seat underneath the
2 bag, if memory serves me correct.  I'd have to refer to my
3 notes.
4 Q.    Could we please take a look at Government Exhibit 769.
5       And what does this photograph show?
6 A.    It just shows the contents of the bag.  It sort of
7 exploded once the bag was opened up.  Shows toiletries,
8 shoes, whatnot.  And the magazine just shows that it was
9 associated in that same general area.
10 Q.    Could we please take a look at Government Exhibit 770.
11       What does this show?
12 A.    This shows the live rounds that were in that extra
13 magazine that was recovered from the back seat of the
14 vehicle.
15 Q.    Okay.  And if you could please take a look at
16 Government Exhibit 3 that's before you.
17 A.    Yes, ma'am.
18 Q.    What is that?
19 A.    This is that same magazine.
20 Q.    The one that we see here in --
21 A.    It is.  I've noted on the front of the cover, it was
22 recovered from rear seat.
23 Q.    Okay.  And this is the same that we see in the
24 photograph?
25 A.    It's the same magazine minus the ammo.

1  Q.    If you could please show that to the jury.

2  A.    Sure.  (Witness complies.)

3  Q.    If we could take a look at Government Exhibit 794.

4  Thank you.

5        What's this photograph show?

6  A.    The very same magazine.  But it shows it after it's

7  been unloaded of the live ammunition.

8  Q.    If we could take a look at Government Exhibit 795,

9  please.

10        What's this photograph?

11  A.    This is just a photograph showing you the what's

12  called the headstamp.  It -- the headstamp typically shows

13  the manufacturer -- in this case, HOTSHOT -- and the

14  caliber.  In this case, it's 7.62x39mm.

15  Q.    Thank you.  If we could look at Government

16  Exhibit 761.

17        What's shown in this photograph?

18  A.    This is the front-passenger seat, the right front

19  seating area that shows the floorboard, floor mat, the seat,

20  seat cover.  Shows a firearm there in the right front

21  floorboard.

22  Q.    Could you pull up, please, Government Exhibit 762.

23        And what is this a photograph of?

24  A.    Just a closer shot of the firearm itself and its

25  location in the vehicle.

1  Q.    Could you please take a look at Government

2  Exhibit No. 2 in front of you?

3        What is that, sir?

4  A.    The weapon's made safe.  This is the same .45 caliber

5  Glock pistol that was recovered.  It's also shown in that

6  picture, Government Exhibit 762.

7  Q.    If you could please hold it for the jury.

8  A.    (Witness complies.)

9  Q.    Thank you.  If we could take a look, please at

10 Government Exhibit 763.

11       Is that just a closer up image?

12 A.    Yes, ma'am.  Again, just a closer image showing it and

13 its position in the floorboard.

14 Q.    Government Exhibit 781, please.

15       What is this?

16 A.    As with the rifle, this is a weapon identification

17 card, specifically for the Glock Model 19.  Shows the serial

18 number, whether a round was chambered, and how many rounds

19 were in the magazine.

20 Q.    What does it mean for a round to be chambered?

21 A.    It means it's ready to be fired.  It means that a

22 bullet has been placed at the back of the barrel, and all

23 you have to do is pull the trigger, and that activates the

24 firing pin which initiates the explosion in the cartridge

25 and projects the projectile out of the barrel.

1  Q.    Okay.  How many rounds were in the magazine in this

2  gun?

3  A.    There were nine.

4  Q.    Okay.  If we could please take a look at Government

5  Exhibit 782.

6        And what's this show?

7  A.    It's just another view.  It shows the magazine once it

8  had been unloaded.  The cartridge or bullet that you see

9  above the chamber there is the way we denote that a bullet

10  was chambered at the time it was recovered.  So in this

11  case, you see the nine rounds that were in the magazine and

12  the tenth round, the one that was in the chamber.

13  Q.    And if we could look, please, at Government

14  Exhibit 783.

15        What's this show?

16  A.    This shows the manufacturer, Glock, Incorporated.  And

17  this particular GBE515 is the serial number for that weapon.

18  Q.    Okay.  If we could look at Government Exhibit 784.

19        What's this show?

20  A.    This is one of the rounds that was removed from the

21  weapon.  It shows it to be a .45 Auto caliber.  This

22  particular brand is a Winchester denoted by "WIN."

23  Q.    Government Exhibit 785.

24  A.    Again, just a view of all of the headstamps on the

25  cartridges that were loaded into the magazine.  You can see

1    they're all -- I believe they're all Winchester.  I know

2    they're all .45 Autos.  Correction:  There are some Rugers

3    in there, so it's a mixed manufactured load.

4    Q.    Could you please take a look at Government Exhibit 5

5    before you.

6          What is that, sir?

7    A.    Yes, these are the live rounds that were recovered

8    from the .45 caliber Glock.

9    Q.    The ones that we see in this photograph, 785?

10   A.    Yes, ma'am.  They are the same.

11   Q.    Could we please take a look at Government Exhibit 764.

12         What's this photograph show?

13   A.    This is a photograph of the -- again, the floorboard.

14   That's the back seat that you see in the gray covering on

15   the left.  You see what appears in this photograph to be

16   body armor.

17   Q.    And is this that same area where the rifle was

18   recovered from?

19   A.    It was actually on top of the main body of the rifle,

20   yes.

21   Q.    So the body armor was on top of the rifle?

22   A.    Yes, ma'am.

23   Q.    Could we take a look, please, at 765.

24         What's this photo?

25   A.    Just a different angle showing that same body armor

1  material.  Just a different angle sort of looking from the

2  top of the cushion, the back seat, onto the floorboard.

3  Q.    Government Exhibit 773, please.

4  A.    This is the body armor once it was removed from the

5  floorboard.  Sat on the ground and the full picture taken.

6  I believe this is the -- this may be the back of it.

7  Q.    Could you please take a look at Government Exhibit 8

8  before you?  And what is that, sir, if you could hold it up

9  for the jury?

10  A.    Sure.  This is the same.  This is what's called body

11  armor.  In common parlance, it's known as a bulletproof

12  vest.  It's made up of two panels, front panel, back panel,

13  made to resist projectiles.

14  Q.    Thank you.  Could we please take a look at Government

15  Exhibit 766.

16        What's this show?

17  A.    This shows a box of Winchester ammunition in the

18  center console of the vehicle.

19  Q.    Okay.  If we could look at Government Exhibit 677 --

20  767, please.

21        What's that?

22  A.    Just a different view of the same.  This one captures

23  more of the title.  Shows a little bit more as to what's in

24  the box.

25  Q.    Okay.  And if we could take a look, please, at

1    Government Exhibit 790.

2          What's that show?

3    A.    This is the box once it's been removed, opened, shows

4    to be Winchester .45 Auto.  "FMJ" denotes "full metal

5    jacket."  And it shows there to be, looks like, eight

6    additional rounds that were left in the box.

7    Q.    And would this ammunition fit inside of that Glock

8    that was recovered from the Camry?

9    A.    Yes.

10   Q.    If you could please take a look at Government

11   Exhibit 6 before you.

12   A.    Yes, ma'am.

13   Q.    What is that, sir?

14   A.    This is the same box that's photographed that's shown

15   in Government Exhibit 790 and the ammo as well.

16   Q.    If you could show that to the jury, please.

17   A.    Sure.  (Witness complies.)

18   Q.    Thank you.  If we could please take a look at

19   Government Exhibit 777.

20         What's this photograph show?

21   A.    This is a photograph of the trunk area of the

22   Toyota Camry.

23   Q.    Okay.  And if we could take a look, please, at

24   Government Exhibit 778.

25         And what's this photograph?

1   A.    In the trunk, a third magazine of 7.62x39mm ammunition

2   was recovered.

3   Q.    Okay.  If we could take a look, please, at Government

4   Exhibit 792.

5        What's that?

6   A.    That just denotes that there were seven rounds of

7   ammunition that were recovered from the -- or removed from

8   that magazine that was in the trunk.

9   Q.    Could you please look at Government Exhibit 4 before

10  you.

11  A.    Yes, ma'am.

12  Q.    And what is that?

13  A.    This is the magazine that was recovered in the trunk.

14  Q.    And if you could hold it up for the jury, please.

15  A.    (Witness complies.)

16  Q.    Thank you.

17        Could we please take a look at Government Exhibit 793.

18  A.    This is a view of the headstamping.  You can see the

19  seven cartridges or seven bullets.  You can see the

20  headstamp.  They're 7.62x39, and the brand in this case is

21  TulAmmo.

22  Q.    If we could take a look, please, at Government

23  Exhibit 771.

24        And what's that?

25  A.    Appears to be a dark-colored navy or black New York

1    Yankees ball cap.

2    Q.    Okay.  If we could look, please, at Government

3    Exhibit 780.

4          What's this?

5    A.    That is a digital scale that was recovered in the

6    front-passenger seat.  Appears to have some residue on the

7    weighing pan.

8    Q.    Okay.  When you say residue, what do you mean by that?

9    A.    I didn't test it at the point in time, so I can't tell

10   you exactly what it is, but it's consistent with narcotics

11   usage.

12   Q.    Okay.  And if you please could take a look at

13   Government Exhibit 9 in front of you.

14   A.    Yes, ma'am.

15   Q.    What is that, sir?

16   A.    This is the digital scale that was recovered pursuant

17   to the search warrant.

18   Q.    Okay.  And how do you know that's the same scale?

19   A.    It's the case number, my initials are on the evidence

20   bag, same brand that shows up in the picture.

21   Q.    Great.  And finally, if you could please take a look

22   at Government Exhibit 7 before you.

23   A.    Yes, ma'am.

24   Q.    What's that, sir?

25   A.    These are all the live rounds that were recovered from

1  the magazines and from the weapon.

2  Q.    Okay.  If you could hold that up for the jury, please.

3  A.    And these specifically are 7.62x39mm rounds.

4  Q.    Okay.  So what did you do with all of this evidence

5  after you collected it?

6  A.    Once it's collected, it's logged and recorded on

7  what's called a property sheet.  Those items are then

8  assigned a bar code.  The items of evidence are then secured

9  in the property room and turned over to evidence personnel.

10 Q.    And how about with photographs that you took?

11 A.    Photographs that I took were uploaded to our digital

12 image scanning system.  It's known as Foray, is the brand

13 name.

14         MS. FARZAD:  Okay.  Your Honor, I have no further

15 questions for this witness.

16         THE COURT:  All right.  Thank you.

17         MS. FARZAD:  Oh, Your Honor, just one moment.

18 I'm sorry.

19         THE COURT:  All right.

20         (Respite.)

21         MS. FARZAD:  Your Honor, actually, I apologize.

22 One photograph that we wanted to take a closer look at.

23 BY MS. FARZAD:

24 Q.    Could you please pull up Government Exhibit 754.

25         Sir, on the right bumper here, what do you notice?

1  A.    On the right side of the rear bumper, there's an --

2  obviously a scratch or some type of deformation, some

3  damage.

4             MS. FARZAD:  Okay.  Thank you, Your Honor.  No

5  further questions.

6             THE COURT:  All right.  Mr. Ganguli?

7             MR. GANGULI:  No questions, Your Honor.

8             THE COURT:  Thank you.

9             Ms. Hood-Schneider?

10             MS. HOOD-SCHNEIDER:  No questions.

11             THE COURT:  All right.  Mr. Mothershead?

12             MR. MOTHERSHEAD:  No questions, Your Honor.

13             THE COURT:  And Mr. Bloom?

14             MR. BLOOM:  No questions, Your Honor.

15             THE COURT:  All right.  Thank you, sir.  You may

16  step down.

17             (The witness stepped down.)

18             THE COURT:  All right.  If the government wishes

19  to call its next witness, please.

20             MR. SAFEEULLAH:  Yes.  The United States calls

21  Kimberly Caceres.

22             THE COURT:  All right.  She may come forward.

23             We'll start by swearing our interpreter who will

24  be interpreting this witness's answers from Spanish into

25  English and also interpreting the questions the same way.

1          (The interpreters were sworn.)

2          **THE COURT:**  Okay.  Thank you.

3          (The witness was sworn.)

4                    *   *   *

5              <u>**KIMBERLY CACERES,**</u>

6  **was called as a witness, and after having been first duly**

7  **sworn, testified through the interpreter as follows:**

8              **DIRECT EXAMINATION**

9  **QUESTIONS BY MR. SAFEEULLAH:**

10 Q.    Good morning.

11 A.    Good morning.

12 Q.    Can you please state and spell your name for the

13 record?

14 A.    Kimberly, K-I-M-B-E-R-L-Y.

15 Q.    And what's your last name?

16 A.    Caceres.

17 Q.    Can you spell that for us as well?

18 A.    C-A-C-E-R-E-S.

19 Q.    Ms. Caceres, how old are you?

20 A.    28.

21 Q.    Do you have any siblings?

22 A.    Yes.

23 Q.    How many siblings do you have in total?

24 A.    Seven.

25 Q.    How many siblings in total?  How many sisters do you

1    have?

2    A.    18, and seven sisters.

3    Q.    So you have 18 siblings in total, but seven sisters?

4    A.    Yes.

5    Q.    Do you have a sister named Anabeli?

6    A.    Yes.

7    Q.    Does she have children?

8    A.    Yes.

9    Q.    So her children would be your nieces and nephews?

10   A.    Yes.

11   Q.    What are the names of Anabeli's children?

12   A.    Franklin Pineda, Jose Pineda, Stephen Pineda, and

13   Christopher Pineda.

14   Q.    So Jose Pineda is your nephew?

15   A.    Yes.

16   Q.    Do you also know Jorge Flores?

17   A.    Yes.

18   Q.    How do you know Jorge Flores?

19   A.    He was my boyfriend.

20   Q.    Do you-all also have children together?

21   A.    Yes.

22   Q.    How many children did you-all have together?

23   A.    Two.

24   Q.    Did one of your children pass away?

25   A.    Yes.

1   Q.    How many children do you have living in total now?

2   A.    Two.

3   Q.    So how many children do you have living now in total?

4   A.    In total, there used to be three.  A female passed

5   away, and now only two are living.

6   Q.    Were you and Jorge Flores in a relationship in 2016

7   and 2017?

8   A.    Yes.

9   Q.    Is it easy being here in court today?

10  A.    No.

11  Q.    Even though you don't want to be here, are you going

12  to lie or are you going to tell the truth?

13  A.    Tell the truth.

14  Q.    How old is the oldest child that you have with

15  Jorge Flores?

16  A.    6.

17  Q.    How old is the second child that you have with

18  Jorge Flores?

19  A.    5.

20  Q.    The 6-year-old, was that child a twin?

21  A.    Yes.

22  Q.    And the twin to that 6-year-old, was that the one that

23  passed away?

24  A.    Yes.

25  Q.    When did that other twin pass away?

```
1    A.    May the 15th of 2017.

2    Q.    Were you and Jorge Flores in a relationship on

3    May 15th, 2017 when you-all's child passed away?

4    A.    Yes.

5    Q.    Did you-all have a vigil for that child that passed

6    away?

7    A.    Yes.

8    Q.    When was that vigil?

9    A.    On the 19th of May, 2017.

10   Q.    Did Jorge Flores attend this vigil?

11   A.    Yes.

12   Q.    After the vigil, what happened between you and

13   Jorge Flores?

14   A.    We had an argument and I told him to leave the house.

15   Q.    Did he actually leave the house?

16   A.    Yes.

17   Q.    So that would have been around May the 20th, 2017?

18   A.    Yes.

19   Q.    Was he with you on May 21st, 2017?

20   A.    No.

21   Q.    Did you learn about a murder on May 21st, 2017?

22   A.    Yes.

23   Q.    Who died?

24   A.    Pelon's brother.

25   Q.    Did you ask Jorge Flores about this murder and whether
```

1  he did it?

2  A.    Yes.

3  Q.    And what did he tell you?

4  A.    That it wasn't him, that he had not killed anybody and

5  not to ask him anything about that.

6  Q.    After you had this conversation with Mr. Flores where

7  he said he didn't kill anybody, did you overhear a

8  conversation between him and his friends at an apartment?

9  A.    Yes.

10  Q.    What were you doing in the apartment while they were

11  having this conversation?

12  A.    Cooking.

13  Q.    And who were you cooking with?

14  A.    With a sister.

15  Q.    And where was Jorge Flores and his friends?

16  A.    In the living room.

17  Q.    What did Jorge Flores say about Pelon's brother's

18  murder?

19  A.    That he was of the 18th and that he deserved it.

20  Q.    And by the 18th, you mean the 18th Street Gang?

21         **MR. LUCAS:**  Objection, Your Honor.  It calls for

22  speculation.

23         **THE COURT:**  All right.  If counsel could

24  approach, please.

25            (WHEREUPON, a bench conference was had out of the

1  hearing of the jury, as follows:)

2           **MR. SAFEEULLAH:**  I can rephrase the question.

3           **MR. LUCAS:**  It's not even that.  He --

4           (Reporter clarification.)

5        **THE COURT:**  Wait, let's stop right there for a

6  moment.  Are you going to withdraw the question and ask

7  another one?

8           **MR. SAFEEULLAH:**  That's correct.

9        **THE COURT:**  That will take care of it, and if you

10  got an objection to the next one, we'll --

11           **MR. LUCAS:**  That's fair.

12        **THE COURT:**  All right.  Thank you.

13           (WHEREUPON, the bench conference concluded, and

14  the following took place within the presence and hearing of

15  the jury:)

16        **THE COURT:**  All right.  That question has been

17  withdrawn, and Mr. Safeeullah will ask another question.

18  **BY MR. SAFEEULLAH:**

19  Q.   Being from Honduras, are you familiar with street

20  gangs?

21  A.   No.

22        **THE COURT:**  Mr. Safeullah, have you established

23  that she's from Honduras?

24           **MR. SAFEEULLAH:**  Yes, I think she testified that

25  she was born in Honduras.

1          THE COURT:  Did she?

2          MR. LUCAS:  Your Honor, I don't think so.

3          THE COURT:  Yeah, I don't think so,

4   Mr. Safeeullah.  So I just don't want the question to assume

5   facts not in evidence.  You may want to cover that.

6   BY MR. SAFEEULLAH:

7   Q.    Ms. Caceres, where were you born?

8   A.    In Honduras.

9   Q.    Do you know anything about gangs?

10  A.    No.

11  Q.    Do you know anything about the MS-13 gang?

12         MR. LUCAS:  Objection, Your Honor.  The witness

13  just testified -- he asked her did she know anything about

14  gangs and she said no.

15         THE COURT:  Well, here's -- all right.  I will --

16  the question -- the question was about gangs.  I will

17  sustain the question to the extent it asked about the MS-13

18  gang.  But, Mr. Safeeullah, you may ask about MS-13 without

19  reference to the word "gang" because that would not actually

20  technically have been covered by your prior question

21  necessarily.

22         MR. SAFEEULLAH:  Okay.

23  BY MR. SAFEEULLAH:

24  Q.    After you heard Jorge Flores say he was with the 18th

25  and he deserved it, did you continue to listen to that

1    conversation in the kitchen or did you go somewhere else?

2    A.    No.   I went to the room.

3    Q.    And who did you go to the room with?

4    A.    With my sister.

5    Q.    And did you-all have a conversation about what you

6    just heard in the apartment?

7    A.    Yes.

8    Q.    Prior to Pelon's brother being murdered, did

9    Jorge Flores have an MS-13 tattoo on his back?

10           **MR. LUCAS:**  Your Honor, I'm going to have an

11   objection.  Can we approach the bench?

12           **THE COURT:**  You may.

13           (WHEREUPON, a bench conference was had out of the

14   hearing of the jury, as follows:)

15           **MR. LUCAS:**  Here's my concern, Your Honor.  He's

16   asking her questions, and there's absolutely no foundation

17   laid.  If anybody disagrees with me, please chime in, but

18   there's absolutely no foundation laid that she even knows

19   what MS-13 is.  There's no foundation been laid that she

20   knows what an MS-13 tattoo would look like.  There's --

21           **THE COURT:**  Okay.  Why don't -- in response to

22   that objection, you can say anything you want,

23   Mr. Safeeullah.  My initial thought is, you can either lay a

24   foundation as to whether she knows what an MS-13 tattoo is,

25   or you can ask her about the tattoos without the question

1    being -- incorporating the notion of MS-13 tattoos and allow

2    her to describe the tattoos, probably one of those two

3    choices.  Does that make sense?

4               MR. SAFEEULLAH:  Yes, it does, Your Honor.

5               THE COURT:  Okay.  All right.  So are you good

6    with withdrawing the question and asking another one?

7               MR. SAFEEULLAH:  Yes, I am, Your Honor.

8               THE COURT:  We'll proceed that way from here.

9               (WHEREUPON, the bench conference concluded, and

10   the following took place within the presence and hearing of

11   the jury:)

12              MR. SAFEEULLAH:  Your Honor, I move to withdraw

13   that last question.

14              THE COURT:  All right.  Thank you.  That last

15   question is withdrawn, Mr. Safeeullah.  You may ask another.

16   BY MR. SAFEEULLAH:

17   Q.    Prior to Pelon's brother's murder, did Jorge Flores

18   have a tattoo on his back?

19   A.    No.

20   Q.    After Pelon's brother's murder, did Jorge Flores get a

21   tattoo on his back?

22   A.    Yes.

23   Q.    And you were living with him at the time?

24   A.    Yes.

25   Q.    You saw him with his shirt off?

1   A.      Yes.

2   Q.      What tattoo did he get on his back?

3   A.      Of the MS.

4   Q.      Who did he go and get this tattoo with?

5   A.      With Humilde.

6   Q.      Do you know Humilde's real name?

7   A.      Javier.

8   Q.      Do you know his last name?

9   A.      Avila.

10  Q.      Around this time frame, when your child passed away,

11  where was the other twin?

12  A.      At the hospital.

13  Q.      Did you have a car at the time?

14  A.      No.

15  Q.      So how did you get to the hospital to see your child?

16  A.      Jorge saw to it how to -- I -- to take me to the

17  hospital, how I would go to the hospital.

18  Q.      And was there a time that he picked you up in a Ford

19  pickup truck?

20  A.      Yes.

21  Q.      How many doors were on that truck?

22  A.      Four.

23  Q.      What color was that truck?

24  A.      Gray.

25  Q.      Was a person named Miklo with him when he picked you

1    up?

2    A.    Yes.

3    Q.    And what's Miklo's real name?

4    A.    Kevin.

5    Q.    What did Jorge tell you about Miklo?

6    A.    That he wanted to join them, to join the gang.

7    Q.    After Pelon's brother's murder, did you learn about

8    another murder that occurred on May 27th, 2017 outside of a

9    convenience store, that started at a convenience store?

10   A.    Yes.

11   Q.    Did you look at pictures from outside of that store?

12   A.    Yes.

13   Q.    And what type of vehicle was sitting outside of that

14   store?

15   A.    A gray four-door truck.

16   Q.    Did you have a conversation with Jorge Flores about

17   that photograph and that pickup truck?

18   A.    Yes.

19   Q.    What did you tell him or what did you ask him?

20   A.    That there was the picture where you could see Miklo

21   and that there was somebody driving that looked like him.

22   Q.    And what was Jorge's response to you when you said

23   that to him?

24   A.    Jorge would always respond to me like, no, that's not

25   me, no.

1  Q.   Around the end of May 2017, were you still talking

2  with Jorge Flores?

3  A.   Yes.

4  Q.   Were you-all still talking and being together in June

5  and July of 2017?

6  A.   Yes.

7  Q.   Were you-all still caring for your children together?

8  A.   Yes.

9  Q.   Would you and Jorge Flores ride in the same car

10 together?

11 A.   Yes.

12 Q.   Would you-all go grocery shopping together?

13 A.   Yes.

14 Q.   Was there a time that he left a gun in your sister's

15 car and he got it out of the car?

16 A.   Yes.

17 Q.   Who was with you when he got the gun out of the car?

18 A.   My sister.

19 Q.   What's your sister's name?

20 A.   Bessie Carolina Caceres.

21 Q.   When he got this gun out of the car, was someone

22 recording you-all?

23 A.   Yes.

24 Q.   And where were they recording from?

25 A.   From inside.

1  Q.    And where were you, Jorge Flores, and your sister,

2  Bessie Caceres, when they were recording?

3  A.    Outside.

4  Q.    And where did Jorge Flores get the gun from?

5  A.    From the trunk of the car.

6  Q.    Have you previously watched two recordings from that

7  day?

8  A.    Yes.

9  Q.    Are you seen in one of those recordings?

10  A.    Yes.

11         MR. SAFEEULLAH:  Your Honor, may I approach?

12         THE COURT:  You may.

13  BY MR. SAFEEULLAH:

14  Q.    I'm passing up what's been previously marked as United

15  States Exhibit Nos. 746 and 747.

16         Have you looked at those disks before coming into

17  court today?

18  A.    Yes.

19  Q.    Do the videos on those disks depict what you just

20  described a couple of moments ago?

21         THE COURT:  Let me -- oh, sorry about that.  Why

22  don't you rephrase that again.  I think it -- I think the

23  fact assumes that what's on the disks are videos.  The

24  question, the way you asked it:  "Do the videos on these

25  disks depict."  So you may want to inquire if she's familiar

1  with the contents of the disk.

2  **BY MR. SAFEEULLAH:**

3  Q.    Are you familiar with the content that's on those

4  disks?

5  A.    Yes.

6  Q.    Did you watch what's on those disks?

7  A.    Yes.

8  Q.    What's on those disks?

9  A.    What is there is when Jorge was taking out the gun

10  from the trunk of the car.

11  Q.    Is it a video on each disk?

12  A.    No, they're different.

13  Q.    So each disk has a different video?

14  A.    Yes.

15  Q.    And did you initial the disks to signify that you

16  watched the video -- the videos on those disks?

17  A.    Yes.

18        **MR. SAFEEULLAH:**  Your Honor, I move to admit into

19  evidence United States Exhibit Nos. 746 and 747 and request

20  permission to publish them to the jury.

21        **THE COURT:**  Seeing no objection, they will be

22  admitted without objection.  746 and 747 are admitted and

23  may be published.

24        (Government Exhibits 746 and 747 were marked and

25  admitted into evidence.)

1          **MR. SAFEEULLAH:**  Can we play United States

2     Exhibit 746, please.

3               (Playing video.)

4          **MR. SAFEEULLAH:**  Can we pause it at this point.

5     **BY MR. SAFEEULLAH:**

6     Q.    Ms. Caceres, what street is this house on where this

7     video was being taken?

8     A.    I don't remember.

9     Q.    Okay.  That's fine.

10          Can you see the back of the car in this video?

11    A.    Yes.

12    Q.    Do you see two people behind that car?

13    A.    Yes.

14    Q.    Is one of them a female?

15    A.    Yes.

16    Q.    Who is that female?

17    A.    That's me.

18    Q.    Who is the other person?

19    A.    Jorge.

20    Q.    And you're talking about Jorge Flores?

21    A.    Yes.

22          **MR. SAFEEULLAH:**  Can we play the video, please.

23               (Playing video.)

24          **MR. SAFEEULLAH:**  Can we stop the video.

25    ///

1    BY MR. SAFEEULLAH:

2    Q.    What did Jorge Flores just get out of that car?

3    A.    A weapon.

4    Q.    Was it a gun?

5    A.    Yes.

6    Q.    Was it a short gun or a long gun?

7    A.    Long.

8              MR. SAFEEULLAH:  If the Court would allow me,

9    could I see Exhibit No. 1 again?

10             THE COURT:  You may.

11             MR. SAFEEULLAH:  Thank you, Your Honor.

12   BY MR. SAFEEULLAH:

13   Q.    I'm holding up what's now United States Exhibit No. 1.

14   When you say a long gun, are you talking about a gun this

15   size?

16   A.    Of that size.

17   Q.    Thank you.

18             MR. SAFEEULLAH:  If we could play the video,

19   please.

20             (Playing video.)

21             MR. SAFEEULLAH:  Can we pause the video and

22   just -- maybe let it go one more second and pause it,

23   please.  I'm sorry.  One more click.  Thank you.

24   BY MR. SAFEEULLAH:

25   Q.    What color is that car that Jorge Flores just put that

1  firearm into?

2  A.     White.

3  Q.     What's the make of that car?

4  A.     Toyota.

5          **MR. SAFEEULLAH:**  If we could play the rest of the

6  video, please.

7          (Playing video.)

8          **MR. SAFEEULLAH:**  Thank you.  Can we please play

9  United States Exhibit No. 747.

10         (Playing video.)

11 **BY MR. SAFEEULLAH:**

12 Q.   Is this video from the same day as the first video

13 that we just watched?

14 A.     Yes.

15 Q.   And the white car that we see in this video, is this

16 the car --

17         **MR. SAFEEULLAH:**  Can you pause it, please.  I'm

18 sorry.  One more.  Pause it.

19 **BY MR. SAFEEULLAH:**

20 Q.   Is this the car that Jorge Flores just put the firearm

21 into?

22 A.     Yes.

23 Q.   I want you to look at the back bumper of this car on

24 the passenger side.  Do you see something on that back

25 bumper?

1    A.    Yes.

2    Q.    What's on that back bumper?

3    A.    It has like a -- it has like a scratch there.

4    Q.    Thank you.

5         **MR. SAFEEULLAH:**  Can you continue to play the

6    video.

7         (Playing video.)

8         **MR. SAFEEULLAH:**  Thank you.  You can take the

9    video down.

10   **BY MR. SAFEEULLAH:**

11   Q.    In early August of 2017, were you and your relatives

12   still living at the address that was depicted in those

13   videos?

14   A.    Yes.

15   Q.    Did the police show up on that day?

16   A.    Yes.

17   Q.    Prior to the police showing up on that day, had you

18   seen Jorge Flores at that residence?

19   A.    Yes.

20   Q.    What type of car was he in?

21   A.    In a white Toyota.

22   Q.    Did you and your family members move from that

23   residence after the police showed up that day?

24   A.    Yes.

25   Q.    And did you and Jorge Flores move into a place with

1  your children that had an upstairs and a downstairs?

2  A.    Yes.

3  Q.    And who rented this property to you and Jorge Flores?

4  A.    Frank's sister.

5  Q.    Do you know Frank's last name?

6  A.    Hernandez.

7  Q.    Do you know if Franklin Hernandez has a nickname?

8  A.    Happy.

9  Q.    So Happy's or Franklin Hernandez's -- Frank

10  Hernandez's sister was renting you and Jorge Flores a place

11  in their residence?

12  A.    Yes.

13  Q.    Can you look at -- in that booklet there to your

14  right, there's some booklets to your right, Ms. Caceres.

15  And there are some that have 1139 through 1144 in there.  Do

16  you see those?

17            **THE COURT:**  1127?

18            **MR. SAFEEULLAH:**  That's correct, Your Honor.

19            **THE COURT:**  Okay, yeah.  Starting with 1127.

20  It's this volume.

21  **BY MR. SAFEEULLAH:**

22  Q.    And can you turn to United States Exhibit 1139.

23            **THE INTERPRETER:**  How does this --

24            **MR. SAFEEULLAH:**  On the end of the tablet, you

25  should see numbers.

1    BY MR. SAFEEULLAH:

2    Q.    Do you see 1139?

3    A.    Yes.

4    Q.    Can you look at 1140, the next one?

5    A.    Yes.

6    Q.    Can you look at 1141, the one after that?

7    A.    Yes.

8    Q.    Can you also look at 1144?

9    A.    Yes.

10   Q.    Do those four pictures depict or show the residence

11   that you were living at with Jorge Flores that Franklin

12   Hernandez's sister rented you?

13   A.    Yes.

14   Q.    And this is the place that you-all were living after

15   you moved from the residence that was in the video?

16   A.    Yes.

17          MR. SAFEEULLAH:  Your Honor, I move to admit into

18   evidence United States Exhibits 1139, 1140, 1141, and 1144,

19   and request permission to publish them to the jury.

20          THE COURT:  All right.  Absent objection,

21   Government Exhibits 1139, 1140, 1141, and 1144 are admitted

22   and may be published.

23          (Government Exhibits 1139, 1140, 1141, and 1144

24   were marked and admitted into evidence.)

25   ///

**BY MR. SAFEEULLAH:**

1

2 Q.    Can we pull up United States Exhibit 1139, please.

3       What are we looking at in this photograph?

4 A.    The place where we lived at.

5 Q.    And how do you walk into this residence?

6 A.    Well, it's there in the front door where the people in

7 this photo are at.

8 Q.    Where that officer is standing, that's how you enter

9 into the residence?

10 A.    Yes.

11 Q.    Can we pull up United States Exhibit 1140, please.

12       What are we looking at in this picture?

13 A.    The living room.

14 Q.    Is this like looking from the front door into the

15 living room?

16 A.    Yes.

17 Q.    What's on the other side of that wall that has the

18 glass in it?

19 A.    That's the kitchen.

20 Q.    Can we please pull up United States Exhibit 1141,

21 please.

22       What are we looking at in this photograph?

23 A.    It's part of the living room that we had been -- that

24 we saw, and then to the other side is the bedroom and the

25 bathroom further on.

1  Q.    And were you and Jorge Flores staying in that bedroom

2  that's on the first floor down where the officers are?

3  A.    Yes.

4  Q.    Can we pull up United States Exhibit 1144.

5        What is this is photograph of?

6  A.    The room where we slept.  That's the bed, and on the

7  side there is where my daughter slept.

8  Q.    So that was a baby crib in this room?

9  A.    Yes.

10 Q.    Can you turn to United States Exhibit 1163 in the book

11 in front of you.

12 A.    Yes.

13 Q.    And is that the baby crib that you just described to

14 us?

15 A.    Yes.

16 Q.    That was in the bedroom of the residence that we just

17 looked at?

18 A.    Yes.

19        **MR. SAFEEULLAH:**  Your Honor, I move to admit into

20 evidence United States Exhibit 1163 and request permission

21 to publish it to the jury.

22        **THE COURT:**  All right.

23        **MR. LUCAS:**  Your Honor, I'm going to object.  May

24 we approach?

25        **THE COURT:**  You may.

1          (WHEREUPON, a bench conference was had out of the

2     hearing of the jury, as follows:)

3          **MR. LUCAS:**  Your Honor, all he's testifying to is

4     the --

5          (Reporter clarification.)

6          **MR. LUCAS:**  -- different than the other picture

7     that has the guns sitting there.  There's no context for it

8     or anything.  He's just asking to put it in.  There's no

9     foundation.  I mean, this picture is more prejudiced than

10    probative at this point.  Now, it may become probative at a

11    point, but at this point --

12         **THE COURT:**  So in other words, there has been not

13    even any showing of a picture of the crib making a fact of

14    consequence to this action more likely than not?

15         **MR. LUCAS:**  Right.

16         **THE COURT:**  Fair enough?  Okay.

17         Response?  What is the purpose for which this

18    picture of a crib is being offered?

19         **MR. SAFEEULLAH:**  It is a crib that their child

20    slept in inside of their residence, and there is a firearm

21    in the crib.  And she said that Jorge Flores lived there

22    because this is where they lived, and he's on trial for

23    being a felon in possession of a firearm.

24         **THE COURT:**  Well, let me say this.  Obviously,

25    the key there is the -- the particularly important thing is

1  the fact that it apparently has a firearm depicted, right?

2          **MR. LUCAS:**  Yes.

3          **THE COURT:**  All right.  Does that not make it

4  relevant, at least minimally relevant?

5          **MR. LUCAS:**  I don't -- there's no context to how

6  it got there.  There's no context to -- I mean, yes, he

7  lives in the house, but there's no context to how it got

8  there, whether somebody else brought it into the house.

9  There's just no context to it at all.

10         **THE COURT:**  All right.  So --

11         **MR. LUCAS:**  I didn't object to the other one, but

12  this one --

13         **MR. SAFEEULLAH:**  I'm wondering what is the

14  objection?  Is it under 401 or is it under 403?

15         **MR. LUCAS:**  The objection is, is that it's more

16  probative than -- it's more prejudicial than probative at

17  this point.

18         **THE COURT:**  All right.  So it sounds like --

19  sounds like it's a 403 objection.  To me, maybe part of what

20  he's saying is, well, we don't know when these were taken.

21  And I think a big part of that is that that can be the kind

22  of thing that would be certainly, if we have any context for

23  that, sort of prop up the probative value.

24         Were you going to have someone come in later and

25  talk about taking these photos?

1          **MR. SAFEEULLAH:**  That's correct, Your Honor.

2          **THE COURT:**  Okay.  Why don't we do this:  Why

3    don't you show it to her, and here's my -- is she able to

4    say from personal knowledge when the photo was taken?

5          **MR. SAFEEULLAH:**  No, she's not.

6          **THE COURT:**  Do you want to ask her about that to

7    lay the foundation, and then when -- and I think it's fair

8    enough to say, to close the loop on its relevance, someone

9    to talk about sort of when this was taken, offer it at that

10   time.

11         **MR. SAFEEULLAH:**  Okay.

12         **THE COURT:**  Does that --does that work?

13         **MR. SAFEEULLAH:**  Yes.  It does, yes.

14         **THE COURT:**  Okay.  Thank you.

15         (WHEREUPON, the bench conference concluded, and

16   the following took place within the presence and hearing of

17   the jury:)

18   **BY MR. SAFEEULLAH:**

19   Q.    Ms. Caceres, in United States Exhibit 1163, is there a

20   baby crib in that photograph?

21   A.    Yes.

22   Q.    Were you present when this photograph was taken?

23   A.    No.

24   Q.    Do you know who took this photograph?

25   A.    No.

```
1    Q.    But this photograph depicts the baby crib that was
2    next to the bed where you and Jorge Flores slept?
3    A.    Yes.
4    Q.    Who lived upstairs in this residence?
5    A.    Frank's sister.
6    Q.    I want to talk to you about one night when you were
7    living in this residence.  Did Jorge Flores come back home
8    and you had to assist him medically?
9    A.    Yes.
10   Q.    And what did you -- what part of his body did you
11   assist him with?
12   A.    In his hand.
13   Q.    What was wrong with his hand?
14   A.    It was burned.
15   Q.    Did you ask him, like, hey, what's happened with your
16   hand?  Where did you get this burn from?
17   A.    Yes.
18   Q.    And what did he tell you?
19   A.    Just to help him with it.
20   Q.    And how did you help him with it?
21   A.    I put mayonnaise on his hand.
22   Q.    After -- do you know when Jorge Flores got locked up?
23   A.    Well, I don't know the exact date.
24   Q.    Was it in 2017?
25   A.    I don't remember the exact date.
```

1   Q.    After he was arrested, did you still talk with

2   Jorge Flores?

3   A.    Yes.

4   Q.    But did you subsequently get into another

5   relationship?

6   A.    Yes.

7   Q.    Did that relationship produce a child?

8   A.    Yes.

9   Q.    Would it be fair to say, though, that you still care

10   for Jorge Flores?

11   A.    No.

12   Q.    Were you told by law enforcement that you had to show

13   up to court pursuant to a subpoena?

14   A.    Yes.

15   Q.    But if it was up to you, you would probably not want

16   to be here?

17   A.    Yes.

18   Q.    Even though you don't want to be here testifying, were

19   you telling the truth or were you not telling the truth?

20           **MR. HAWKINS:**  Your Honor?

21           **THE COURT:**  Yes.

22           **MR. HAWKINS:**  Bolstering.

23           **THE COURT:**  All right.  I'm going to sustain the

24   objection, and we'll see if it's a question that can be

25   asked on any hypothetical redirect.

1   **BY MR. SAFEEULLAH:**

2   Q.    What's the most important thing for you to do here

3   today?

4   A.    I don't understand the question.

5   Q.    You're here testifying in federal court, and you took

6   an oath to tell the truth.

7   A.    Yes.

8   Q.    And --

9           **MR. LUCAS:**  Your Honor, same objection.  At this

10  time also, this is -- this whole exercise is basically an

11  exercise in leading the witness.

12          **THE COURT:**  All right.  Let's approach.

13          (WHEREUPON, a bench conference was had out of the

14  hearing of the jury, as follows:)

15          **THE COURT:**  All right.  I'm going to start with

16  my general views on this, and to tell you the truth, I

17  haven't -- I don't recall looking at Sixth Circuit case law

18  on this.  I remember very strongly from the -- my days doing

19  these kinds of cases on the Third Circuit.  The Third

20  Circuit's view was, listen, fair point, it's sort of

21  bolstering, but the Third Circuit would allow this to be

22  done on the front end when everyone kind of knew attacks on

23  credibility were coming.  All right.  Do it on front end,

24  you know, including things -- you know, including things

25  like in cooperating plea agreements, talking about, you

know, the incentives to testify truthfully or not.

And that sort of testimony does come before an attack on credibility, and therefore, it is sort of challengeable as being premature. But the Third Circuit would let it slide.

I don't know that the Sixth Circuit takes the same approach. I think technically, it's probably a valid objection.

Now, what I want to know, if anyone wants to tell me, if you want to tell me, Mr. Lucas -- and I'm not going to make you tell me, but you can if you want, if it's in your client's interests, right? Are we going to have an attack on credibility?

**MR. LUCAS:** At this point, I don't intend on it.

**THE COURT:** Okay. Particularly with that understanding, I will sustain the objection to more questions about whether she's sort of telling the truth with, of course, the understanding that if this does happen, if you choose to do that, then this can be brought out on redirect.

**MR. LUCAS:** Understood.

**THE COURT:** Just so you know, my thought is, we were able to skip the morning break, I was thinking of maybe -- particularly since we're breaking a little early, maybe like 20 till 12:00, let them go early. We'll skip a

1    break, catch up a little bit.  Start maybe up about

2    12:40-ish.  All right?

3              MR. SAFEEULLAH:  So we'll come back and -- you

4    think we'll come back and cross-examine her?

5              THE COURT:  Yeah.  And I don't know how much

6    longer you have.

7              MR. SAFEEULLAH:  Not much longer at all.

8              THE COURT:  Maybe when we finish up, it will be a

9    little bit early.  Do you think you'll go a while?

10             MR. LUCAS:  Me, personally?  I don't intend on

11   it, no, not at all.

12             THE COURT:  Okay.  And I don't know if it makes

13   sense to break.  Would you request to break right after

14   direct, or do you want to start?  Obviously it's a question

15   of relevance.  Do you want to keep the same order?

16             Were you going to have much?

17             MR. GANGULI:  Your Honor, I don't think I'll be

18   lengthy.  With that said, I will have some questions.

19             THE COURT:  Okay.  Why don't we do this.  We'll

20   allow Mr. Ganguli to go, and then we'll take a break, give

21   them about a hour, and then come back and finish cross.

22             IN UNISON:  Thank you, Your Honor.

23             THE COURT:  Thank you.

24             (WHEREUPON, the bench conference concluded, and

25   the following took place within the presence and hearing of

```
 1   the jury:)
 2              THE COURT:  All right.  Folks, we were talking
 3   about a couple of things there.  That last question, you can
 4   disregard, folks.
 5              We talked a little bit about scheduling.  We'll
 6   go a few more minutes.  We're going to break early for
 7   lunch.  Given that we started late and given what I'm about
 8   to tell you, it makes sense to break a little bit early.
 9              We're going to stop about 4:25 today because the
10   Court has a pressing matter that it needs to try and slip in
11   on the back end, so we'll break a little bit early at 4:25.
12   So the lunch break will be a little bit early.  We'll give
13   you, again, as usual, an hour, but we'll break a little bit
14   early.
15              All right.  Mr. Safeeullah, you may ask another
16   question.
17              MR. SAFEEULLAH:  I just have a few questions
18   left.
19   BY MR. SAFEEULLAH:
20   Q.    Ms. Caceres, do you see Jorge Flores in the courtroom
21   today?
22   A.    Yes.
23   Q.    What type of shirt is he wearing?
24   A.    A long-sleeved black shirt.
25   Q.    And is he sitting towards my left?
```

```
 1   A.    Yes.
 2             MR. SAFEEULLAH:  Let the record reflect that this
 3   witness has identified Jorge Flores.
 4             THE COURT:  Okay.  Any objection?  No?  Okay.
 5   All right.  Absent objection, the record will so reflect.
 6   BY MR. SAFEEULLAH:
 7   Q.    Do you also see Miklo in the courtroom today?
 8   A.    Yes.
 9   Q.    And that's the person you identified as Kevin?
10   A.    Yes.
11   Q.    And could you describe what he's wearing?
12   A.    A long-sleeved shirt, light blue, sky blue.  Sky blue.
13   Q.    And is he also seated to my left?
14   A.    Yes.
15             MR. SAFEEULLAH:  Let the record reflect that this
16   witness has identified Miklo or Kevin.
17             THE COURT:  All right.  Absent objection, the
18   record will so reflect.
19   BY MR. SAFEEULLAH:
20   Q.    Do you also see your nephew, Jose Pineda, in the
21   courtroom today?
22   A.    Yes.
23   Q.    And what is he wearing?
24   A.    A long-sleeved shirt, also sky blue.
25   Q.    And is his hair pulled up in a little ponytail and is
```

1    he sitting to my left?

2    A.     Yes.

3           **MR. SAFEEULLAH:**   Let the record reflect that this

4    witness has identified Jose Pineda.

5           **THE COURT:**   All right.   Absent objection, the

6    record will so reflect.

7           **MR. SAFEEULLAH:**   I don't have any additional

8    questions at this time.

9           **THE COURT:**   Thank you, Mr. Safeeullah.

10           We will begin the cross-examination, just

11    questions from Mr. Ganguli, and then we'll have our

12    lunchtime break.

13                       **CROSS-EXAMINATION**

14    **QUESTIONS BY MR. GANGULI:**

15    Q.     Ms. Caceres, I'm going to ask you some questions.   And

16    with the Court's permission, if there's something that I ask

17    you that I'm unclear about, if you'll please tell me, I'll

18    back up and I'll try to do better.

19           Is that okay?

20    A.     Yes.

21    Q.     And none of the questions that I ask you are designed

22    to embarrass you.   Okay?

23    A.     Yes.

24    Q.     Ms. Caceres, are you in this country documented?

25    A.     No.

Q.    All right.   Are you familiar with the concept of a
U visa?

A.    Yes.

Q.    All right.   Since you're familiar with the concept of
a U visa, would you agree with me that it's a way for a
person who is undocumented to become documented?

A.    Yes.

Q.    So just to be clear, it's a way for a person who's not
documented to become a United States citizen?

A.    Yes.

Q.    Have you begun the process to get a U visa?

A.    No.   I already had my U visa when I entered the United
States.

Q.    Okay.   Is it fair to say that you're not a citizen
yet?

A.    No.

Q.    Okay.   Maybe I asked a bad question.

      Are you a citizen?

A.    No.

Q.    Is it fair to say that you intend to become a United
States citizen?

A.    One day, if God permits it.

Q.    I understand.

      I want to invite your attention to May of 2017.

          THE INTERPRETER:   I'm sorry, counsel?

1    **BY MR. GANGULI:**

2    Q.    I want to invite your attention to May of 2017.  At

3    that time, you and Mr. Flores were in a relationship; is

4    that right?

5    A.    Yes.

6    Q.    How long had you and Mr. Flores been in a

7    relationship?

8    A.    A year.

9    Q.    Okay.  And in that year that you and Mr. Flores had

10    been in a relationship, you'd had an opportunity to meet

11    some of his friends?

12    A.    Yes.

13    Q.    And one of the friends of Mr. Flores that you met was

14    a man named Miklo?

15    A.    Yes.

16    Q.    And would you agree with me that you see Miklo in the

17    courtroom today?

18    A.    Yes.

19    Q.    All right.  And Miklo would come around and hang out

20    in the place that you and Mr. Flores would stay?

21    A.    Yes.

22    Q.    Because he was friends with Mr. Flores, right?

23    A.    Yes.

24    Q.    So on May 21st, 2017, did I understand you correctly

25    that you had a child in the hospital?

1  A.   Yes.

2  Q.   At that time, Mr. Flores was in a gray truck, right?

3  A.   Yes.

4  Q.   Did you tell us that Miklo was also in that gray

5  truck?

6  A.   Yes.

7  Q.   Okay.  What time of day or night did you see Miklo in

8  that gray truck?

9  A.   We used to go see our daughter at night.

10  Q.   All right.

11  A.   But I couldn't tell you what time it was, what hours

12  when that was.

13  Q.   I understand.  Because it's been six years ago, and

14  you probably weren't looking at your watch, right?

15  A.   Of course.

16  Q.   But with that said, was it early in the evening or was

17  it close to midnight?

18  A.   I don't remember.

19  Q.   All right.  And that's fine.  Was Miklo in the truck

20  with Mr. Flores when you went to go to the hospital?

21  A.   Yes.

22  Q.   All right.  Is it fair to say that you got dropped off

23  at the hospital?

24  A.   They would drop me off at the hospital.

25  Q.   Okay.  But you don't know where Miklo went after you

```
1   got dropped off?

2   A.     No.

3   Q.     And that night when Miklo was in the truck, did you

4   see Miklo with a gun?

5   A.     No.

6   Q.     All right.  Did you tell us that you saw Miklo again

7   with Mr. Flores on May 27th, 2017?

8   A.     I don't remember the date.

9   Q.     All right.  So after May 21st of 2017, did you see

10  Miklo again with Mr. Flores?

11  A.     I'm not correct on the dates, but I do know that I saw

12  him with him.

13  Q.     All right.  And tell us about that day that you saw

14  Miklo with Mr. Flores.

15  A.     What can I tell you?  They took me to see my daughter

16  and that was all.

17  Q.     Right.  So maybe I misunderstood.  So on both

18  occasions, it was pretty much the same fact pattern?

19  A.     I don't understand the question.

20  Q.     So on both days, they were together in the truck?

21  A.     I couldn't tell you the dates, but -- what the exact

22  dates were, but I can say that I did see him with him.

23  Q.     Okay.  And on both occasions, you didn't see Miklo

24  with a gun?

25  A.     No.
```

1    Q.    And you don't know where Miklo went after you got

2    dropped off?

3    A.    No.

4          MR. GANGULI:  Thank you.  No further questions,

5    Your Honor.

6          THE COURT:  All right.  Thank you, Mr. Ganguli.

7          What we'll do is break for an hour here, folks.

8    We'll aim to pick back up about 12:40, and appreciate our

9    jurors continuing to follow my admonition about no speaking

10   about the case, no research, no investigation.  Thanks for

11   your continued adherence to that.

12         All right.  Folks may step down now.  Thank you.

13         (WHEREUPON, the jury was excused from the

14   courtroom at 11:44 a.m., with matters being heard in open

15   court as follows:)

16         THE COURT:  All right.  Thanks, folks.  Please be

17   seated.  Anything that needs to be discussed before we

18   reconvene, Mr. Safeeullah?

19         MR. SAFEEULLAH:  No, Your Honor.  Just, what time

20   did you envision us coming back to recommence the

21   cross-examination of Ms. Caceres?

22         THE COURT:  Yeah, I had told them 1:40 -- I mean,

23   excuse me -- 12:40, and I suppose if there are no matters

24   anyone anticipates taking up, 12:40 should be fine for

25   everyone else, and then we'll just bring them in.

```
 1              Anything from the defense side?

 2              MS. HOOD-SCHNEIDER:  Hold on, Your Honor.

 3              THE COURT:  Yes.

 4              (Respite.)

 5              MS. HOOD-SCHNEIDER:  Nothing further.

 6              THE COURT:  All right.  Ms. Hood-Schneider, one

 7  final thing.  I believe that you did get a Rule 17 subpoena

 8  for you to fill out.  Is that correct?

 9              MS. HOOD-SCHNEIDER:  Yes, Your Honor.

10              THE COURT:  Okay.  All right.  Squared away then.

11              All right, folks.  We'll see everybody at 12:40.

12  Thank you.

13              (Lunch recess 11:46 a.m. to 12:48 p.m.)

14              THE COURT:  All right.  Do we have any

15  preliminary matters?

16              MR. SAFEEULLAH:  Nothing substantial from the

17  United States.  However, when this witness finishes

18  testifying, the United States would like to read into the

19  record two stipulations between the United States and

20  Mr. Flores.

21              THE COURT:  Okay.  Very well.  We will proceed

22  accordingly and if, presumably, I'll be able to keep that in

23  mind.  If I ask you to call your next witness, you just tell

24  me that instead, you're going to proceed with a stipulation.

25  But hopefully I'll keep that in mind.
```

```
1              So we'll read those two stipulations after the
2    cross are completed.
3              All right.  Anything from the defense?
4              Okay.  All right.  We'll call in the jurors.
5              (WHEREUPON, the jury re-entered the courtroom at
6    12:50 p.m., with matters being heard in open court as
7    follows:)
8         THE COURT:  Thanks, folks.  Please be seated.
9              All right, folks.  You'll recall when we broke,
10   we had completed one cross-examination of Ms. Caceres, and
11   now counsel for Mr. Flores may cross-examine as they see
12   fit.
13             Mr. Lucas?
14        MR. LUCAS:  We have no questions for this
15   witness, Your Honor.
16        THE COURT:  Okay.  Very well.  Thank you very
17   much.
18             Then we have Mr. Mothershead?
19        MR. MOTHERSHEAD:  No questions.
20        THE COURT:  All right.  Mr. Bloom?
21        MR. HAWKINS:  No questions for this witness, Your
22   Honor.
23        THE COURT:  All right.  Thank you, Mr. Hawkins.
24             Then Ms. Caceres may step down.  Thank you.
25             (The witness stepped down.)
```

1        THE COURT:  All right.  Mr. Safeeullah, how would

2   the government want to proceed next?

3        MR. SAFEEULLAH:  Your Honor, the United States

4   would like to read into the record two stipulations between

5   the United States and Defendant Jorge Flores.

6        THE COURT:  All right.  You may proceed.

7        And, ladies and gentlemen, before he proceeds, I

8   should probably note something that I indicated earlier,

9   which is that a stipulation really is an agreement between

10  two parties -- in this case, it sounds like it's Mr. Flores

11  and the government -- that certain facts are true.

12        And, Mr. Safeeullah, is it your understanding

13  that none of the other defendants dispute the truth of these

14  facts either?

15        MR. SAFEEULLAH:  No.  It's not our -- I mean, it

16  is our understanding that this stipulation is just between

17  Mr. Flores and the United States, and it relates to his

18  status of being convicted of a crime punishable by a year;

19  and also, the firearms, that they were manufactured outside

20  of the state of Tennessee.

21        THE COURT:  Okay.  Sounds then like counsel for

22  none of the other defendants would have a dog in the hunt,

23  but since the jury would be instructed to treat these facts

24  as true for all purposes, I just want to make sure.

25        Any defendant disagree with the stipulation?

1      All right.  What this means, folks, is that this

2   is an agreement between Mr. Flores and the government that

3   certain facts are true, and Mr. Safeeullah will read to you

4   what these facts are.  And I instruct you that you would

5   need to and do need to treat these facts as established just

6   as the parties have agreed to them.

7      All right, Mr. Safeeullah.  You may proceed.

8      **MR. SAFEEULLAH:**  "It is hereby stipulated and

9   agreed among the parties that:

10     "The Romarm SA/Cugir (imported by

11  I.O. Incorporated), Model STG2000C, 7.62x.39 caliber rifle,

12  with serial number G-0583-06, admitted as United States

13  Exhibit 1, is a firearm as defined under Title 18, United

14  States Code, Section 921(a)(3), in that it is a weapon which

15  will, or is designed to, or may readily be converted to,

16  expel a projectile by the action of an explosive.

17     "The Romarm SA/Cugir (imported by I.O.

18  Incorporated), Model STG2000C, 7.62x.39 caliber rifle, with

19  serial number G-0583-06, admitted as United States Exhibit

20  No. 1, was manufactured outside of the State of Tennessee,

21  and was transported across state lines into the State of

22  Tennessee, thereby affecting interstate commerce.

23     "2:  The Glock Model GmbH (imported by Glock,

24  Incorporated) Model 30, .45 caliber pistol, with serial

25  number GBE515, admitted as United States Exhibit No. 2, is a

1  firearm as defined under Title 18, United States Code,

2  Section 921(a)(3), in that it is a weapon which will, or is

3  designed to, or may readily be converted to, expel a

4  projectile by the action of an explosive.

5          "The Glock GmbH (imported by Glock Incorporated),

6  Model 30, .45 caliber pistol, with serial number GBE515,

7  admitted as United States Exhibit No. 2, was manufactured

8  outside of the State of Tennessee, and was transported

9  across state lines into the State of Tennessee, thereby

10 affecting interstate commerce.

11          "3:  The Palmetto --"

12          Your Honor?

13          **THE COURT:**  Yes, sir.

14          **MR. SAFEEULLAH:**  I think part of the stipulation

15 agrees to facts that aren't into evidence yet.

16          **THE COURT:**  You want to read the remaining parts

17 of this later?

18          **MR. SAFEEULLAH:**  Yes, let me do that.

19          But as far as the second stipulation that the

20 United States would read relates to Mr. Jorge Flores:

21          "It is hereby stipulated among the parties that:

22          "Before August 4, 2017, the defendant,

23 Jorge Flores, was convicted of a crime punishable by

24 imprisonment for more than one year.

25          "Before August 4, 2017, the defendant,

1    Jorge Flores, knew he had been convicted of a crime

2    punishable by imprisonment for more than one year."

3              And it is so stipulated by the parties.

4              And this is tagged as United States Exhibit

5    No. 1330.

6              **THE COURT:**  All right.  We'll get to the other

7    one later.  Part of that's been read; you can read the other

8    part later if and when the time comes.

9              Any objections to its being admitted in paper

10   form into evidence?  We're talking about 1330.  Okay, don't

11   see any objections, so 1330 will be admitted into evidence

12   and, as indicated, the jurors are to accept these facts as

13   true.

14             (Government Exhibit 1330 was marked and admitted

15   into evidence.)

16             **THE COURT:**  Regarding the first stipulation, two

17   of the four components, folks, have been read into evidence.

18   The other two parts, the government may read into evidence

19   later.  But the first two parts, you should accept as true,

20   and we'll get to the other two parts of that stipulation.

21             Mr. Safeeullah, just to clarify terminology, is

22   it your understanding that that reference to GmbH, that's

23   really a reference to a German corporation, right, or

24   Austrian or something like that?

25             **MR. SAFEEULLAH:**  To be honest, Your Honor, I'm

1    not really sure.

2              **THE COURT:**  Don't really know?  Yeah.  So GmbH,

3    but that's -- you would say in any event, that's not a

4    reference to anything other than sort of part of the name of

5    the company that makes this model, right?

6              **MR. SAFEEULLAH:**  That's correct, Your Honor.

7              **THE COURT:**  All right.  Thank you.

8              All right.  Mr. Safeeullah, does the government

9    wish to call another witness at this time?

10             **MR. HOFF:**  Yes, Your Honor.  The government calls

11   Ethan Luffman.

12             **THE COURT:**  All right.  He may come forward.

13             (The witness was sworn.)

14             **MR. HOFF:**  May I proceed, Your Honor?

15             **THE COURT:**  You may.

16             **MR. HOFF:**  Thank you.

17                        *    *    *

18                   <u>**ETHAN LUFFMAN,**</u>

19   **was called as a witness, and after having been first duly**

20   **sworn, testified as follows:**

21                   **DIRECT EXAMINATION**

22   **QUESTIONS BY MR. HOFF:**

23   Q.    Sir, can you please state and spell your name for the

24   record.

25   A.    It's Ethan Luffman, E-T-H-A-N, L-U-F-F-M-A-N.

Q.    And, Mr. Luffman, in 2016, where did you work?

A.    The Metropolitan Police Department.

Q.    Have you since changed careers?

A.    I have, yes.

Q.    Okay.  What do you do now?

A.    I'm a contractor.

Q.    In July of 2016, what was your position with the Metro
Nashville Police Department?

A.    I was a zone patrol officer in the South Precinct.

Q.    Okay.  When you say a zone patrol officer, what
exactly does that mean?

A.    We are assigned zones.  That police officer
essentially polices that zone, that area in Nashville.

Q.    In the area that you were working in that zone, how
long had you been in that zone?

A.    Almost a year.

Q.    And so were you familiar with that area?

A.    I was, yes.

Q.    What area did that zone encompass?

A.    All the way from the downtown loop all the way past
Haywood Lane.

Q.    And were you working in the early morning hours on
July 31st of 2016?

A.    I was, yes, sir.

Q.    In what capacity were you working?

1    A.    I was a patrol officer, and I was in the area, at the

2    time, of Luna-Antioch Pike.

3    Q.    At the time you're speaking of, did you respond to an

4    emergency that day?

5    A.    I did, yes, sir.

6    Q.    And what was the call for?

7    A.    Originally there was a shooting that happened on the

8    interstate.  I didn't know all the details yet.

9    Q.    And did you -- as -- you mentioned you were where at

10   that time?

11   A.    I was at Luna and Antioch Pike.

12   Q.    If you could, there's a binder up there, and it's

13   labeled Exhibits 1127 through 1328.  Do you see that?

14         And if you could turn to Exhibit 1252.  There's a tab

15   there, right-hand side.  Are you there?

16   A.    Yes.

17   Q.    Okay.  Can you describe what that Exhibit 1252 is?

18   A.    I'm sorry.  I'm on 1152.  I apologize.

19   Q.    No problem.

20   A.    I apologize.

21         Yes, that's the map of South Precinct.

22   Q.    Okay.  And does that map encompass the area where you

23   were at on July 31st, 2016?

24   A.    It does, yes.

25   Q.    Okay.  And is that a fair depiction of the area of

1   your zone?

2   A.    Yes, sir.

3           **MR. HOFF:**  Your Honor, at this time, the

4   government would move to admit Exhibit 1252 and ask to

5   publish to the jury.

6           **THE COURT:**  Absent objection, 1252 is admitted

7   and may be published.

8           (Government Exhibit 1252 was marked and admitted

9   into evidence.)

10  **BY MR. HOFF:**

11  Q.    And I'm going to zoom in on a portion of this,

12  Mr. Luffman.  And can you see that area there?

13  A.    Yes, sir.

14  Q.    Okay.  And what is that area that's zoomed in on?

15  A.    That is Luna Drive at Antioch Pike.

16  Q.    Okay.  And is that where you were on those early

17  morning hours of July 31st, 2016?

18  A.    Yes, sir, I was.

19  Q.    And was there something that you saw that drew your

20  attention?

21  A.    Yeah.  I observed a black four-door Infiniti traveling

22  southbound towards Haywood Lane.  When the car passed, other

23  than having black tinted windows and it was black, I noticed

24  they had a tag -- over the tag was a bright LED light over

25  the tag.

1  Q.    Okay.  Is that the rear tag?

2  A.    The rear tag, yes, sir.

3  Q.    And which road was the car on?

4  A.    It's on Antioch Pike.

5  Q.    And did you notice anything about the speed of -- how

6  fast the car was driving?

7  A.    It was moving above the speed limit for sure.

8  Q.    In which direction did you turn?

9  A.    I turned left, northbound towards Harding so I could

10  get on the interstate.

11  Q.    Okay.  So it was the opposite direction in which the

12  vehicle was driving?

13  A.    Yes, sir.

14  Q.    Okay.  Where were you headed?

15  A.    To assist in the other patrol officers that were on

16  the interstate needing the interstate blocked off.

17  Q.    Did you respond to the incident that you were called

18  for?

19  A.    Yes, sir.  I responded to the initial incident, yes,

20  sir.

21  Q.    And ultimately, did you write a report about the

22  vehicle that you saw?

23  A.    I did, yes, sir.

24  Q.    And why did you do that?

25  A.    First, it's actually under our Metro policy that we

```
1    have to write a supplement about our involvement, and it was
2    specific about the car details that needed to be narrated so
3    we could have for the file.
4    Q.    And you mentioned the car was traveling south.
5    What -- what street was that towards?
6    A.    Haywood Lane.
7              MR. HOFF:  Okay.  Nothing further, Your Honor.
8              THE COURT:  Okay.  All right.  One moment.
9              (Respite.)
10             THE COURT:  All right.  Mr. Ganguli, any
11   questions?
12             MR. GANGULI:  No questions, Your Honor.
13             THE COURT:  All right.  Ms. Hood-Schneider, any
14   questions?
15             MS. HOOD-SCHNEIDER:  No questions.
16             THE COURT:  Thank you.
17             Mr. Mothershead?
18             MR. MOTHERSHEAD:  No questions.
19             THE COURT:  And Mr. Bloom?
20             MR. BLOOM:  No questions, Your Honor.
21             THE COURT:  All right.  Thank you, sir.  You may
22   step down.  Thank you.
23             (The witness stepped down.)
24             MR. HOFF:  Your Honor, the United States calls
25   Francisco Avila.
```

 1            THE COURT:  Do you need the interpreters on this

 2     witness?

 3            MR. HOFF:  Yes, Your Honor.  And I believe Agent

 4     Johnson is getting them.

 5            THE COURT:  All right.

 6            MR. HOFF:  And, Your Honor, just before I begin

 7     with this witness, I did speak with defense counsel, and

 8     there is an agreement for a number of exhibits, and I would

 9     just ask if I could admit them before Mr. Avila's testimony

10     and publish them at the appropriate time.

11            THE COURT:  All right.  If you want to read off

12     the numbers, I'll confirm that there's no objection to their

13     pre-admittance, and we'll go from there.

14            (The witness was sworn.)

15            MR. HOFF:  Your Honor, if I may read this list of

16     exhibits.

17            THE COURT:  Yes, sir.

18            MR. HOFF:  Okay.  It is 1258, 1259, 162 through

19     164 -- I'm sorry -- 1262 through 1264, 1266 through 1271,

20     1273 through 1278, 1280, 1281, and 1301 through 1303.

21            THE COURT:  All right.  Any objection to the

22     admission of these exhibits at this time?  If so, raise your

23     hand.

24            Okay.  Absent objection, the following exhibits

25     are admitted:  Government Exhibits 1258, 1259, 1262 to 1264,

1   1266, 1271, 1273 through 1278, 1280 through 1281, and 1301

2   through 1303.

3            (Government Exhibits 1258, 1259, 1262 through

4   1264, 1266 through 1271, 1273 through 1278, 1280, 1281, and

5   1301 through 1303 were marked and admitted into evidence.)

6            **THE COURT:**  All right.  You may proceed,

7   Mr. Hoff.

8            **MR. HOFF:**  Thank you, Your Honor.

9                        *   *   *

10                     <u>FRANCISCO AVILA</u>,

11  **was called as a witness, and after having been first duly**

12  **sworn, testified through the interpreter as follows:**

13                   **DIRECT EXAMINATION**

14  **QUESTIONS BY MR. HOFF:**

15  Q.    Sir, can you please state and spell your name for the

16  record.

17  A.    Francisco Avila.

18  Q.    Okay.  And, sir, I'm just going to ask you to keep

19  your voice up.  Okay?

20  A.    Yes.

21  Q.    How old are you?

22  A.    25 years old.

23  Q.    Where were you born?

24  A.    Honduras.

25  Q.    How far did you go in school?

```
1    A.    I went to school in Honduras for six years.

2    Q.    Did you go to school in the United States?

3    A.    For a year.

4    Q.    Okay.  And where was that?

5    A.    In the Glencliff School.

6    Q.    And what year did you come to the United States?

7    A.    2012.

8    Q.    How old were you?

9    A.    15.

10   Q.    Did you come to the United States legally or

11   illegally?

12   A.    Illegal.

13   Q.    When you came to the United States, where did you

14   first live?

15   A.    In the state of Georgia.

16   Q.    And did you later move to Nashville?

17   A.    Yes.

18   Q.    Mr. Avila, are you a member of a gang?

19   A.    Yes.

20   Q.    What gang?

21   A.    La Mara Salvatrucha.

22   Q.    Is that -- does La Mara Salvatrucha also have another

23   name?

24   A.    MS-13.

25   Q.    As part of your membership in MS-13, did you plead
```

1  guilty to several offenses?

2  A.    Yes.

3  Q.    Do those offenses include RICO conspiracy?

4  A.    Yes.

5  Q.    Does it also include three counts of murder in aid of

6  racketeering?

7  A.    Yes.

8  Q.    Was that on March the 24th of 2021?

9  A.    Yes.

10  Q.    And what sentence are you facing?

11  A.    Four life sentences.

12  Q.    In addition to your plea agreement, did you also sign

13  a cooperation agreement and agree to cooperate with the

14  United States?

15  A.    Yes.

16  Q.    As part of your cooperation agreement, what must you

17  do?

18  A.    Be sincere.

19  Q.    Okay.  And what do you mean by "be sincere"?

20  A.    Tell the truth.

21  Q.    Are you also cooperating because you hope for a

22  reduced sentence at the time of your sentencing?

23  A.    Yes.

24  Q.    Has anyone promised you that you will receive a lower

25  sentence?

```
1    A.    No.

2    Q.    Who makes that decision?

3    A.    The Judge.

4    Q.    You testified a moment ago that you entered the United

5    States illegally; is that right?

6    A.    Yes.

7    Q.    Are you also cooperating because you hope for an

8    immigration benefit and potentially to stay in the United

9    States after you serve a sentence?

10   A.    Yes.

11   Q.    Why do you want to stay in the United States after you

12   serve a sentence?

13   A.    It would be very dangerous for me in Honduras.

14   Q.    Why do you believe it would be very dangerous for you

15   in Honduras?

16   A.    Because down there, the gang is real strong.

17   Q.    Is there MS-13 in Honduras?

18   A.    Yes.

19   Q.    Were any immigration benefits promised to you?

20   A.    No.

21   Q.    As part of your cooperation, were some of your family

22   members allowed to come from Honduras to the United States?

23   A.    Yes.

24   Q.    Who is that?

25   A.    It was my mother and my sister.
```

```
1    Q.    And did you ask for that to happen?

2    A.    Yes.

3    Q.    Why did you ask for that?

4    A.    Because they were in danger down there in Honduras.

5    Q.    Is that because of what you're doing here today?

6    A.    Yes.

7    Q.    Are you also hoping that you will receive some type of

8    protection when you leave prison?

9    A.    Yes.

10   Q.    What happens if you are not truthful?

11   A.    The plea agreement is torn up.

12   Q.    Mr. Avila, how old were you when you joined MS-13?

13   A.    Like 17 or 18.

14   Q.    And where did -- where were you when you joined?

15   A.    In Nashville.

16   Q.    What clique were you a member of?

17   A.    The TPLS.

18   Q.    What does TPLS stand for?

19   A.    Thompson Place Locos Salvatrucha.

20   Q.    What was the highest rank you achieved within TPLS?

21   A.    Second Word.

22   Q.    Were you a homeboy?

23   A.    Yes.

24   Q.    When you joined MS-13, were you taught the rules?

25   A.    Yes.
```

1  Q.    Were you taught what was expected of you as a member

2  of MS-13?

3  A.    Yes.

4  Q.    Who was responsible for that in your clique?

5  A.    The palabrero.

6  Q.    Who is the palabrero when -- what is the palabrero?

7  A.    He is the guy who rules, gives orders in the clique.

8  Q.    And who was the palabrero when you joined?

9  A.    Cuervo.

10  Q.    I want to show you Government Exhibit 1276.  Do you

11  recognize that person?

12  A.    Yes.

13  Q.    Who is that?

14  A.    Cuervo.

15  Q.    And how did you become associated with MS-13?

16  A.    Through Happy and Demente.

17  Q.    Did you go to school with Happy and Demente?

18  A.    Yes.

19  Q.    Do you see Demente in the courtroom?

20  A.    Yes.

21  Q.    And could you describe what he's wearing and where he

22  is in the courtroom?

23  A.    He's got a blue shirt with buttons and a tie.

24  Q.    Okay.  And can you describe his hair?

25  A.    He got a haircut.

1  Q.    Is he to my left?

2  A.    Yes.

3         **MR. HOFF:**  And, Your Honor, indicating for the

4  record Defendant Jose Pineda.

5         **THE COURT:**  Any objection to that for the record?

6         No?  All right.  The record will reflect that

7  Jose Pineda has been identified as Demente.

8  **BY MR. HOFF:**

9  Q.    And, Mr. Avila, I want to show you Government

10 Exhibit 1274.  Do you recognize that person?

11 A.    Yes.

12 Q.    Who is that?

13 A.    Demente.

14 Q.    Now, did you also --

15        **MR. HOFF:**  If we can take that down.  Thank you.

16 **BY MR. HOFF:**

17 Q.    Did you also, when you were -- became associated with

18 the gang, did Cuervo teach you about some of the history and

19 the customs of the gang?

20 A.    A little bit.

21 Q.    Did he teach you about the rules of the gang?

22 A.    Yes.

23 Q.    Why is it important, if you're a member of the gang,

24 to know the rules?

25 A.    Because you have to have order.

1    Q.    And what do you mean by that?  Why do you have to have

2    order?

3    A.    You have to have order in the clique because you have

4    to follow the program that rules the clique.

5    Q.    Over the course of your time with MS-13, did you

6    continue to learn about the gang and the rules?

7    A.    A few of them, yes.

8    Q.    Did you also teach others about the gang and the

9    rules?

10   A.    A little bit, I did.

11   Q.    Did you have some -- at some point when you were the

12   Second Word, was that like the second-in-command?

13   A.    Yes.

14   Q.    And did you have people under you at that time?

15   A.    A few of them, I did.

16   Q.    Do MS-13 members typically go by their real names?

17   A.    No.

18   Q.    Why not?

19   A.    To avoid the police from identifying us.

20   Q.    Did you identify the other members in your clique by

21   their nicknames?

22   A.    Yes.

23   Q.    Do you have a nickname?

24   A.    Yes.

25   Q.    What is your nickname?

```
 1    A.      Humilde, H-U-M-I-L-D-E.

 2    Q.      What does that mean?

 3    A.      Someone who is quiet, calm.

 4    Q.      Who gave you that nickname?

 5    A.      Demente.

 6    Q.      What nationality are most members of MS-13?

 7    A.      Honduras and El Salvador.

 8    Q.      Over your time at MS-13, did you communicate with

 9    MS-13 leaders outside of the United States?

10    A.      Yes.

11    Q.      Where?

12    A.      El Salvador.

13    Q.      How did you communicate with those members in

14    El Salvador?

15    A.      By means of an application that's called WhatsApp.

16    Q.      And is that where most of the leaders of MS-13 are

17    located?

18    A.      Yes.

19    Q.      Now, you mentioned you were in a clique.  Is MS-13

20    divided into smaller groups?

21    A.      Yes.

22    Q.      And what are those groups called?

23    A.      They're called "clicas."

24    Q.      And can you describe what a clique is?

25    A.      A clique is a group of gang members of about 10 or 15
```

1 people.

2 Q. Are there lots of different cliques?

3 A. Yes.

4 Q. But are other cliques a part of the larger gang,

5 MS-13?

6 A. Yes.

7 Q. You -- are you familiar with the term "program"?

8 A. A little bit.

9 Q. Okay. What is a program?

10 A. A "manda" gives the orders to a group of persons in a

11 clique who live in a certain sector.

12 Q. Is it made up of several cliques, a program?

13 A. Yes.

14 Q. Was your clique a part of a program?

15 A. Yes.

16 Q. What program?

17 A. East Coast, yes.

18 Q. I'm sorry. Was that East Coast?

19 A. Yes.

20 Q. And what did your clique have to do as part of the

21 East Coast program?

22 A. Follow the rules of the program and report yourself

23 with money.

24 Q. Okay. When you say "report yourself with money," what

25 do you mean by that?

1   A.    It refers to you having to pay for a quota.

2   Q.    Did your clique have to send money as part of the

3   program?

4   A.    Yes.

5   Q.    Did you send money as part of your clique having to

6   send money for the program?

7   A.    Yes.

8   Q.    How did you send the money?

9   A.    Through money order.

10  Q.    And where did you send the money to?

11  A.    To El Salvador.

12  Q.    Are there ranks within MS-13?

13  A.    Yes.

14  Q.    Did your clique have ranks?

15  A.    Yes.

16  Q.    What was the lowest rank in your clique?

17  A.    It could be said that it would be a paro.

18          **THE INTERPRETER:**  P-A-R-O.

19  **BY MR. HOFF:**

20  Q.    And what did the -- what's a paro?

21  A.    A paro does favors for the clique when needed.

22  Q.    Did you start out as a paro?

23  A.    I started as a chequeo.

24          **THE INTERPRETER:**  C-H-E-Q-U-E-O.

25  ///

**BY MR. HOFF:**

Q.    And what is a chequeo?

A.    It's like being on a probation or so.

Q.    And is a chequeo above the paro?

A.    Yes.

Q.    Do paros sometimes move up to chequeos?

A.    When they want to do so, yes.

Q.    Who made you a chequeo?

A.    The palabrero.

Q.    And who was that at the time?

A.    Cuervo.

Q.    What is after chequeo?

A.    Homeboy.

Q.    And in your clique, how did one become a homeboy?

A.    I did so by killing.

Q.    And is a homeboy a full-fledged member of the gang?

A.    Yes.

Q.    What were the leadership positions within your clique?

A.    I did not understand that word.

Q.    What's the leader -- you mentioned -- other than the First and Second Word, were there any other leader positions in your clique?

A.    No.

Q.    What are the main responsibilities of the palabrero or the First Word?

1    A.    To keep the homeboys in order for them to not get out

2    of line.

3    Q.    And do -- how do they do that?  How does the

4    First Word do that?

5    A.    When a homeboy breaks the rule, something which we

6    refer to as a calenton is applied to him.

7              THE INTERPRETER:  C-A-L-E-N-T-O, accent mark over

8    the O, N.

9    BY MR. HOFF:

10   Q.    So is that like a -- that's a punishment?

11   A.    Yes.

12   Q.    And who decides that?

13   A.    The palabrero.

14   Q.    What about the Second Word?  What are their

15   responsibilities?

16   A.    To carry out the orders of the First Word.  And in

17   case that the First Word dies or ends up in jail, the

18   Second Word takes his place.

19   Q.    Can there be multiple homeboys in a clique?

20   A.    Yes.

21   Q.    Are you familiar with the phrase "being jumped in"?

22   A.    Yes.

23   Q.    What does that mean?

24   A.    That's when a chequeo is converted over to being a

25   homeboy.

1    Q.    What happens during that?

2    A.    At least three homeboys gives him a calenton during 13

3    seconds.

4    Q.    And is that a beating?

5    A.    Yes.

6    Q.    Were you jumped in?

7    A.    Yes.

8    Q.    Who jumped you in?

9    A.    Chino, Scrappy, and Demente.

10   Q.    And did someone have to count the 13 seconds?

11   A.    Yes, the palabrero.

12   Q.    Who counted for you?

13   A.    Cabezon.

14   Q.    I want to show you Government's Exhibit 1271.  Do you

15   recognize that person?

16   A.    Yes.

17   Q.    Who is that?

18   A.    Cabezon.

19              (Reporter clarification.)

20              **THE INTERPRETER:**  The interpreter repeats the

21   word.  C-A-B-E-Z-O -- accent over the O -- N.

22   **BY MR. HOFF:**

23   Q.    Was Cabezon the palabrero by the time you were jumped

24   in?

25   A.    Yes.

1   Q.    What happened to Cuervo?

2   A.    He ended up getting incarcerated.

3   Q.    I also want to show you Government Exhibit 1270.  Do

4   you recognize that person?

5   A.    Yes.

6   Q.    Who is that?

7   A.    Chino.

8   Q.    Was that one of the individuals who jumped you in?

9   A.    Yes.

10  Q.    What was his rank in MS-13?

11  A.    Homeboy.

12  Q.    I want to show you Government Exhibit 1258.  Do you

13  recognize this person?

14  A.    Yes.

15  Q.    Who is that?

16  A.    Scrappy.

17  Q.    And what was Scrappy's rank in MS-13?

18  A.    Homeboy.

19  Q.    Was Scrappy related to anyone?

20  A.    He is Cabezon's brother.

21  Q.    Thank you.

22        Do some MS-13 members obtain gang-related tattoos?

23  A.    Yes.

24  Q.    Did many of the members in your clique get MS-13

25  tattoos?

1  A.    Yes.

2  Q.    And what were some of those tattoos?

3  A.    They were TPLS and MS-13.

4  Q.    Do you have MS-13 tattoos?

5  A.    Yes.

6  Q.    Where?

7  A.    Head, back, tummy, arm.

8  Q.    And did you get some of those tattoos while you were

9  in jail?

10  A.    Yes.

11  Q.    Which ones?

12  A.    Tummy and back.

13  Q.    I want to show you Government Exhibit 1301.  Do you

14  recognize this person?

15  A.    Yes.

16  Q.    Who is that?

17  A.    It is I.

18  Q.    Okay.  And are those the tattoos that you received

19  while in jail?

20  A.    Yes.

21  Q.    And what are those tattoos of?

22  A.    Of the gang.

23  Q.    Are those the letters M and S and the number 13?

24  A.    Yes.

25  Q.    And is there also your clique letters, TPLS, on your

```
1    stomach?

2    A.    Yes.

3    Q.    And did you take those photos with someone's phone in

4    jail?

5    A.    Yes.

6    Q.    Okay.  And you can't have a cell phone in jail; is

7    that right?

8    A.    Yes.

9    Q.    Okay.  But someone did and you took these photos?

10   A.    Yes.

11   Q.    Did some MS-13 members choose not to get tattoos?

12   A.    Yes.

13   Q.    Okay.  But did many of the members in your clique have

14   them?

15   A.    Yes.

16   Q.    What does earning your letters mean?

17   A.    It means killing a chavala.

18   Q.    And is that something you have to do to earn your

19   letters?

20   A.    Yes.

21   Q.    Is that something that was required in your clique?

22   A.    Yes.

23   Q.    Is that how you earned your MS-13 tattoo?

24   A.    Yes.

25   Q.    And you mentioned the term "chavalas."  What is a
```

1    chavala?

2    A.    The most known are those of the 18th Street Gang and

3    also those from the Brown Pride.

4    Q.    And is that -- were those MS-13's main rivals in

5    Nashville?

6    A.    Yes.

7    Q.    Does MS-13 have hand signs?

8    A.    Yes.

9    Q.    And can you display some of those hand signs for the

10   jury?

11   A.    (Witness complies.)

12   Q.    And what are you doing with your hands?

13   A.    An M and an S.

14   Q.    And so you're forming an M and an S with your hands;

15   is that right?

16   A.    Yes.

17   Q.    What is the purpose of displaying the hand signs?

18   A.    It's to identify yourself with the homeboys and also

19   to make yourself known with the chavalas.

20   Q.    Can anyone display the hand signs?

21   A.    No.

22   Q.    Who can?

23   A.    Only the members of the gang.

24   Q.    What happens if someone displays the hand signs and

25   they're not a member of the gang?

1    A.    They will earn a calenton or death.

2           THE COURT:  Mr. Hoff, do you -- your choice, I'm

3    inclined to leave it to you, but do you want to clarify what

4    he means by "member" there?  You may not want to, you know.

5    It's your call.

6           MR. HOFF:  I can.

7           THE COURT:  Homeboy and up, or also would include

8    chequeo and paros?

9           MR. HOFF:  I can clarify, Your Honor.

10          THE COURT:  All right.

11   BY MR. HOFF:

12   Q.    Do you have to be a certain rank to display the hand

13   signs?

14   A.    Mostly the homeboys, but some of the chequeos do it.

15   Q.    And is that allowed for some of the chequeos?

16   A.    Yes.  There's no problem.

17   Q.    And that's how it was with your clique?

18   A.    Yes.

19   Q.    Are MS-13 members required to follow certain rules?

20   A.    Yes.

21   Q.    What are the main rules that you're required to

22   follow?

23   A.    The first one is not to talk to the police.  The

24   second one is not to do heavy drugs, not to sell drugs that

25   belong to the clique, to not kill women or children.

1    Q.    Are there -- are there rules about chavalas?

2    A.    They deserve death.

3    Q.    What is the punishment for cooperating with the

4    police?

5    A.    Death.

6    Q.    Is it fair to say you're breaking that rule by being

7    here today?

8    A.    Yes.

9    Q.    Are there other rules that could -- for breaking them,

10   could result in death?

11   A.    If you kill a woman or a child.

12   Q.    And what is the punishment for breaking the other

13   rules?

14   A.    A calenton.

15   Q.    Have you received calentons?

16   A.    Several.

17   Q.    For what?

18   A.    For selling drugs that were not coming from the

19   clique, for using drugs, and for losing a backpack of

20   bullets.

21   Q.    So were you supposed to get the drugs you sold from

22   someone in your clique?

23   A.    Yes.

24   Q.    When do these beatings or calentons typically take

25   place?

1    A.    It -- they occur on Sundays when there is a mass.

2    Q.    And I think you used the term "misa"; is that right?

3    A.    Yes.

4    Q.    What is a misa?

5    A.    It is a meeting that is carried out every Sunday to

6    see the goings on of the clique.

7    Q.    And are the clique members required to attend?

8    A.    Yes.

9    Q.    Are paros allowed to attend?

10   A.    They cannot hear what's spoken at a misa, M-I-S-A.

11          (Reporter clarification.)

12          **THE INTERPRETER:**  They are not allowed to hear

13   what takes place in a misa.

14   **BY MR. HOFF:**

15   Q.    What about chequeos?

16   A.    Some.

17   Q.    And what is discussed at misas?

18   A.    The sale of drugs is spoken about.

19   Q.    What else?

20   A.    If someone has broken some rule.  And I can't remember

21   any more.

22   Q.    Are you familiar with the term "green light"?

23   A.    Yes.

24   Q.    What is a green light?

25   A.    That's given to somebody who is going to die.

1    Q.    Is it like an order?

2    A.    Yes.

3    Q.    Did -- were green lights discussed at misas?

4    A.    Yes.

5    Q.    Why is that?

6    A.    Because that was at the moment when all of us homeboys

7    were together.

8    Q.    Did you need authorization to kill a chavala?

9    A.    Yes.

10   Q.    Did you always get permission?

11   A.    Yes.

12   Q.    And who typically authorizes a green light?

13   A.    The palabrero.

14   Q.    Can any member of the clique carry out the green

15   light?

16   A.    The one who's got the opportunity to, yes.

17   Q.    Okay.  And when you say "the one that's got the

18   opportunity to," is that any opportunity you have?

19   A.    Yes.

20   Q.    And what are the main goals of MS-13?

21   A.    To finish off the chavalas.

22   Q.    How does one move up in rank or increase their status

23   in MS-13?

24   A.    I did so by killing.

25   Q.    How did you -- how does one move from a paro to a

1  chequeo in your clique?

2  A.    The paro speaks with the palabrero for him to be

3  ascended.

4  Q.    Do you have to show that you're worthy of that?

5  A.    Yes.

6  Q.    What did you do to show that you were worthy of moving

7  up?

8  A.    I killed a chavala.

9  Q.    Have you met members of MS-13 from other cliques?

10  A.    A few, yes.

11  Q.    Based on what you've been taught and learned about

12  MS-13, do most MS-13 cliques follow the same rules and

13  customs that you've described?

14  A.    Yes.

15  Q.    Can you leave MS-13?

16  A.    Becoming a Christian.

17  Q.    When you first joined MS-13 at 17 or 18, who was in

18  the gang?

19  A.    Cuervo, Cabezon, Scrappy, Chino, Chamaco, Miguel,

20  Demente, Happy, and JoJo.

21  Q.    And I want to -- and so this would have been around

22  2015 or 2016?

23  A.    Yes.

24  Q.    I want to show you Government Exhibit 1268.  Do you

25  recognize that person?

```
1    A.     Yes.

2    Q.     Who is that?

3    A.     It's Happy.

4    Q.     When you first became associated with MS-13, what rank

5    was Happy?

6    A.     He was a chequeo.

7    Q.     Did you guys go to school together?

8    A.     Yes.

9    Q.     What was the last rank you knew Happy to have in

10   MS-13?

11   A.     Homeboy.

12   Q.     I want to show you Government's Exhibit 1280.  Do you

13   recognize that person?

14   A.     Yes.

15   Q.     Who is that?

16   A.     Chamaco.

17   Q.     And what rank was Chamaco?

18   A.     He was supposedly a homeboy.

19   Q.     Okay.  And why do you say supposedly?

20   A.     Supposedly he was a homeboy when he was in Honduras.

21   Q.     And was Chamaco with the gang before you became

22   involved?

23   A.     Yes.

24   Q.     I'll show you Government Exhibit 1262.  Do you

25   recognize that person?
```

1   A.    Yes.

2   Q.    Who is that?

3   A.    JoJo.

4   Q.    And what rank was JoJo?

5   A.    Homeboy.

6   Q.    Did other people later join your clique?

7   A.    Yes.

8   Q.    Who were those people?

9   A.    Peluche, Frijol, Listo, Shaggy, and I don't remember

10  the other ones.

11  Q.    I want to show you Government Exhibit 1277.  Do you

12  recognize that person?

13  A.    Yes.

14  Q.    Who is that?

15  A.    Frijol.

16  Q.    What rank was Frijol?

17  A.    Chequeo.

18  Q.    You mentioned someone by the name of Peluche.  Do you

19  see Peluche in the courtroom?

20  A.    Yes.

21  Q.    Can you describe what he's wearing?

22  A.    Black jacket.

23  Q.    Is he to my left?

24  A.    Yes.

25          MR. HOFF:  Okay.  And, Your Honor, for the

1    record, identifying the defendant, Flores.

2             **THE COURT:**  All right.  Any objection to that?

3             All right.  The record will reflect the

4    identification of Mr. Flores.

5    **BY MR. HOFF:**

6    Q.    I want to show you also Government Exhibit 1266.  Do

7    you recognize that person?

8    A.    Yes.

9    Q.    Who is that?

10   A.    Peluche.

11   Q.    What was the last rank you knew Peluche to have?

12   A.    Secunda Palabra.

13   Q.    Is that Second Word?

14   A.    Yes.

15   Q.    Did you know someone by the name of Bomba?

16   A.    Yes.

17   Q.    Who is Bomba?

18   A.    They're a gang, homeboys.

19   Q.    Was it a person?

20   A.    Yes.

21   Q.    Okay.  And what rank was Bomba?

22   A.    Last I heard, he was a homeboy.

23   Q.    I want to show you Government Exhibit 1273.  Do you

24   recognize that person?

25   A.    Yes.

```
1    Q.    Who is that?

2    A.    Bomba.

3    Q.    Is Bomba related to anyone?

4    A.    He's Demente's brother.

5    Q.    I also want to show you Government Exhibit 1267.  Do

6    you recognize that person?

7    A.    Yes.

8    Q.    Who is that?

9    A.    Shaggy.

10   Q.    Who is Shaggy?

11   A.    He's another of the Mara's homeboys.

12   Q.    Now, you also mentioned someone by the name of Listo.

13   Do you remember that?

14   A.    Yes.

15   Q.    Do you see Listo in the courtroom?

16   A.    Yes.

17   Q.    And where is Listo seated in the courtroom?

18   A.    On the left.

19   Q.    Okay.  Is that to my left?

20   A.    Yes.

21   Q.    And what is that person wearing?

22   A.    A blue jacket with a tie.

23          MR. HOFF:  Your Honor, indicating for the record

24   Defendant Luis Colindres.

25          THE COURT:  All right.  Absent objection, the
```

1  record will reflect that identification.

2  **BY MR. HOFF:**

3  Q.    What was the last rank you knew Listo to have?

4  A.    Homeboy.

5  Q.    I also want to show you Government Exhibit 1264.  Do

6  you recognize this person?

7  A.    Yes.

8  Q.    Who is that?

9  A.    Listo.

10  Q.    When you were first associated with MS-13 as a

11  chequeo, what were your primary responsibilities?

12  A.    Sell drugs, rob.

13  Q.    And what did -- drugs did you first start selling?

14  A.    Marijuana.

15  Q.    Who did you get the marijuana from?

16  A.    I got it from Scrappy.

17  Q.    And was that the only person you were allowed to get

18  marijuana from at the time?

19  A.    If you were in charge of selling the marijuana, yes.

20  Q.    And how much were you selling?

21  A.    An ounce weekly.

22  Q.    Was anyone else selling marijuana at the time?

23  A.    Demente and Happy were.

24  Q.    And how much -- do you know how much marijuana Demente

25  and Happy were selling?

1   A.    The same thing I was: an ounce.

2   Q.    And what did you do -- how much money did you have to

3   give back to Scrappy?

4   A.    The price of what the ounce was worth.

5   Q.    And what did you do with the profits?

6   A.    I kept them.

7   Q.    And what did you use them for?

8   A.    To buy weapons to meet the weekly quota.

9   Q.    And so this would have been when you were about 17 or

10  18 when you first joined?

11  A.    Yes.

12  Q.    Did there come a point in December of 2015 when you

13  were arrested?

14  A.    Yes.

15  Q.    What was that for?

16  A.    Marijuana and weapons.

17  Q.    And after -- did you get out of jail?

18  A.    Yes.

19  Q.    After you got out of jail, did you start selling

20  something other than marijuana?

21  A.    Cocaine and heroin.

22  Q.    And when were you released?

23  A.    That was on a day in February in 2016.

24  Q.    Where did you get the cocaine from?

25  A.    From Cabezon.

```
1   Q.    Was Cabezon the palabrero at the time?

2   A.    Yes.

3   Q.    So was Cabezon providing the cocaine for all of the

4   clique members?

5   A.    Yes.

6   Q.    Was anyone else selling -- anyone else in the clique

7   selling cocaine at that time?

8   A.    Yes.

9   Q.    Who?

10  A.    Demente, Happy, Scrappy, JoJo sold.

11  Q.    Where were you selling the cocaine?

12  A.    In the bars.

13  Q.    What bars?

14  A.    I began selling at One.

15            MR. HOFF:  I'm sorry.  He said "Bar Uno"?

16            (The interpreter reasked the question.)

17            THE WITNESS:  Yes.

18  BY MR. HOFF:

19  Q.    And were there other bars as well?

20  A.    Barra Bola Ocho.

21            THE INTERPRETER:  B-A-R-R-A, B-O-L-A, O-C-H-O.

22  BY MR. HOFF:

23  Q.    Did you -- outside of selling at the bars, did you

24  have other customers?

25  A.    Yes.
```

Q.    Did anyone else sell in the bars with you, sell cocaine in the bars with you?

A.    Demente and Happy did.

Q.    And where did Demente and Happy get their cocaine from?

A.    Also from Cabezon.

Q.    How much cocaine were you selling a week?

A.    I began selling what's known as an 8, and then I climbed up to selling up to an ounce.

Q.    And how often were you selling an ounce?

A.    Weekly.

Q.    Was anyone else selling an ounce a week?

A.    Demente was.

Q.    Now, you were later arrested in August of 2017; is that right?

A.    Yes.

Q.    And you've been in jail since?

A.    Yes.

Q.    And did you sell cocaine from the time you got out in February 2016 until you were arrested in August 2017?

A.    Yes.

Q.    Did you ever get cocaine from anyone other than Cabezon?

A.    Yes.

Q.    Who is that?

```
1   A.    Daniel.

2   Q.    Who is Daniel?

3   A.    Daniel Caceres, and he's the uncle of Demente.

4   Q.    Was Daniel a member of MS-13?

5   A.    No.

6   Q.    So was it a problem that you bought cocaine from

7   someone who wasn't Cabezon?

8   A.    Well, I earned a calenton from having bought cocaine

9   from him.

10  Q.    How much from the cocaine sales did you have to pay

11  back to Cabezon?

12  A.    What it was worth, the price of the cocaine.

13  Q.    And what did you do with the profits?

14  A.    Well, I supported myself with that.

15  Q.    Who else other than you were selling cocaine in 2016

16  and 2017?

17  A.    All of us were.

18  Q.    Okay.  And who was all of you?

19  A.    Well, it was Cabezon, Peluche, Scrappy, Demente,

20  myself, Happy, Listo, Shaggy, Gangbang, Bomba, and I don't

21  remember the other ones.

22  Q.    Who is Gangbang?

23  A.    He was another one of the clique's chequeos.

24  Q.    Do you know where everyone else was getting their

25  cocaine from?
```

```
1   A.    From Cabezon.

2   Q.    How do you know that?

3   A.    Because it's mandatory that we buy from Cabezon.

4   Q.    As a member of TPLS, did you have to pay dues?

5   A.    Weekly.

6   Q.    How much were your dues?

7   A.    Like 25 or 30.

8   Q.    Where did you pay them -- or let me rephrase.

9         When did you pay your dues?

10  A.    On the Sunday misas.

11  Q.    What were the dues used for by the clique?

12  A.    It was to put money for the homeboys who are in jail,

13  to buy weapons, also to send to pay for the program.

14  Q.    Did you use any of your drug proceeds to pay your

15  dues?

16  A.    Yes.

17  Q.    Do you know if anyone else did?

18  A.    All of us.

19  Q.    How do you know that?

20  A.    Because none of us had a job.

21  Q.    Would you also send others to sell drugs for you?

22  A.    Yes.

23  Q.    Who?

24  A.    I sent Listo, Cigarrito, and two others.

25         THE INTERPRETER:  C-I-G-A-R-R-I-T-O.
```

**BY MR. HOFF:**

Q.    Okay.  Who are the others?

A.    I don't recall the names anymore.

Q.    And where would you send Cigarrito and Listo to sell drugs?

A.    I would send to Uno, Bola Ocho, and to La Mansion.

Q.    And are those all bars or nightclubs?

A.    Yes.

Q.    I want to show you Government Exhibit 1263.  Do you recognize that person?

A.    Yes.

Q.    Who is that?

A.    Cigarrito.

Q.    Did you know someone by the name of Arling?

A.    Yes.

Q.    Who is Arling?

A.    Arling was a paro of the clique, and he also sold cocaine for me.

Q.    Was he friends with people in the gang?

A.    Yes.

Q.    I want to show you Government Exhibit 1269.  Do you recognize this person?

A.    Yes.

Q.    Who is that?

A.    Arling.

1  Q.    How much cocaine were you giving Cigarrito, Listo, and
2  Arling to sell?
3  A.    I gave them between 25 to 30 baggies that were each
4  worth $20.
5  Q.    Do you know if anyone else was also using paros to
6  sell cocaine?
7  A.    Yes.
8  Q.    Who?
9  A.    Peluche.
10  Q.    How do you know that?
11  A.    He took Listo from me.
12  Q.    How did he do that?
13  A.    Because he would give him a better price.
14  Q.    So Listo started selling cocaine for Peluche instead
15  of you?
16  A.    Yes.
17  Q.    Did you and the other members of your clique ever have
18  any conflicts with other drug dealers in the bars you were
19  selling in?
20  A.    Yes, several times.
21  Q.    And how did the clique deal with that?
22  A.    With violence.
23  Q.    Did you ever threaten someone for selling drugs in
24  your territory?
25  A.    Yes.  I also beat them up.

1   Q.    Did you ever see any other members of your clique do
2   that?
3   A.    Yes.
4   Q.    Who?
5   A.    Demente.
6   Q.    Anyone else?
7   A.    Cabezon, Happy.
8   Q.    You said you were arrested in August of 2017; is that
9   right?
10  A.    Yes.
11  Q.    What was that for?
12  A.    Two armed robberies and domestic violence.
13  Q.    Now, you mentioned that you pled guilty to several
14  murders as part of your plea agreement; is that right?
15  A.    Yes.
16  Q.    As part of your plea agreement, did you plead guilty
17  to a murder that occurred on April 6th, 2016?
18  A.    Yes.
19  Q.    At some point that day, did you speak with Demente?
20  A.    Yes.
21  Q.    Do you remember when that was?
22  A.    It was at night.
23  Q.    And what did you and Demente talk about?
24  A.    Demente arrived at my house and asked me if I wanted
25  to earn my letters.

1    Q.    And what was your rank at that point?

2    A.    Chequeo.

3    Q.    Had you killed anyone to that point?

4    A.    No.

5    Q.    And what did you understand Demente asking you if you

6    wanted to earn your letters to mean?

7    A.    That there was a need to go kill a chavala.

8    Q.    Where were you living at the time?

9    A.    At Wallace.

10   Q.    And is that -- who were you living with?

11   A.    With my baby mama and her aunt.

12   Q.    Did Demente come to your house?

13   A.    Yes.

14   Q.    And what rank was Demente at the time?

15   A.    He was also a chequeo.

16   Q.    What happened when Demente came to your house?

17   A.    He told me if I wanted to earn my letters.

18   Q.    And what did you say?

19   A.    I don't remember.

20   Q.    Was Demente with anyone?

21   A.    He entered the house alone to the inside.

22   Q.    Is that when you had the conversation about earning

23   your letters?

24   A.    Yes.

25   Q.    Did you find out if anyone was with Demente when he

1   came to your house?

2   A.    Shortly thereafter, yes.  He was with JoJo and --

3             **THE INTERPRETER:**  I'm sorry.  The interpreter

4   requests a repetition.

5             (The witness repeated his answer.)

6             **THE WITNESS:**  And with chavala.

7   **BY MR. HOFF:**

8   Q.    And where were JoJo and the chavala?

9   A.    They were in the car.

10  Q.    Do you remember what kind of car it was?

11  A.    No.

12  Q.    Did you, prior to -- well, let me ask you this:  Did

13  you go -- did you leave your house?

14  A.    Yes.  I left with him.

15  Q.    Prior to getting in the car, did Demente give anything

16  to you?

17  A.    He gave me a revolver.

18  Q.    And did Demente tell you what the plan was for the

19  chavala?

20  A.    He just said that we were going to go kill him.

21  Q.    And where was the chavala when this conversation

22  happened?

23  A.    He was in the car.

24  Q.    Did Demente tell you how he got the victim to come

25  with him?

1  A.    He told me that he had told him that he was going to

2  come smoke marijuana.

3  Q.    So did you get in the car?

4  A.    Yes.

5  Q.    Where did you sit in the car?

6  A.    On the rear part relative to the one who drives.

7  Q.    So the rear driver's side?

8  A.    Yes.

9  Q.    And where -- who was driving?

10  A.    Demente.

11  Q.    Where was JoJo?

12  A.    On the passenger.

13  Q.    Is that the front passenger?

14  A.    Yes.

15  Q.    And where was the chavala?

16  A.    Behind JoJo.

17  Q.    Did you know that person?

18  A.    No.

19  Q.    What did he look like?

20  A.    Long hair, a little bit chubby.

21  Q.    Do you remember what -- let me ask -- let me withdraw

22  that and ask another question.

23        Other than the revolver -- other than the revolver you

24  had, did anyone else have a gun?

25  A.    Demente had one and JoJo had one.

Q.   So did you leave your house?

A.   Yes.

Q.   And where did you go?

A.   I didn't know where we were going.

Q.   What was it like in the car when you were driving?

A.   Very quiet.

Q.   So you said you didn't know where you were going?

A.   No.

Q.   And who was driving?

A.   Demente.

Q.   Can you describe the area you were driving through?

A.   We left the group of houses.  It was an area that was
mountainous with trees and high grass, few houses.

Q.   Had you ever been to that location before?

A.   No.

Q.   Who picked that location?

A.   Demente.

Q.   Did there come a point when you stopped?

A.   Yes.

Q.   Where did you stop?

A.   We stopped, it looked like a cattle feeding ground.

Q.   Was it like a field?

A.   Yes.

Q.   And what did you see when you stopped?

A.   Where we parked, I saw that -- where we parked, I saw

1  that in the front, there was a house.

2  Q.    Was it dark?

3  A.    Yes.

4  Q.    What happened after you stopped?

5  A.    All of us got out of the car.

6  Q.    All four of you?

7  A.    Yes.

8  Q.    And after you got out of the car, what happened?

9  A.    We told the chavala that he was going to die because

10  he was a chavala.

11  Q.    Did the person say anything?

12  A.    He said that he was just a paro of the Brown Pride.

13  Q.    And did anyone say anything in response to that?

14  A.    Yes.

15  Q.    Who?

16  A.    I don't remember who said it.

17  Q.    What was said?

18  A.    That Cabezon was going to be called to see what we

19  could do in that situation.

20  Q.    Why did you-all decide to call Cabezon?

21  A.    Because he was the palabrero.

22  Q.    Why did you need to call the palabrero?

23  A.    For him to give us the green light.

24  Q.    So you were seeking authorization?

25  A.    Yes.

1  Q.     And what happened?  What happened when you tried to

2  call Cabezon?

3  A.     JoJo was calling his phone but he never answered.

4  Q.     So after -- well, when Cabezon didn't answer, what

5  happened?

6  A.     JoJo said that he was going to call Happy.

7  Q.     And what rank was Happy at the time?

8  A.     Chequeo.

9  Q.     So he wasn't any higher rank than the three of you?

10  A.     No.

11  Q.     Did -- do you know if JoJo got in touch with Happy?

12  A.     Yes.

13  Q.     What happened then?

14  A.     Oh, I heard that he was talking with him on the phone.

15  Q.     Could you hear what they were saying?

16  A.     No, because quickly thereafter, he retired a few

17  distance off.

18  Q.     Who did?

19  A.     JoJo.

20  Q.     So you walked away?  He walked away from where you

21  were standing?

22  A.     Yes.

23  Q.     Did he come back?

24  A.     Yes.

25  Q.     What happened when JoJo came back?

1    A.    He told us that -- he only told us that he had said

2    "fuck him."

3    Q.    JoJo said that?

4    A.    Yes.

5    Q.    And who was he speaking about?

6    A.    The chavala.

7    Q.    So what happened then?

8    A.    So the three of us aimed our guns at the chavala.

9    Q.    And did the chavala say anything?

10   A.    He began asking us to not kill him, saying that he had

11   family.  And I don't remember what else --

12   Q.    What --

13   A.    And I don't remember what else he was saying.

14   Q.    Sorry.  Didn't mean to cut you off.

15         What happened then?

16   A.    So then he began running towards the high grass,

17   towards the trees.

18   Q.    And when the victim began running, what did the three

19   of you do?

20   A.    Demente started shooting at him, then JoJo shot at

21   him, then I shot him.

22   Q.    So the three of you had guns?

23   A.    Yes.

24   Q.    And the gun you had was a revolver?

25   A.    Yes.

1    Q.    Does that leave casings on the ground?

2    A.    No.

3    Q.    Do you know if any of you shot him?

4    A.    When we were shooting at him, I heard him yell.

5    Q.    And when you say you heard him yell, what do you mean?

6    A.    From a shot of irony, of pain.

7    Q.    Did you see --

8              **THE INTERPRETER:**  I'm sorry.  The interpreter

9    needs a moment.  Strike that.  Not irony:  Agony of pain.

10   **BY MR. HOFF:**

11   Q.    Did you see the victim fall?

12   A.    No.

13   Q.    Did you -- did the three of you walk up after him?

14   A.    No.

15   Q.    And did you know at that time if he had died?

16   A.    No.

17   Q.    Why didn't you or the others walk up to him?

18   A.    I was afraid.  I did not want to go.

19   Q.    What did the three of you then do?

20   A.    We got into the car and left to the house.

21   Q.    Who drove?

22   A.    Demente.

23   Q.    What did you do with the revolver that Demente gave

24   you?

25   A.    He told me to give it back to him, that he was going

1  to throw it away because the gun was burnt.

2  Q.    And when you say "the gun was burnt," what do you mean

3  by that?

4  A.    Well, that it had a body.

5  Q.    So you had to get rid of it?

6  A.    Yes.

7  Q.    Do you know what happened with JoJo's gun?

8  A.    No.

9  Q.    Do you know what Demente did with the revolver after

10 you gave it back to him?

11 A.    No.

12 Q.    So after you left the field, where did you go?

13 A.    Demente went to drop me off at my house.

14 Q.    And after you got dropped off, did Demente leave?

15 A.    Yes.

16 Q.    Did you later learn that the victim had died?

17 A.    Yes.

18 Q.    Once it was confirmed that the victim had died, what

19 happened?

20 A.    Well, according to misa -- there was a misa.

21 Q.    So there was a meeting after this?

22 A.    Yes.

23 Q.    And who was at the meeting?

24 A.    Cabezon was there, Demente was there, I was there,

25 Happy was there, JoJo was there, and I can't remember who

1   else.

2   Q.    And what happened at the misa?

3   A.    Cabezon reprimanded us, because he said, "Why are

4   y'all talking on the phone?"

5   Q.    And was that in response to JoJo trying to call him?

6   A.    Yes.

7   Q.    So you never got in touch with Cabezon that night?

8   A.    I don't know who JoJo spoke with.

9   Q.    And after you were scolded for using the phone by

10  Cabezon, what happened then?

11  A.    Cabezon congratulated us, telling us that we had just

12  become homeboys.

13  Q.    And so did that mean you were going to become a

14  full-fledged member of MS-13?

15  A.    Yes.

16  Q.    Was that for all three of you?

17  A.    Yes.

18  Q.    Did you receive your MS-13 letters for this murder?

19  A.    Two months later.

20  Q.    And was that for this murder?

21  A.    Yes.

22  Q.    Did you become a homeboy?

23  A.    Yes.

24  Q.    Do you know if Demente or JoJo received their letters?

25  A.    Demente.

```
1    Q.    Do you know about JoJo?

2    A.    JoJo received them much later on.

3    Q.    Did you get jumped in for this?

4    A.    Yes.

5    Q.    Did Demente get jumped in?

6    A.    Yes.

7    Q.    Did JoJo get jumped in?

8    A.    Yes.

9    Q.    And where -- did you-all get jumped in at the same

10   misa?

11   A.    I don't remember.

12   Q.    I want to show you Government Exhibit 250.

13         THE COURT:  You know, I think, Mr. Hoff, it might

14   be a good time to take our midafternoon break before we take

15   any exhibits.

16         So we'll take about 15 minutes, folks, and we'll

17   reconvene with the examination.  Thank you.  You may step

18   down at this time.

19         (WHEREUPON, the jury was excused from the

20   courtroom at 2:37 p.m., with matters being heard in open

21   court as follows:)

22         THE COURT:  Thank you.  Please be seated.

23         All right.  As I indicated, we'll proceed to

24   about 4:25.  Upon our return, we'll take about 15 minutes.

25         Anything to discuss in the meantime,
```

```
 1    Mr. Safeeullah?
 2              MR. SAFEEULLAH:  No, Your Honor.
 3              THE COURT:  All right.  Anyone from defense side?
 4    Okay.  Don't see anything.  We'll reconvene in about 15.
 5    Thank you.
 6              (Recess 2:38 p.m. to 3:03 p.m.)
 7              THE COURT:  All right.  Mr. Hoff, if you want to
 8    take the podium, and we can call in our jurors.  Thank you.
 9              (WHEREUPON, the jury re-entered the courtroom at
10    3:02 p.m., with matters being heard in open court as
11    follows:)
12              THE COURT:  All right.  Thanks, folks.  Please be
13    seated.
14              MR. HOFF:  May I continue, Your Honor?
15              THE COURT:  You may.
16              MR. HOFF:  Okay.
17    BY MR. HOFF:
18    Q.    Mr. Avila, I think where we left off, I asked if you,
19    Demente, and JoJo had all become homeboys after this.  Do
20    you remember that question?
21    A.    Yes.
22    Q.    And was that the case?
23    A.    Yes.
24    Q.    I want to show you Government Exhibit 250.  Do you
25    recognize that person?
```

```
1    A.    Yes.

2    Q.    Who is that?

3    A.    That's the chavala.

4    Q.    Okay.  Thank you.  And is that -- that's the chavala

5    that you just talked about?

6    A.    Yes.

7    Q.    That's the victim from the field?

8    A.    Yes.

9    Q.    Shortly after this murder, were you involved in a

10   robbery near a Walmart in Nolensville?

11   A.    Yes.

12   Q.    Approximately how long after this murder?

13   A.    I would say a couple of months.

14   Q.    And did it involve a victim in a red Camaro?

15   A.    Yes.

16   Q.    Who were you with when it happened?

17   A.    With Demente and with Robery.

18   Q.    And who is Robery?

19   A.    Robery is a distant cousin of Demente's.

20   Q.    Just to be clear, when you're talking about Demente,

21   it's the person you identified in the back here, the last

22   seat?

23   A.    Yes.

24   Q.    What were you doing before this robbery?

25   A.    I don't remember.
```

1  Q.    Were you guys in a car?  Were the three of you in a

2  car?

3  A.    Yes.

4  Q.    And when you -- were you driving around?

5  A.    We were looking for a car to steal it.

6  Q.    Why did you need to steal a car?

7  A.    In case we needed it for a situation.

8  Q.    When you say a situation, what do you mean by that?

9  A.    For example, if a chavala came out.

10 Q.    Did the members of the clique often use stolen cars

11 when committing crimes?

12 A.    Yes.

13 Q.    Did you find a car that night to steal?

14 A.    Yes, the red Camaro.

15 Q.    Where did you find that car?

16 A.    They were across the street from the apartments from

17 Walmart in Nolensville.

18 Q.    Once you saw that red car, what did you -- what did

19 the three of you do?

20 A.    Demente parked and -- right alongside the car.

21 Q.    After Demente parked, what happened?

22 A.    I and Robery quickly got out of the car.

23 Q.    What did you and Robery do?

24 A.    Robery hit the guy with a shotgun, and the guy fell by

25 himself.

1   Q.    And what did you do?

2   A.    I picked up the keys and I got into the car.

3   Q.    Did you drive the car away?

4   A.    Yes.

5   Q.    What did you do with the car?

6   A.    We drove it for a good amount of time.

7   Q.    And what did you do with it after that?

8   A.    At the end of it, it was picked up by a tow truck at a

9  parking lot.

10  Q.    After you stole this car, did you help Cabezon kidnap

11  a person by the name of Danielito?

12          THE INTERPRETER:  I'm sorry, counsel.  That last

13  part?

14  **BY MR. HOFF:**

15  Q.    Danielito.

16  A.    Yes.

17  Q.    Who is Danielito?

18  A.    You would say an associate of the clique.

19  Q.    And how did you become involved with this?

20  A.    I was at home when Cabezon dropped by my house and he

21  said let's go for a ride.

22  Q.    And did you go for a ride with him?

23  A.    Yes.

24  Q.    Was Cabezon the leader of -- the palabrero at this

25  time?

1  A.    Yes.

2  Q.    Did you have to follow orders?

3  A.    Yes.

4  Q.    What -- so what did you and Cabezon do?

5  A.    Cabezon told me we had to go pick Danielito up because

6  he had fucked up.

7  Q.    And did he say why, how?

8  A.    He said that he had beaten up Jocelyn and drugged her.

9  Q.    So what did you and -- who is Jocelyn?

10 A.    That's her -- his baby mama.

11       THE INTERPRETER:  Interpreter correction.  Had

12 given her a pill rather than beaten.  Gave her a pill.

13 BY MR. HOFF:

14 Q.    Okay.  So I just want to make sure we're clear.  So

15 what did Cabezon say Danielito did?

16 A.    He said that Danielito had given a pill to Jocelyn and

17 had drugged her.

18 Q.    And who was Jocelyn?

19 A.    Cabezon's baby mama.

20 Q.    So after Cabezon told you this, what did you and he

21 do?

22 A.    Cabezon said that we were going to pick him up at

23 La Mansion where he was at.

24 Q.    And to be clear, La Mansion is one of the nightclubs?

25 A.    Yes.

Q.    Did you go to La Mansion?

A.    Yes.

Q.    What happened when you got there?

A.    Before we got there, Cabezon told me to get to the back seat and to point the gun at Danielito.

Q.    And when you -- did you see Danielito?

A.    Yes, when we got there.

Q.    What happened when you saw -- when you saw him?

A.    Cabezon told Danielito, "Get in the car."

Q.    And did Danielito get in the car?

A.    Yes.

Q.    What happened then?

A.    Well, I pointed the gun at him, and Cabezon began driving towards West Nashville.

Q.    Did you know what the plan was?

A.    Cabezon said we were going to toss him into the river by West Nashville.

Q.    Did that happen?

A.    No.

Q.    Why not?

A.    When we began driving, they began to talk.

Q.    And was there an agreement made between Danielito and Cabezon?

A.    Drugs were mentioned, yes.

Q.    Okay.  And what happened?

1  A.    Cabezon told Danielito he was going to give him
2  another chance.
3  Q.    And did that happen?
4  A.    Yes.
5  Q.    Did you and Cabezon let him go?
6  A.    Yes.
7  Q.    What gun did you have that day?
8  A.    I had a chrome-plated .40 Smith & Wesson.
9  Q.    Did you later give that gun to someone?
10 A.    Yes.
11 Q.    Who is that?
12 A.    To Demente.
13 Q.    Why did you give that gun to Demente?
14 A.    Because Demente didn't have a gun, and we were going
15 to go to the street to sell drugs.
16 Q.    Did you later learn that that gun was used in any
17 crimes?
18 A.    Yes.
19 Q.    What's that?
20 A.    It was a death of a girl.
21 Q.    Did you have another gun?
22 A.    Yes.
23 Q.    So you were able to give him your .40 caliber
24 Smith & Wesson?
25 A.    Yes.

Q.    And you mentioned the death of a girl.  Where did that happen?

A.    Happened on the freeway.

Q.    And before that death happened, were you with Demente that night?

A.    Yes.

Q.    Where were you?

A.    We were on Wallace.

Q.    Okay.  Prior to going to Wallace, were you at any bars or clubs that night?

A.    Yes.

Q.    Where were you?

A.    At La Mansion.

Q.    And what were you doing at La Mansion?

A.    Selling drugs.

Q.    Who else was at La Mansion that you remember that night?

A.    I remember Cabezon, Frijol, Demente, Smiley, and just that.

Q.    Who is Smiley?

A.    Smiley was supposedly a member of another clique.

Q.    I want to show you Government Exhibit 1303.  Do you recognize this person?

A.    Yes.

Q.    Who is that?

```
 1    A.      Smiley.
 2    Q.      Do you remember what clique Smiley was supposed to be
 3    a member of?
 4    A.      I don't remember.
 5    Q.      But it wasn't TPLS?
 6    A.      No.
 7    Q.      Okay.  Thank you.
 8            Did -- while you were at La Mansion, did anyone say
 9    anything to you about chavalas at the club that night?
10    A.      Yes.
11    Q.      Who?
12    A.      Demente and Smiley.
13    Q.      What did Demente say to you?
14    A.      He said to be trucha, that there were chavalas there.
15    Q.      What does that mean?
16    A.      To pay attention.  To pay attention.
17    Q.      And what did Smiley say to you?
18    A.      Also that there was a chavala there.
19    Q.      And this was after you gave the .40 caliber gun to
20    Demente?
21    A.      Yes.
22    Q.      So what happened at the club that night?
23    A.      A fight broke out inside the club.
24    Q.      And after the fight broke out, did everyone have to
25    leave?
```

1   A.    The security began throwing people out.

2   Q.    And did you go outside of the nightclub?

3   A.    Yes.

4   Q.    And when you went outside, did you see Demente?

5   A.    Yes.

6   Q.    Who was he with?

7   A.    He was with Smiley.

8   Q.    Did you see him with anyone else?

9   A.    I don't remember.

10  Q.    And did you see him leave?

11  A.    That he had left from where?

12  Q.    I'm sorry.  Did you see him leave the nightclub

13  parking lot?

14  A.    Yes.

15  Q.    And who did Demente leave with?

16  A.    They left real fast in a car.

17  Q.    Who is "they"?

18  A.    I only remember having seen him and Smiley.

19  Q.    And when you say "him," do you mean Demente?

20  A.    Yes.

21  Q.    Do you remember what kind of car they left in?

22  A.    No.

23  Q.    What did -- what did you do then?

24  A.    Before -- when they left in the car, I tried to catch

25  up to them, but I was unable to.

Q.    Why did you try to catch up to them?

A.    Because I knew that they were going to go kill the chavala.

Q.    How did you know that?

A.    Well, my first instinct.

Q.    Did you see who they were talking about inside the La Mansion?

A.    One of them had given me a description of him having a shirt with buttons.

Q.    Did you see the person?

A.    No.

Q.    Did you know who they were talking about?

A.    No.

Q.    So where did you then go?

A.    I went home.

Q.    And where were you living at the time?

A.    On Wallace.

Q.    Who were you living with?

A.    With my baby mama and her aunt.

Q.    When you got to your house, was anyone else there?

A.    Yes.

Q.    Who?

A.    Cabezon, Frijol, Danielito, and Demente's mother were there.

Q.    Who was Demente's mother?

1          (Communication between the interpreter and the

2    witness.)

3          **THE WITNESS:**  Sadelle.  Sadelle?

4    **BY MR. HOFF:**

5    Q.    I'm sorry.

6    A.    Her name?

7    Q.    Yes.

8    A.    Sally [phonetic] Caceres.

9    Q.    At some point, did Demente come to the house?

10   A.    Yes.

11   Q.    Did he come with anyone else?

12   A.    Yes.

13   Q.    Who is that?

14   A.    He was with Tonito and with Smiley.

15   Q.    Who is Tonito?

16   A.    Tonito was a guy who sold heroin with Danielito.

17   Q.    Was he a member of the clique?

18   A.    No.

19   Q.    Did Demente say anything when he got to the house?

20   A.    He said he had just finished killing a chavala.

21   Q.    How was he acting?

22   A.    He was very happy, jumping.

23   Q.    Did Demente say how he killed the chavala he was

24   talking about?

25   A.    He said he approached in the car, lowered the window,

1   and then shot at the chavala in the other car.

2   Q.    Did he say whose car he was in?

3   A.    "He" who?

4   Q.    Did Demente say whose car he was in when he shot?

5   A.    In the same car that he had taken home.

6   Q.    Do you know whose car that was?

7   A.    It was Smiley's.

8   Q.    Did Demente say what happened after he shot at the

9   car?

10  A.    Only that it had stopped.

11  Q.    Did -- after he told you guys that, did you turn on

12  the news?

13  A.    Yes.

14  Q.    And once you turned on the news, did the people at the

15  house learn that there was a problem?

16  A.    Yes.

17  Q.    What was that?

18  A.    That a girl had died.

19  Q.    Why was that a problem?

20  A.    Because in the clique, it was not permitted to kill

21  women.

22  Q.    And what was supposed to be the punishment for

23  breaking this rule?

24  A.    Death.

25  Q.    After you guys learned that a woman had been killed,

1    did Cabezon say anything?

2    A.    Yes.

3    Q.    What did Cabezon say?

4    A.    That no one was to talk about that.

5    Q.    Did he say why no one was to talk about it?

6    A.    He said that if the locos downstairs found out about

7    it, that if they had heard anyone talking, that everyone in

8    the clique was going to get killed.

9         **THE INTERPRETER:**  Correction:  If he did nothing

10   about it, then everyone in the clique was going to be

11   killed.

12   **BY MR. HOFF:**

13   Q.    And when you say the locos -- I believe you said the

14   locos downstairs; is that right?

15   A.    Yes.

16   Q.    Who was he talking about?

17   A.    Referring to the locos of El Salvador.

18   Q.    So was Cabezon concerned that a rule had been broken?

19   A.    Yes.

20   Q.    Did he seem worried?

21   A.    A bit.

22   Q.    How did Demente seem at this time?

23   A.    Worried.

24   Q.    Did Demente say why he was worried?

25   A.    Well, he had fucked up, he hadn't killed a -- he

1  hadn't hit a chavala.

2  Q.    So after this conversation at Wallace, what happened?

3  A.    Several meetings or misas afterwards, it was

4  determined that Demente would go back to Honduras.

5  Q.    So there was a misa called about this?

6  A.    A bit afterwards, yes.

7  Q.    Do you remember about how long afterwards?

8  A.    I would say that at least from three to five months.

9  Q.    Okay.  And what happened at the mass?

10 A.    What was said at the misa was that Demente was very

11 hot with the police.

12 Q.    And what does that mean?

13 A.    Well, that they were looking for him.

14 Q.    And was there a discussion about what Demente should

15 do because of that?

16 A.    That he was going to go to Honduras.

17 Q.    And why was it decided at the misa that Demente was

18 going to go to Honduras?

19 A.    Because it was going to be a decision that Cabezon was

20 going to make, something that he was going to approve.

21 Q.    And did he -- why did Cabezon need to approve it?

22 A.    So that for him, once Cabezon arrived in Honduras, he

23 would report it so that there would be no problems.

24 Q.    And what kind of problems could there be?

25 A.    One problem could have been that people in Honduras

1  might have thought that Demente was a deserter of the

2  clique.

3  Q.    So did Cabezon say he was going to let people know

4  that he was coming to Honduras, other MS-13 members?

5  A.    I don't remember.  I just remember, though, that

6  Cabezon told him that once he arrived over there, to call

7  him so that he would speak to them.

8  Q.    Was there an event that happened that caused Demente

9  to go back to Honduras other than avoiding the police?

10  A.    They incarcerated Smiley.

11  Q.    And did Demente say anything about that?

12  A.    Well, he became afraid that Smiley might start talking

13  with the police.

14  Q.    Do you know if Demente went to Honduras?

15  A.    Yes.

16  Q.    How do you know?

17  A.    Because I and Cabezon's uncle went to drop him off at

18  the border.

19  Q.    Did anyone else go with you?

20  A.    Yes.

21  Q.    Who?

22  A.    Demente's mother.

23  Q.    Anyone else?

24  A.    Also my baby mama and Happy.

25  Q.    How many cars did you take?

1    A.    Three.

2    Q.    And where did you go to?

3    A.    I don't remember what part of Texas it was.

4    Q.    So you drove to Texas?

5    A.    Yes.

6    Q.    And when you got to Texas, what happened?

7    A.    We left him off at the coyote's house.

8    Q.    And did you then return to Nashville?

9    A.    Yes, the following day.

10   Q.    After the murder on the freeway, do you know what

11   Demente did with the gun?

12   A.    He gave it to me.

13   Q.    And did he say anything when he gave it to you?

14   A.    He told me to get rid of it because it was hot.

15   Q.    And did you agree to help him?

16   A.    Yes.

17   Q.    Why?

18   A.    Because he was my homeboy.

19   Q.    Were you guys pretty close?

20   A.    Yes.

21   Q.    So what did you do with the gun?

22   A.    I cleaned it and I put it into a -- I cleaned it and I

23   put it into a lockbox and I put it in the ground behind the

24   house.

25   Q.    And what house was that?

1  A.    The house at Wallace.

2  Q.    And did the gun stay where you buried it?

3  A.    A week later, I unearthed it, and I went and buried it

4  further up right there.

5  Q.    Why did you move it?

6  A.    Because by then, many people knew already that it was

7  there.

8  Q.    So where did you move it to?

9  A.    Just a few paces up from where it was.

10 Q.    And where did you -- and when you buried it, where did

11 you bury it in the ground?

12 A.    I put it into a hole in between the roots of a tree.

13 Q.    Did you -- what happened to it after that?

14 A.    Somewhat like a hurricane passed through, and trees

15 and branches fell down, and then I could no longer identify

16 the tree.

17 Q.    So could you ever find it after that?

18 A.    No.

19 Q.    After Demente went to Honduras, did you speak with him

20 over Facebook?

21 A.    Yes.

22 Q.    What was your Facebook name?

23 A.    It was Edwin Reyes.

24 Q.    Do you remember what Demente's name was?

25 A.    No.

1  Q.    Is there something that I could show you that might

2  help you remember what his Facebook name was?

3  A.    Yes.

4  Q.    If you could, if there's a -- should be a binder up

5  there with the numbers 1127 through 1328.

6        If you could turn to Exhibit 1218 and turn to page --

7  for identification purposes only.  Are you there?  If you

8  could turn to page 30.

9             THE COURT:  And don't say anything until another

10  question is asked, but do review that page, and let us know

11  when you're done reviewing it.

12            THE INTERPRETER:  Interpreter asks:  1218,

13  Tab 1218?

14            MR. HOFF:  Tab 1218.

15            THE INTERPRETER:  There is nothing between

16  Tabs 1218 and 1219.  It's empty.

17            MR. HOFF:  Okay.  May I have a moment, Your

18  Honor?

19            THE COURT:  You may.

20            (Respite.)

21            MR. HOFF:  All right.  When the interpreter is

22  ready, Your Honor, I'll move on.

23            THE COURT:  All right.

24  BY MR. HOFF:

25  Q.    Now, you mentioned before that one of the people who

1  jumped you in was someone by the name of Chino.

2  A.    Yes.

3  Q.    And did, at some point, you learn that Chino had been

4  killed?

5  A.    Yes.

6  Q.    And how was Chino killed?

7  A.    They shot him and they lit his body on fire.

8  Q.    Did you and other members of your clique discuss this

9  at a misa?

10 A.    Yes.

11 Q.    And what was discussed at the misa regarding Chino?

12 A.    That they had killed him and that they had gone over

13 to Georgia to throw him away.

14 Q.    Did anyone -- who said that?

15 A.    Cabezon.

16 Q.    And did Cabezon suspect who killed Chino?

17 A.    Yes.

18 Q.    And what did Cabezon say about that?

19 A.    He gave me the names, but I did not know the dudes.

20 Q.    And did he say who the guys were?  Did Cabezon say who

21 those guys were?

22 A.    Yes.

23 Q.    What did Cabezon say?

24 A.    He said that there were these guys that dedicated

25 themselves to selling marijuana.

1  Q.    What did Cabezon -- sorry.  Let me rephrase.

2      Did Cabezon say what, if anything, was going to happen

3  to these guys?

4  A.    He said -- he mentioned a reason why he had been

5  killed, but he also said that that did not give them a right

6  to them to do anything.

7  Q.    Who was at this misa?

8  A.    Cabezon was there, I was there, Peluche was there,

9  Frijol, and I can't remember who else.

10 Q.    And just to clarify, when you're talking about

11 Peluche, are you talking about this individual back here in

12 the black shirt?

13 A.    Yes.

14 Q.    So did Cabezon say what was going to happen to

15 those -- the people responsible for Chino's death?

16 A.    He said that they had a green light.

17 Q.    And what did that mean?

18 A.    Well, that they were going to die.

19 Q.    And was any -- was -- were all members of the clique

20 supposed to carry out that green light?

21 A.    Yes.

22 Q.    And did there come a point in time when you tried to

23 carry out that green light?

24 A.    Yes.

25 Q.    Okay.  And who were you with that day?

1    A.    I was with Peluche, with my baby mama, and with his

2    baby mama.

3    Q.    And what was the name of your baby's mother?

4    A.    Chrislie.

5    Q.    Okay.  And how about Peluche's?

6    A.    Kimberly.

7    Q.    Where were you?

8    A.    We were at the Walmart over by the Sapporo.

9    Q.    I'm sorry.  Did you say Walmart by Murfreesboro?

10   A.    Yes.

11   Q.    Okay.  And what happened when you were at the Walmart?

12   A.    When we were going inside, one of the ones who had

13   killed Chico -- rather, Chino -- was coming out.

14   Q.    And how did you know that was one of the people?

15   A.    Because Peluche identified him.

16   Q.    What did Peluche say to you?

17   A.    He said that there goes one of the dudes that had

18   killed Chino.

19   Q.    So after Peluche said this to you, what did you guys

20   do?

21              **THE INTERPRETER:**  I'm sorry.  The interpreter

22   asks for a repetition.

23   **BY MR. HOFF:**

24   Q.    After Peluche identified the person, one of the people

25   responsible for killing Chino, what did you guys do?

1    A.    We told the girls to go inside the Walmart.

2    Q.    And did they go inside the Walmart?

3    A.    Yes.

4    Q.    What did you and Peluche then do?

5    A.    We got into the car and we went to some stores that

6    are in front of the Walmart to wait for the guy.

7    Q.    Did you call -- did you or Peluche call anyone?

8    A.    Peluche called Chamaco.

9    Q.    Could you -- did Peluche say why he was calling

10   Chamaco?

11   A.    He said that Chamaco had a stolen car.

12   Q.    And what about the car you were in?

13   A.    That car belonged to Peluche's father and said that he

14   did not want to burn it up.

15   Q.    Who said that?

16   A.    Peluche.

17   Q.    I want to show you Government Exhibit 1281.  Do you

18   recognize this person?

19   A.    Yes.

20   Q.    Who is that?

21   A.    Chico.

22   Q.    That's -- is that the person you saw outside the

23   Walmart?

24   A.    Yes.

25   Q.    And how -- why do you call him Chico?

1  A.    There was a time when I had been incarcerated that I
2  met him at the jail.
3  Q.    And was this after the day where you saw him at the
4  Walmart?
5  A.    Yes.
6  Q.    Okay.  So after Peluche called Chamaco, did Chamaco
7  show up with the car?
8  A.    An amount of time transpired and Chamaco did not
9  arrive.
10 Q.    What kind of car were you and Peluche in?
11 A.    We were in a white Honda.
12 Q.    Did you find out why Chamaco didn't arrive?
13 A.    Peluche called him back, and he said that Chamaco had
14 a flat tire.
15 Q.    So what did -- after Chamaco called back and said he
16 had a flat tire, what did you and Peluche do?
17 A.    Peluche said that we were going to do that in his
18 father's car.
19 Q.    Do what?
20 A.    To try to kill that man.
21 Q.    When you saw the person that you identified as Chico,
22 was he with anyone?
23 A.    He was with a woman and with some children.
24 Q.    So after you decided to kill the person, Chico, what
25 did you and Peluche do?

1   A.    We waited for him there until he got out of Walmart.

2   Q.    Did he come out of Walmart?

3   A.    Yes.

4   Q.    Was he still with his -- with a woman and some kids?

5   A.    Yes.

6   Q.    And where did that person go?

7   A.    Well, they went in their car to his house.

8   Q.    And what did you and Peluche do?

9   A.    We followed them.

10  Q.    Where did you follow them?

11  A.    To an apartment complex where he headed towards his

12  house.

13  Q.    Who was driving the car?  Who -- I'm sorry.  Let me

14  clarify.

15        Who was driving Peluche's dad's car?

16  A.    He did.

17  Q.    And where -- did there come a point when Chico's car

18  stopped?

19  A.    It parked -- he parked it outside a house.

20  Q.    What happened when he parked the car?

21  A.    I don't know.  They got out of the car -- correction.

22        No, they did not get out of the car.  They did not get

23  out of the car.

24  Q.    And did you or Peluche do anything?

25  A.    Yes.

Q.    What did Peluche do?

A.    I told Peluche before he fired to be very careful with the children, that he not hit any of them.

Q.    Okay.  And what about the woman in the car?

A.    I don't recall having said anything about the woman.

Q.    And after you said that, did Peluche say anything?

A.    He began shooting at the car.

Q.    And what did you do?

A.    I was there sitting down in the passenger seat.

Q.    Did Peluche at some point stop shooting?

A.    He ran out of bullets, so I gave him one of my guns.

Q.    And after you gave him a gun, what happened?

A.    He continued shooting at him, and then the guy took off in the car.

Q.    After he took off in the car, what did you and Peluche do?

A.    We began to follow him.

Q.    Did you see if anyone in the car had been hit?

A.    No.

Q.    No, you couldn't see or no, you --

A.    No, I didn't look to see if anyone had . . .

Q.    Did -- after you started following the car, what happened?

A.    We lost him.

Q.    And where did you go then?

1    A.    Towards my house.

2    Q.    Did you tell Cabeza about the shooting?

3    A.    Yes.

4    Q.    Why did you tell him?

5    A.    Because he had to know that we had tried to hit that

6    guy.

7    Q.    Why did he need to know?

8    A.    Because he had put a green light on for him.

9    Q.    So were you letting him know you tried to fulfill the

10   green light?

11   A.    Yes.

12   Q.    And were you guys trying to get revenge for Chino?

13   A.    Yes.

14   Q.    Did you learn that -- well, at some point, you said

15   you were incarcerated with Chico; is that right?

16   A.    Yes.

17   Q.    And so did you speak with him when you were

18   incarcerated together?

19   A.    Yes.

20   Q.    And did you learn that he had been shot on that day?

21   A.    Yes.

22   Q.    Did -- at some point, did you and Peluche learn that

23   prior to you being incarcerated with Chico, that he had not

24   died?

25   A.    Yes.

Q.    And did you talk to Cabezon about that?

A.    Yes.

Q.    And what did Cabezon say?

A.    That we be careful because those locos had money, and we would suffer the same fate as what Chino did.

Q.    And so -- okay.  So he was talking about the people that were associated with Chico?

A.    Yes.

Q.    The gun that you gave to Peluche that day, did you later give that gun to someone else?

A.    Yes.

Q.    Who was that?

A.    Aaron.

Q.    Who is Aaron?

A.    He was a chequeo of the clique too.

Q.    I want to show you Government Exhibit 1302.  Do you recognize this person?

A.    Yes.

Q.    Who is that?

A.    Aaron.

Q.    Is that the person you just described as a chequeo of the clique?

A.    Yes.

Q.    Okay.  Thank you.

      Why did you give that gun to Aaron?

```
1    A.    Because he wanted to go steal a car.

2    Q.    And did you go with him to steal a car?

3    A.    Yes.  I went with him and with Huanaco.

4    Q.    Who is Huanaco?

5    A.    He's another chequeo of the clique.

6    Q.    Why did you go with him to steal the car?

7    A.    Because they didn't have a car.  I had one.

8    Q.    And so where did you go with them?

9    A.    We went towards the trailers that are in Vergne.

10   Q.    I'm sorry.  Is it in La Vergne?

11   A.    Yes.

12   Q.    And what kind of car were you in?

13   A.    I brought a Ford mini SUV.

14   Q.    Did you drive them -- did you drive those two

15   individuals to the trailer park?

16   A.    Yes.

17   Q.    What happened when you got there?

18   A.    We approached a lady who was getting out of her

19   trailer.

20   Q.    Who approached the lady?

21   A.    We did: me, Huanaco, and Aaron.

22   Q.    And other than the gun that you gave Aaron, did anyone

23   else have a gun?

24   A.    I had another one.

25   Q.    Did you almost always have a gun?
```

1    A.    Yes.

2    Q.    So what happened as you approached the woman?

3    A.    Huanaco and Aaron got out of the car, and they headed

4    towards her, and I left driving.

5    Q.    So you -- were you -- did you stay in your car or did

6    you get back in your SUV and drive away?

7    A.    I never got out.

8    Q.    Could you see what happened as you were driving away?

9    A.    Well, only that Aaron pointed the gun at the woman,

10   and I didn't see any more after that.

11   Q.    So after that happened, where did you go?

12   A.    I waited for a little bit below the trailers to see if

13   they would pass by.

14   Q.    Did they pass by?

15   A.    Yes.

16   Q.    Did they have the woman's car?

17   A.    Yes.

18   Q.    And after they drove by, did you follow them?

19   A.    Yes.

20   Q.    Were you planning on meeting up with them?

21   A.    Yes.

22   Q.    Did something happen before you met up with them?

23   A.    Well, I was following them, and when we were headed to

24   Nolensboro, the police stopped them.

25   Q.    Did you see that happen?

1  A.    Yes.

2  Q.    What did you see?

3  A.    That the police came at them everywhere and began

4  pointing the guns at Aaron.

5  Q.    Did you see them get arrested?

6  A.    Yes.

7  Q.    What did you do?

8  A.    I stayed in the car, waiting.

9  Q.    Did you stick --

10  A.    Perhaps the police did not know that I was with them.

11  Q.    Did you stick around?

12  A.    Well, when they were arrested and the police headed

13  towards where I was, I made a U-turn, and I left.

14  Q.    How did you drive out of there?

15  A.    I crossed to the lane on the other side of the road,

16  and I took off quickly.

17  Q.    Did you drive over the median?

18  A.    Yes.

19  Q.    Did -- were you ever arrested for that that day?

20  A.    No.

21  Q.    As part of your plea agreement, did you also plead

22  guilty to killing two men outside of a nightclub on

23  April 2nd, 2017?

24  A.    Yes.

25  Q.    Why did you go to the nightclub that night?

1  A.    Because Frijol and Shaggy had been messaging me,

2  telling me that there were two chavalas there.

3  Q.    Where were Shaggy and Frijol?

4  A.    At La Mansion.

5  Q.    So after you were contacted by them, what did you

6  decide to do?

7  A.    I decided to go out to La Mansion.

8  Q.    Why?

9  A.    Well, because the two chavalas were there.

10  Q.    And what was the importance of that?

11  A.    Kill them.

12  Q.    Why?

13  A.    Because by being a chavala, you got a green light.

14  Q.    So did you stop anywhere on the way to La Mansion that

15  night?

16  A.    When they were texting me, I was in my apartment.

17  Q.    And did you flee from your apartment to go to

18  La Mansion?

19  A.    Yes.

20  Q.    Did you take anything with you?

21  A.    An AK-47.

22  Q.    Whose car were you in?

23  A.    I was in my car.

24  Q.    So when you -- what kind of car was that?

25  A.    It was a Mercedes.

1  Q.    Was that car in your name?

2  A.    Yes.

3  Q.    So where did you go when you got to the area of

4  La Mansion?

5  A.    I stopped several blocks before reaching La Mansion.

6  Q.    Why did you do that?

7  A.    To see if someone had brought a stolen car.

8  Q.    And when you say to see if someone brought a stolen

9  car, did you try and get in touch with anyone?

10  A.    Yes.

11  Q.    Who?

12  A.    I called Cabezon and I called Peluche.

13  Q.    Why did you call Cabezon and Peluche?

14  A.    To tell them about the situation there with the

15  chavalas and also to ask them if they were bringing a car.

16  Q.    Did you get in touch with either of them?

17  A.    No.

18  Q.    So what did you do then?

19  A.    I stayed there, and at that moment, Bryan passed by.

20  Q.    Who is Bryan?

21  A.    Another of the clique's chequeos.

22  Q.    So when you saw Bryan pass by, what did you do?

23  A.    I beeped on the horn so he would come back with me.

24  Q.    Did you get his attention?

25  A.    Yes.

1  Q.    And safe to say you didn't want to use the car that

2  was in your name to do anything?

3  A.    I didn't want to burn it.

4  Q.    When you say "burn it," what do you mean by that?

5  A.    I'm referring that the police would identify that that

6  was my car.

7  Q.    So after you honked at Bryan, what happened?

8  A.    He returned back to where I was.

9  Q.    And after he -- what kind of car was Bryan in?

10 A.    He was in a gray Honda.

11 Q.    So after Bryan came back, what happened?

12 A.    I told him that there were two chavalas at La Mansion

13 and to follow me to the apartments and that we were going to

14 go kill them in the car that he was bringing.

15 Q.    Why did you need to go to the apartments?

16 A.    To park my car over there.

17 Q.    Where were the apartments?

18 A.    They are some apartments that are close to the

19 Vancleave's school.

20 Q.    Are you saying Glencliff School?

21 A.    Yes.

22 Q.    And did you know those apartments?

23 A.    Yes.

24 Q.    So were you going to leave your car there?

25 A.    Yes.

1  Q.    Did you go to the apartments?

2  A.    Yes.

3  Q.    And did you leave your car there?

4  A.    Yes.

5  Q.    And what did you do then?

6  A.    I took the AK, and we went in the car that Bryan had

7  brought.

8  Q.    And where did you go?

9  A.    To the mansion -- strike that.  To La Mansion.

10  Q.    What happened when you got back to La Mansion?

11  A.    We parked at a bar that's in front of La Mansion, a

12  bar belonging to some gringos.

13  Q.    Did -- who was driving?

14  A.    Bryan.

15  Q.    What did you do when you parked at that bar?

16  A.    Well, to wait for the chavalas to come out.

17  Q.    How -- and did you wait?

18  A.    Yes.

19  Q.    How did you know they were still inside La Mansion?

20  A.    Because Frijol was texting me.

21  Q.    So at some point, did the two men come out?

22  A.    Frijol told me that they had been in a fight and that

23  the dudes were going to come out.

24  Q.    And what happened after that?

25  A.    Well, I went out to do a runabout and to see, but I

1    didn't see them come out.

2    Q.    Did you -- how did you know what the two men you were

3    looking for looked like?

4    A.    Frijol gave me a description.

5    Q.    So after you did a roundabout and went looking for

6    them, did you find them?

7    A.    When we were on our way back, I saw them, that they

8    were walking on one of the lanes of the street.

9    Q.    What did you do then?

10   A.    I saw that they went into a parking lot.  I told Bryan

11   to go in it all the way to the back, to go around and to

12   stop in front of them.

13   Q.    Did Bryan do that?

14   A.    Yes.

15   Q.    What happened when he did that?

16   A.    I lowered the window and I started to shoot at the

17   dudes.

18   Q.    What -- was that with the AK-47 that you had?

19   A.    Yes.

20   Q.    Did you hit either of those two men?

21   A.    One of them fell down, and at that point, Bryan took

22   off in the car.

23   Q.    And did you leave?

24            THE INTERPRETER:  The interpreter requests a

25   repetition.

1                  (Communication between the interpreter and the

2      witness.)

3                  **THE WITNESS:**  I told Bryan to return because one

4      of the two dudes was still alive.

5      **BY MR. HOFF:**

6      Q.    So what happened -- or did Bryan return?

7      A.    Yes.

8      Q.    And what happened when Bryan returned?

9      A.    Well, I got out of the car, and I shot at the other

10     guy.

11     Q.    And did you hit the other guy?

12     A.    Yes.

13     Q.    How many times did you shoot?

14     A.    I do not remember.

15     Q.    After you stopped shooting, what did you and Bryan do?

16     A.    We left in that car to pick up my car.

17     Q.    And why did you go pick up your car?

18     A.    Because we were going to go burn up that car that we

19     had just gotten through using.

20     Q.    And is that the car that Bryan was driving?

21     A.    Yes.

22     Q.    When you say "burn up," do you mean literally light it

23     on fire?

24     A.    Yes.

25     Q.    So where did you and Bryan go?

1  A.    We headed towards West Nashville.

2  Q.    And did Bryan follow you or did you follow Bryan?

3  A.    I don't remember.

4  Q.    Did you stop anywhere on the way?

5  A.    Yes.

6  Q.    Where did you stop?

7  A.    I went into a gas station.

8  Q.    Why?

9  A.    To buy the gasoline.

10  Q.    And did you -- how did you get the gasoline?

11  A.    In a big refreshment bottle.

12  Q.    And did you -- when you say "a refreshment bottle,"

13  like a two-liter, or what type of bottle?

14  A.    Yes, about two liters.

15  Q.    And after you filled up that two-liter with gasoline,

16  where did you go?

17  A.    We went somewhat in the direction of the outskirts of

18  West Nashville.

19  Q.    And did you stop at some point?

20  A.    Yes.

21  Q.    Where did you stop?

22  A.    We were in a very desolate place.

23  Q.    And once you stopped there, what did you do?

24  A.    I told Bryan to park the car quite a ways out from the

25  street, and I lit it on fire.

Q.    Did anyone tell you to burn the car?

A.    A long time prior, Cabezon had told us that when we did something like that, to get rid of everything.

Q.    And was that at a misa?

A.    Yes.

Q.    And was it common for -- had you learned of other instances where vehicles had been burned?

A.    Many times prior, I burned several.

Q.    Had other members of your clique done that?

A.    I don't remember.

Q.    After you lit the car on fire, where did you go?

A.    I went in the direction of Chepe's house.

Q.    Who is Chepe?

A.    Chepe was a paro of the clique.

Q.    Why did you go to Chepe's house?

A.    Because I didn't want to drive with that firearm to Nashville again.

Q.    So did you leave the firearm at Chepe's house?

A.    Yes.

Q.    Had you left other firearms there before?

A.    No, but I had picked up bullets.

Q.    Did you learn later that both of the men had been killed?

A.    Yes.

Q.    After this murder, did you talk to Cabezon about it?

1    A.    Yes.

2    Q.    What did you tell Cabezon?

3    A.    Well, about the two chavalas who had died.

4    Q.    Why?

5    A.    Because he had to know about it.

6    Q.    Why did he need to know about it?

7    A.    Because it was two less chavalas that were no longer

8    around.

9    Q.    Well, is it important, when somebody in the clique

10   would go after some chavalas, to -- that the others in the

11   clique knew?

12   A.    Yes.

13   Q.    Why is that important?

14   A.    Because there's a war raging with the chavalas.

15   Q.    And so why is it important for other members of the

16   clique to know when a chavala is killed?

17   A.    Because it's one chavala -- one less chavala.

18   Q.    And did you -- did the members of TPLS keep each other

19   informed when chavalas were killed?

20   A.    The palabrero always found out.

21   Q.    Did -- when you told Cabezon, what did he say?

22   A.    He was happy.

23   Q.    And did he say anything about Cuervo?

24            **THE INTERPRETER:**  Your Honor, the interpreter

25   wants to retranslate that he was "happy" to he was

1   "overjoyed," because there's somebody with the name Happy in

2   the case.  Does not want to create confusion.

3          (The interpreter reasked the question.)

4          **THE COURT:**  All right.  We'll finish this

5   question that you had -- thank you.  We'll finish this

6   question, and then we'll break for the day.

7          Did Cabezon say anything about Cuervo?

8          **THE WITNESS:**  He also said that Cabezon was very

9   overjoyed -- he said that Cuervo was very overjoyed.

10          **THE COURT:**  All right.  Out of time for today.

11   We'll continue with the examination tomorrow.  And, folks, I

12   will, at the risk of sounding like the metaphorical broken

13   record, just give the admonition not to talk about this case

14   and not to do any research or investigation related to it.

15          We will start at 9:00 tomorrow morning.

16   Appreciate your continued service and attention as we go

17   through the testimony.

18          All right.  The jurors may step down.  Thank you.

19          (WHEREUPON, the jury was excused from the

20   courtroom at 4:26 p.m., with matters being heard in open

21   court as follows:)

22          **THE COURT:**  Thank you.  Please be seated.

23          All right.  My thought was we can meet about

24   8:30.  I'm going to have some preliminary remarks about the

25   jury instructions, and we can take up any additional

1    matters, if any, that we need to address before continuing

2    with the testimony of the current witness.

3              Anything pressing before then, Mr. Safeeullah?

4              **MR. SAFEEULLAH:**  No, Your Honor.

5              **THE COURT:**  Thank you.

6              Anything pressing from any defendant?

7              All right.  Then we will reconvene with the

8    attorneys at 8:30 tomorrow.  Thank you.

9              We stand in recess.

10             (WHEREUPON, the foregoing proceedings were

11   adjourned for the day at 4:27 p.m., to be resumed April

12   12, 2023, at 8:30 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1    REPORTER'S CERTIFICATE

2

3              I, Deborah K. Watson, Official Court Reporter for

4    the United States District Court for the Middle District of

5    Tennessee, with offices at Nashville, do hereby certify:

6              That I reported on the Stenograph machine the

7    proceedings held in open court on April 11, 2023, in the

8    matter of *UNITED STATES OF AMERICA vs. JORGE FLORES, ET AL.*,

9    Case No. 3:18-cr-00293; that said proceedings in connection

10   with the hearing were reduced to typewritten form by me; and

11   that the foregoing transcript (Trial Volume 5 of 18, pages 1

12   through 203) is a true and accurate record of said

13   proceedings.

14             This the 24th day of July, 2023.

15

16                          /s/ Deborah K. Watson
                            DEBORAH K. WATSON, RPR, CRR
17                          Official Court Reporter

18

19

20

21

22

23

24

25